<div style="border: 1px solid black; padding: 10px;">
Aubrey Land
Law Enforcement, Prison and Jail Consultant
721 Gowan Road
La Fayette Georgia, 30728
</div>

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

L LAURIE GARLAND., an individual          Case No. *CIV 2020-306-RAW.*

**Plaintiff,**

v.

(1) STATE OF OKLAHOMA EX REL
OKLAHOMA DEPARTMENT OF
CORRECTIONS,
(2) CHRISTOPHER REDEAGLE, individually
(3) SHARON MCCOY, individually
(4) JOE ALLBAUGH, Individually
(5) PENNY LEWIS, Individually
(6) RABEKAH MOONEYHAM, individually
(7) HEATHER CARLSON, individually
(8) BOARD OF CORRECTIONS
    Defendants.

## EXPERT WITNESS REPORT AUTHORED BY AUBREY LAND

I, Aubrey Land, am over the age of 18 and make this report and declaration:

## I. Introduction, Compensation & Cases

I have been retained KELLER, KELLER & DALTON 201 Robert S. Kerr, Suite 1001 Oklahoma City, Oklahoma 73102 (405) 235-6693 to render a professional opinion and/or testify in the above referenced complaint.

1

**Compensation:**
The compensation to be paid for the study of documents and testimony:
The compensation which has been agreed upon includes a retainer in the amount of Two Thousand Dollars ($2,000) for an initial report.

$100.00 per hour for travel to and from courtroom/place of inspection or interview as well as waiting time.

$250.00 per hour while conducting analytical review of evidence, conducting interviews, inspections, preparing reports, Attorney/Consultant consultations preparing for deposition and court testimony.

Document review $750.00 for up to 250 pages, $1500.00 for up to 500 pages, $3000.00 for up to 1000 pages or $3.00 per page thereafter.

Testimony and depositions is $350.00 per hour or a fraction thereof (Minimum $1400.00).

Hotel: actual paid either by Fair-Play Justice or firm.

Food: Actual or per-diem rate allowed.

Travel $.60 per mile if via vehicle plus tolls or government rate (if Applicable)

Travel actual airfare (Business or first class only) plus parking and ground transportation.

*Testified in court as an expert*

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared an expert option reports, Attorney/Consultant consultations and testimony in the following case: The Estate of Mark Bolus, by and through Maria Rathbun, the personal representative of the Estate of deceased, Mark Bolus, Plaintiff, VS State of Alaska, Department of Corrections, Defendant. Case # **3AN-16-06141CI**. I was deposed and provided sworn testimony related to my professional findings and options on September 07, 2017. I testify as an expert, In the Superior Court for the State of Alaska, Third Judicial District in Anchorage, on November 09, 2017. On November 23, 2017, the jury rendered a verdict in favor of the Plaintiff.

I was previously retained and providing expert analytical review of evidence, conducting interviews, inspections, preparing reports, Attorney/Consultant consultations in the following case: Miller/Graham resentencing of Timothy Preston Chavers. I testified as a correctional expert witness in this case on August 27, 2018. In the Circuit Court of The First Judicial Circuit, In and For Okaloosa County, Florida

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: Miller/Graham resentencing of Phillip Mosier. I testified as a correctional expert in this case on September 11, 2018. In The Circuit Court of the Twelfth Judicial Circuit in and For Manatee County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: resentencing of Misti Ehrlich. I testified as a correctional expert in this case on January 4, 2019. In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: resentencing of Wilson Pierre. I testified as a correctional expert in this case on April 29, 2019. In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: resentencing of Lolita Barthel. I testified as a correctional expert in this case on May 21, 2019. In the Circuit Court of the Fifteenth Judicial Circuit in and for Hillsborough County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: resentencing of Jermaine Jones. I testified as a correctional expert in this case on January 30, 2019. In the Circuit Court of the 20th Judicial Circuit in and for Collier County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, prepared reports, Attorney/Consultant consultations in the following case: resentencing of Michael Scott. I testified as a correctional expert in this case on September 26th and 27th 2019. In the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida.

I was previously retained and provided expert analytical review of evidence, conducted interviews, inspections, Attorney/Consultant consultations in the following case: murder trial/penalty stage for Grandville Ritchie. I testified as a correctional expert in this case on September 26, 2019. In the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida.

List of courts that I have testified in as an expert are as followed:

1. Testified one (1) time as an expert in the Superior Court for the State of Alaska, Third Judicial District in Anchorage.
2. Testified one (1) time as an expert in the Circuit Court of The First Judicial Circuit, In and For Okaloosa County, Florida
3. Testified one (1) time as an expert in The Circuit Court of the Twelfth Judicial Circuit in and For Manatee County, Florida.

4. Testified two (2) times as an expert In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.
5. Testified three (3) times as an expert in the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida.
6. Testified one (1) time in the Circuit Court of the 20th Judicial Circuit in and for Collier County, Florida.

## II. Qualifications of the Expert

I have worked in the field of law enforcement and corrections for 33 years. During this time, I served as a certified correctional officer, sergeant, correctional law enforcement inspector, and senior law enforcement inspector at six full time major close/maximum custody prisons in Florida.

As a correctional officer, in the various security capacities, I performed all 'gut level' assignments in open population, administrative confinement, protective confinement and disciplinary confinement, food service, control room assignments, mail room officer, visitation officer, visitation sergeant, inside and outside security officer, receiving officer, transport officer, hospital officer, perimeter security officer, medical officer, psychiatric observation officer, medical escort officer, escape and recapture officer; confrontation team member (riot team); and orientation officer.

As inspector and as senior inspector, I responded to and conducted both administrative and criminal investigations at prisons throughout the northern part of the state. My duties consisted of reviewing countless use of force incidents. I conducted more than 100 administrative investigations involving allegations of prisoner abuse, prisoner neglect, sexual harassment, battery of prisoners, staff improper conduct, policy and procedure violations, death investigations and excessive force. Additionally, I have personally reviewed in excess of 1000 use of force incidents for proper documentation, compliance with departmental rule, policies and procedures, state and federal laws. As part of these reviews and investigations I was routinely provided video recordings of correctional settings as well as handheld videos related to use of force and abuse allegations. I am familiar with most of the housing units designed to house prisoners. [in the state of Florida, and within the United States.

I am very familiar with departmental rules, regulation, directives, state and federal laws related to the proper treatment of inmates housed in the care of jails and prisons. My working knowledge of law enforcement and corrections provided me with expertise in applying the totality of the circumstances to determine if penological actions are consistent with standards.

During my 10 years as inspector, I testified in excess of 20 times in the 3rd Judicial Circuit of Florida in Lafayette, Suwannee, Columbia, Dixie, Taylor, Madison and Hamilton counties, in cases that I had filed with the State Attorney's Office supporting criminal investigations that I had conducted. In addition to the duties as an institutional inspector I conducted investigations throughout Florida as part of a joint task force with the Florida Department of Law Enforcement

and the U.S. Postal Inspections Service. In this capacity, I was directly involved in conducting more serious criminal investigations involving organized crime and public corruption.

In 2013 I was promoted to senior inspector with similar duties. During my years with the Office of the Inspector General I conducted the following type investigations: Assault, Battery, Aggravated Battery, Battery on Public Safety Officials, Robbery, In-custody Deaths, Homicides, Sexual Battery, Sexual Misconduct, Property Crimes, Thefts, Grand Theft, Narcotics, Money Laundering, Criminal gang activities, Public Corruption, Racketeering, Prisoner Abuse, Riots, Contraband in Correctional Facilities and Escapes from State and Local Facilities

During my tenure as inspector, I testified in Federal Court on matters related to the use of force by correctional staff. I also testified before the Florida Senate Criminal Justice Committee on corruption within the Florida Department of Corrections, mismanagement, staff shortages, organized criminal gang activity, prison violence and public corruption.

During my tenure in law enforcement, I worked uniform patrol, criminal investigation division (CID), narcotics, death and homicide, organized crimes, public corruption, and racketeering cases.

I testified in state and federal court more than 100 times. I have prepared over 100 search warrants, in excess of 100 arrest warrants and made countless warrantless arrests. All were successfully prosecuted in both state and federal court with the exception of one case.

My qualifications in the field of corrections are further summarized in my résumé.

## III. Testimony as an Expert Witness at Trial or Deposition

A listing of cases in which I (Aubrey Land) have testified as an expert at trial or deposition within the preceding three years is attached.

## IV. Incident Summary

On March 13, 2019, Joy Arnold, a Correctional Teacher employed by EWCC submitted an "Incident/Staff Report," notifying the facility of a PREA complaint filed by Inmate Janessa Estes, 691335.

Estes provided information to Arnold indicating Deputy Warden (DW) Christopher RedEagle and Inmate Laurie Garland, 712727, had engaged in inappropriate contact, to include RedEagle introducing underwear to Garland. On March 18, 2019, Chief of Security (COS) Bryan Cox interviewed Estes regarding her PREA complaint.

Estes informed Chief Cox the information she provided to Arnold was hearsay, and she was unable to identify the inmates disclosing the information.

During the investigation into the PREA allegation that Deputy Warden Christopher RedEagle and Inmate Laurie Garland were involved in a staff offender relationship yielded evidence to support

5

the allegation. Evidence was discovered during the search RedEagle's residence as well as confessions by both parties.

According to Inmate Garland she was fondled by RedEagle, and she masturbated his penis on the outside of his clothing.

### V. Material reviewed in preparation for providing this report

| 1.  | Video recordings |
| --- | --- |
| 2.  | Security Standards for the Oklahoma Department of Corrections P-040100 effective 10-10-2018 |
| 3.  | Board Operating Procedures P-010200 effective date 1-27-2020 |
| 4.  | ACA standards |
| 5.  | Performance Expectations for Members of the Oklahoma Board of Corrections (Attachment A) |
| 6.  | Oklahoma Efficiency Review |
| 7.  | Standards for Maintain Logs OP-040103 effective date 2-27-2020 |
| 8.  | Oklahoma Department of Correction Investigative Report Investigator Randy Knight |
| 9.  | Criminal complaint filed against Christopher RedEagle |
| 10. | Prison Rape Elimination Act (PREA) |
| 11. | Audio recorded interview of Deputy RedEagle |
| 12. | Audio recorded interview of Inmate Laurie Garland |

*In his criminal investigation report dated April 3, 2019, Agent Randy Knight offered the following:*

On March 13, 2019, Joy Arnold, a Correctional Teacher employed by EWCC submitted an "Incident/Staff Report," notifying the facility of a PREA complaint filed by Inmate Janessa Estes, 691335.

Estes provided information to Arnold indicating Deputy Warden (DW) Christopher RedEagle and Inmate Laurie Garland, 712727, had engaged in inappropriate contact, to include RedEagle introducing underwear to Garland.

On March 18, 2019, Chief of Security (COS) Bryan Cox interviewed Estes regarding her PREA complaint. Estes informed Chief Cox the information she provided to Arnold was hearsay, and she was unable to identify the inmates disclosing the information.

In an Interoffice Memorable dated April 3, 2019 and in an incident report prepared by DW RedEagle dated March 18, 2019 the following is revealed:

Deputy Warden RedEagle provided a written statement regarding the allegations against him. DW RedEagle referred to the allegations as rumors and denied the allegations. DW RedEagle further described within his incident report he was aware of the name and identification of complainant Inmate Janessa Estes.

*On Page 9 of the investigative report Agent Knight documents the following:*

6

Agent Knight conducted an informal interview with Warden Sharon McCoy at the Jess Dunn Correctional Center. Warden McCoy confirmed she had not reported the initial PREA complaint filed against employee Christopher RedEagle; regarding a reported inappropriate relationship with Inmate Laurie Garland through the Region I Office or OFAI. McCoy advised she had forgotten to report the allegations as required.

Note. The PREA allegation was reported on March 13, 2019, by Correctional Teacher Joy Arnold in an "Incident/Staff Report," alleging Deputy Warden Christopher RedEagle and Inmate Laurie Garland were involved in a staff offender relationship, to include RedEagle introducing underwear to Garland. On March 18, 2019, Chief of Security Bryan Cox interviewed Estes regarding her PREA complaint. Estes informed Chief Cox the information she provided to Arnold was hearsay following the reporting of the PREA Deputy Warden RedEagle was advised of the allegations and submitted a written statement to Chief Cox regarding the complaint. However no formal reporting of the allegations were entered or reported to the criminal investigative unit of the department of corrections in violation of policy and directives.

The failure to report resulted in both the inmate reporting the allegation being unprotected and Inmate Garland at the mercy of RedEagle. This correctional professional finds it disturbing that such lack of concern for the safety of both inmates were omitted. Additionally, I find it concerning that the warden and chief correctional officer at the facility would allow RedEagle to have knowledge of the allegation prior to formal investigation being conducted.

The investigative finding of Agent Knight's report strongly suggests the allegation would not have been investigated except for Psychologist Whitney Louis having reported the allegation on April 2, 2019 which was the second time the administration was notified.

### *State law*

No person shall commit sexual battery on any person. "Sexual Battery" shall mean the intentional touching, mauling or feeling of the body or private parts of any person sixteen (16) years of age or older, in a lewd and lascivious manner and without consent of that person or when committed by a state, county, municipal or political subdivision employee or a contractor or an employee contracted by a state, county, municipal or political subdivision of this state upon a person who is under the legal custody, supervision or authority of a state agency, a county, a municipality or a political subdivision of this state.

### *Investigative findings*

It has been determined Christopher RedEagle, an employee with the Oklahoma Department of Corrections (ODOC), violated the above noted state statute by committing "Sexual Battery" on inmate Laurie Garland in the property room located at the Dr. Eddie Warrior Correctional Center (EWCC), on February 19, 2019, and February 22, 2019. During his interview, Christopher RedEagle admitted he engaged in an inappropriate relationship with inmate Laurie Garland, where he exchanged correspondence letters and received three (3) pair of unwashed underwear from Garland. RedEagle admitted he placed the underwear in his safe inside the residence provided by ODOC, where he would "sniff" the lotion or perfumed contained on the underwear left by Garland.

However, RedEagle denied he had engaged in physical or sexual contact with Garland. Inmate Laurie Garland disclosed on two (2) separate occasions in February of 2019, she met with employee Christopher RedEagle in the property room where they engaged in physical or sexual contact. Garland disclosed on the first occasion, she and RedEagle kissed and RedEagle rubbed her buttocks outside of her clothing. On the second occasion, Garland disclosed she and RedEagle kissed and RedEagle rubbed her buttocks inside of her underwear while she masturbated his penis outside of his clothing. Video footage provided by EWCC, revealed RedEagle entered the property room with Garland on February 19, 2019, and on February 22, 2019.

***Departmental policy related to staff offender relationships reveal the following:***

OP-110215 "Rules Concerning the Individual Conduct of Employees," VII "Regulations Governing Activities and Relationships with Inmates or Offenders/180-Day Ex-inmates or 180 Day Ex-Offenders, Section C "Prohibited Relationships with inmates or Offenders and 180-Day Ex-Inmates or Ex-Offenders, Paragraph 1 and Line a; Sexual abuse, battery, contact, intimacy, harassment, or invasion of privacy, as defined in OP-030601 entitled "Oklahoma Prison Rape Elimination Act," are prohibited sexual misconduct.

It has been determined Christopher RedEagle, an employee with the Oklahoma Department of Corrections (ODOC), violated the above noted department policy and procedure by committing "Sexual Battery" on inmate Laurie Garland in the property room.

OP-030601 "Oklahoma Prison Rape Elimination Act," IV "Duties and Responsibilities," Section A "Employees," in part; Treating all reported incidents or prohibited conduct seriously and ensure that known, suspected acts or allegations of sexual assault are reported immediately to the supervisor or higher authority and referred to the Office of Fugitive Apprehension and Investigations for investigation. It has been determined Warden Sharon McCoy, an employee with the Oklahoma Department of Corrections (ODOC), violated the above noted department policies and procedures by failing to refer the inquiry conducted by Chief of Security Bryan Cox in March of 2019, regarding a PREA complaint filed against Deputy Warden Christopher RedEagle

***Criminal case disposition***

Agent Knight was notified by the Muskogee County District Attorney that the case against former Deputy Warden Christopher RedEagle had been dismissed based on the U.S. Supreme Court's decision related to the arrests of Native Americans. Alex, the DA's contact, reported the case was being forwarded to the U.S. Attorney's Office in Muskogee, however, she didn't believe the case would be prosecuted.

***In a letter dated March 18, 2019 and suspected to be written by the victim.***

The writer documents the events that are unfolding with the discovery of the relationship. She is clearly concerned as she is emotionally connected to him. Note: as a correctional professional this is the reason staff members are cautioned about becoming involved in such relationships. Inmates often suffer from a loss of connection with loved ones. As with this case the emotions run high, when other inmates learn of the relationship and often the inmate victim is pressured by other inmates to pay them or obtain contraband for their silence. Additionally, when staff violate security

procedures the safety of the facility is compromised as is the safety of the facility staff, inmates and public. Furthermore, from the onset of such relationships the victim is often helpless to deny the advances in fear of being punished.

### *In the Review of Security Standards for the Oklahoma Department of Corrections the following is revealed:*

It is the policy of the Board of Corrections (BOC) that the Oklahoma Department of Corrections (ODOC) provides security at all institutions, community corrections centers and probation and parole offices. Security standards are established to protect the public, the employees and inmates/offenders. (2-CO-3A-01

   A. Security Standards
   To provide for compliance monitoring of internal and external security, the agency has developed plans to include the following: (4-4174, 4-4195M, 4-4196M, 4-4199, 4-4200, 4-4201, 4-4215M, 4-ACRS-1C-17M, 4-ACRS2C-01, 4-ACRS-2D-01M, 4-ACRS-2D-02M, 4-ACRS-2D-03M)

1. Inventory and control of:

a. Keys and tools; b. Hazardous substances; c. Contraband and evidence; d. Weapons, security devices and equipment; e. Medical equipment and supplies, to include needles and syringes; and f. Pharmaceutical drugs and medications.

2. Process for executions

Transportation of inmates/offenders; (4-4189, 4-APPFS-3G-03) 4. Post orders, to include staff review and the recording of routine and unusual events in post logs; (4-4178, 4-4179, 4-4183, 4-ACRS-2A09) 5. The identification of visitors, employees and inmates/offenders; (2- CO-1G-06, 4-4117) 6. Control of inmate/offender movement; (4-4187, 4-4188, 4-ACRS2A-11) 7. The operation of segregated housing units; (4-4249) 8. Process for requesting and conducting investigations; and 9. Provisions for facility staffing to ensure 24-hour continuous coverage. (4-4175, 4-ACRS-2A-04)

B. Inspections

The agency will ensure compliance with security standards, facility operations, and maintenance of physical plants through routine inspections. (4-4179, 4-4184, 4-4185, 4-4212M, 4-4455M)

II. Action

The agency director is responsible for compliance with this policy. The agency director is responsible for the annual review and revisions. Any exceptions to this policy statement will require prior written approval of the Board of Corrections. This policy is effective as indicated. Replaced: Policy Statement No. P-040100 entitled "Security Standards for the Oklahoma Department of Corrections" dated October 4, 2017 Distribution: Policy and Operations Manuals Agency Website.

In the Review of Operating Procedures and Policies for the Oklahoma Board of Corrections the following is revealed:

The Oklahoma Board of Corrections (BOC) will establish and maintain written policies for the operation of the Oklahoma Department of Corrections (ODOC) pursuant to Section 504 of Title 57 of the Oklahoma Statutes. (5-ACI-1A-01, 4-APPFS-3D-01)

I. Operating Procedures

A. Duties and Responsibilities Upon selection by the Governor, the Oklahoma State Senate, or the Oklahoma House of Representatives to the BOC, the prospective new BOC member(s) shall promptly receive a copy of these Operating Procedures and Policies and its attachments, including the "Performance Expectations for Members of the Oklahoma Board of Corrections" which is incorporated by reference (Attachment A, attached).

The Governor will appoint five members to the BOC, with the President Pro Tempore of the Senate and the Speaker of the House of Representatives each appointing two members.

The duties and responsibilities outlined in these Operating Procedures and Policies will be reviewed annually by the BOC and the ODOC director. The BOC will have the following powers and duties:

1. Establishment of Policies the BOC will establish policies for the operation of the ODOC.

2. Approval of Personnel Matters (2-CO-1A-10)

a. The BOC may require the agency director and any other ODOC personnel, when deemed necessary by the BOC, to give bond for the faithful performance of their duties (57 O.S. 504(5)).

VI. Action

The agency director is responsible for compliance with this policy. The agency director and the Board of Corrections are responsible for the annual review and revisions.

***In the review of Oklahoma Efficiency Review completed by Alvarez and Marsal the following is cited:***

Offender Management System: A comprehensive system for capturing, storing, and maintaining inmate-related information starting from the point of entry into the system (reception) through reentry, across all facilities.

3. Issues reported with data integrity / lack of standard practices around data entry at facilities. Note reporting requirements are essential for the safe operations of any correctional facility. Once these standards are ignored accountability is lost. Such as in this case where the warden failed to document the PREA requirements related to the victim.

The report further documents a concern with facilities staffing all units in accordance with facility and state policy. Note: the documenting of this concern strongly suggests the facilities are operating below critical staffing levels. Critical staff are needed to maintain security of the facility, provide for the safety of staff, inmates and the public.

Retention Rate among correctional officers, as well as other correctional staff remains extremely low due to: • Low Pay • Working Conditions • Understaffed Facilities 2. An anonymous survey returned results indicating that staffing shortages often make corrections officers feel unsafe, further citing those facilities are dangerous to operate.

### *Review of PREA standards.*

PREA is a concern for both male and female inmates throughout the United States. Sexual assaults occur daily in our correctional facilities and the injury to the victims is long lasting. When a correctional facility trains their staff to be vigilantly cautious in preventing such attacks, incidents such as this one can be prevented. However, critical staffing is a must and proper reporting requirements must be implemented and followed fort the safety of the inmates in our facilities. In a case such as this with the sexual predator being a deputy warden and knowing the understaffing and lack of reporting by administrators provided him the opportunity to violate the victim without detection.

### *In the review of Standards for Maintaining Logs the following is required:*

It is the policy of the Oklahoma Department of Corrections (ODOC) to maintain a system of records that document operational processes of each facility/probation and parole region and the agency's security programs. These records are internal documents of the agency and are considered confidential. (2-CO-3A-01)

Establishment of Bound Logs

8. Other locations identified by the facility head. For those posts not requiring a log, a method will be established to record non-routine incidents (e.g., via shift supervisor or security control log). Such incidents will be supported with an incident report in accordance with OP-050109 entitled "Reporting of Incidents."

Record Keeping Facilities and probation and parole regions will maintain records of all routine information, emergency situations, unusual/extraordinary events, and inventory control.

2. Post log entries will reflect the activities of the post or immediate area, any emergency situations, unusual incidents, and other pertinent information regarding inmates and activities on the post.

3. Supervisors are expected to review and sign the post log when they enter an area at a minimum, once each shift.

D. Log Entries

Log entries will be legible and as follows:

f. Any unusual occurrences.

11. Inmates will not have access to any control room or housing unit post log.

III. Action

The facility head/deputy director is responsible for compliance with this procedure.

## VI. Professional findings and Opinions

The findings and opinions expressed herein are to a reasonable degree of certainty, within the fields of law enforcement and corrections and based on my many years of experience in the respective fields. Together with the materials and evidence I have reviewed thus far, I reserve the right to supplement this report at a later date, should new material or evidence become available to me.

Having read and reviewed the abovementioned material and having relied on my own professional experiences, I have developed the following professional findings and opinions.

It is my opinion, beyond a reasonable degree of professional certainty, that the State of Oklahoma and the Oklahoma Department of Corrections (ODC), together with Deputy Christopher RedEagle, Warden Sharon Mccoy, Department Administrators Joe Allbaugh, Penny Lewis, Rabekah Mooneyham, Heather Carlson, and the Board of Corrections Members acted with deliberate indifference and reckless disregard for the safety of Inmate Laurie Garland. The actions of the above defendants were clearly outside of the training practices of the agency as well as the practices utilized within the corrections industry and training provided to all corrections officers throughout the country. Experienced and well-trained correctional personnel know, and are trained, that the standard for evaluating whether, or not, correctional performance is constitutional is governed by what a reasonable, and trained, corrections professional would do under the same or similar circumstances. When correctional professionals clearly know the dangers to an inmate's health and safety and ignore or disregard this substantial risk of serious injury, death or sexual assault, the correctional personnel are authorizing cruel and unusual punishment, and inhumane treatment to an inmate. In that light, it is my considered and professional opinion that the defendants can be viewed as deliberately indifferent to the protected rights of Inmate Laurie Garland based on their routine and required training together with departmental policies, state and federal laws. This opinion is supported by physical evidence and testimony.

It is my professional opinion Warden Sharon McCoy did knowingly and willfully violate ODC policy by refusing or failing to report the PREA allegations against Deputy Warden RedEagle. Warden McCoy knew of the allegations as early as March 13, 2019 and did not report the violation until April 03, 2019. The failure to report resulted in the victim being subject to sexual and physical control of Deputy Warden RedEagle. Warden McCoy as the highest-ranking staff member of the facility clearly understood her failure to report posed a real threat to the safety of the victim as well as the safety of the inmate who reported the PREA incident.

I further opine Deputy Warden RedEagle did knowingly and intentionally sexually assault Inmate Laurie Garland, an inmate under his direct supervision, care custody and control in violation of the laws of the State of Oklahoma and the United States Federal Code in addition to the policies of the ODC.

I further opine the ODC to include the Director of ODC, Administrators Joe Allbaugh, Penny Lewis, Rabekah Mooneyham, Heather Carlson, and the Board of Corrections Members were all made aware of the violations of Warden McCoy and failed to take disciplinary actions. The lack of such action by the above mentioned strongly suggest they condone such violations as their duties were to ensure compliance with policy.

It is my professional opinion the Oklahoma Department of Corrections, the Board of Oklahoma Corrections, Warden Sharon McCoy who were present for the benefit of Ms. Garland, held no greater appointment than the protection and preservation of her safety. Correctional professionals are entrusted by the public we serve to police society, safeguard the inmates entrusted to the agency's care, custody, control, supervision, accountability, and safety. Correctional professionals should fully understand the importance of the position they hold and accept full ownership of policing themselves through sound policies, procedures and directives, together with utilizing good correctional judgement to prevent foreseeable sexual assaults such as the attack of Ms. Garland. This opinion is supported in part by the failure to report as well as the failure to immediately transfer Ms. Garland to another facility and or place her in protective or administrative confinement.

The above findings and opinions are further supported by the standards set forth by the American Correctional Association 4-ACRS-1C-01-1 Added January 2003. Critical incidents are defined for the facility along with a debriefing to be conducted after each such incident. The debriefing process includes coordination and feedback about the incident with designated agency staff and facility staff as soon as possible after the incident. A debriefing includes, but is not limited to several items:

- A review of staff and offender actions during the incident.
- A review of the incident's impact on staff and offenders.
- A review of corrective actions taken and still needed.
- Plans for improvement to avoid another incident.

A critical incident is any event or situation that threatens staff or offenders in their community (criminal justice setting). While debriefings should occur as soon as possible, some information may not be available until later. All staff impacted by a critical incident should be included in Performance-Based Standards for Adult Community Residential Services (ACRS), 4th Edition 2016 Supplement the debriefings and referred to appropriate services to mitigate the stress associated with these events. All critical incidents should be reviewed by the administration, security, and health services. A two-week follow-up debriefing should occur to review the validity and appropriateness of all policies, plans, and information used during the critical incident and immediately after.

## VII. Declaration

I hereby declare under penalty of perjury this 3rd day of June 2021 that the foregoing is true and correct to the best of my knowledge and belief.


*[signature]*


Aubrey P. Land
721 Gowan Road
La Fayette Georgia, 30728

14