# William F. Schmid, Ph.D.
Clinical Psychologist, P.L.L.C.

To: Keller Keller & Dalton, Attorneys at Law          May 23, 2021
Name: Laurie Garland
Date of Interview: 4.21.2021
Examiner: W. F. Schmid Ph.D.

## Identifying Information:

Ms. Garland was referred for a psychological evaluation to assess potential short and long term damages due to reported sexual and psychological abuse while in the custody of the Oklahoma Department of Corrections. She was an inmate at the Dr. Eddie Warriors Correctional Center (EWCC) in Taft Oklahoma.

**Records Reviewed**: Documents were considered Highly Confidential – Subject To Protective Order:

The United States District Court for
Eastern Oklahoma, Rule 26 Disclosures

Oklahoma Department of Corrections
Investigative Reports and Investigative Supplements,
Memos and Notes

Case Masters Report and Incident/Staff reports

Email to Rachel Vernon MSW from Chris Redeagle

Letters to Warden Cooper and DOC staff by Inmates including Ms. Garland

Letters to DOC administration, and Mr. Redeagle from Laurie Garland

Letters and notes between Ms. Garland and Mr. Redeagle

3280 Marshall Ave.
Norman, Oklahoma 73072
Answering Service 405.321.5574
Fax 405.292.1787
wfschmidphd@msn.com

**Background information:**

My analysis is limited to my recent review of documents, my personal interview with Ms. Garland, and my experience, knowledge, training and education.

Ms. Garland was referred by her attorney for a psychological evaluation. The diagnostic question was related to what psychological damages, if any, did Laurie Garland experience due to her interactions with Mr. Redeagle while an inmate at EWCC.

Laurie Garland was interviewed on 4.21.2021. She was cooperative during the interview and discussed events in a clear, but at times emotional manner. She began the interview by stating she feels overwhelmed since leaving prison. She stated she had a panic attack the day before the interview "just because of all that's going on." She also stated she had to take the train to see her attorney and to our appointment. She went on to discuss her auto being stolen and the difficulties she experienced getting it back.

Ms. Garland stated she was an inmate in EWCC on a 10 year sentence. She stated she had previously had legal issues and was employed in the oil and gas industry. She had also studied Sociology and Criminal Justice in College. She stated while in EWCC she had a prison job in administration building. Stating "I worked there, the Deputy Warden and I got acquainted, we had some of the same interests. He would ask questions about my history. We began to talk, I wrote him some letters, it gave me something to do. He started calling me into his office. I was scared and nervous. I told him we needed to stop, people are talking and wanted to stop. He had say-so over my GPS release. He started meeting me and the relationship got intense. I don't remember dates but he started wanting to see me all the time. It was nice to escape my daily life in prison, I felt like a person again, I asked him to stop at first, he said I acted like I did not want him to do this stuff, like I was pulling away. He did not want me to pull away, I was in a crossfire. He could mess me up and I would not get my GPS."

"He (Redeagle) knew things about me, like my address, what my parents looked like, it got scary. He would make comments like I looked more like my sister or another family member. He also knew about my time in oil and gas, there was no way he should have known about it. He wrote me letters but we only have about one-half of them."

"I did write things to him, but I really wanted to get out of prison and did not want to mess things up. He was the Deputy Warden. It was good to have someone to talk too, but at the same time it was making my life hell. People were talking and I really did not want to get into trouble."

"I don't trust men at all, they cross the line. In fact, I don't trust anyone now, I've been hurt so many times."

Ms. Garland went on to discuss concerns about stalking and is currently afraid.

She reported "having dreams of being captured by a group of men, trapped in a situation and being made to do sexual things to get by. Being passed around and I have vivid dreams I was stuck with people in a random town. Anymore, I almost refuse to meet with people, I know not all men are bad, I know they are not, but I feel that way. When I worked for my dad I did not feel that way, but now I do."

Ms. Garland and Mr. Redeagle did exchange letters. Ms. Garland wrote; "you asked what I think when I ware these...(Mr. Redeagle according to documents reviewed, acquired undergarments for Ms. Garland) so many thoughts go through my physical as well as mental processes-first off is the mere idea of you taking time to go pick them out and subliminally surprise me with them secretly. Second is what was on your dirty mind to do such a thing, third is the feel of softness in combination with warm wetness when I'm lucky enough to have an encounter with you.. One thing I can say off the top is...Baby come back...You can blame it all on me. That tune is radiating in my mind for some reason-Wonder Why? I've felt so lonesome with all thoughts and no visual reality so to speak of here lately. It's been a highlight to get mail from my sweetheart who is obviously thinking of me just as much as Im thinking of him...Im glad it is a mutual feeling that's honestly at all levels and times is accepted-that helps to alleviate some of the stress..."

There are several psychological conceptual structures to help understand Ms. Garlands participation and cooperation in her interaction with the Deputy Warden. Three of the major concepts are as follows:

> **Identification with the aggressor**: In this construct, the weaker person in the relationship, victim, prisoner, child, identifies with the more powerful aggressor, such as a guard, overseer, or parent. Some theorist discuss the identification as a survival defense in order to draw favor for the more powerful and perhaps dangerous person.

> **Stockholm syndrome**: The syndrome tends to have a more mutual aspect, the identification with the more powerful person can be more mutual and can lead to defending and protecting the more powerful person. There may also be reciprocation by the more powerful person or persons.

**Trauma Coercive Bond**: This type of bonding is sometimes with an individual or a group. The bonding often comes about after a recurring pattern of abuse perpetuated by intermittent positive reinforcement. The process is referred to as traumatic bonding. This type of bonding can be one sided, but is also referred to in abusive relationships.

These conceptual structures/constructs are helpful in understanding complicated human behaviors in situations in which the power dynamics is unevenly distributed. One person has power over the well being or life direction of another. While the differentiation between these syndromes is not exact, Ms. Garland seems to have characteristics of all three.

In Ms. Garlands situations, she had the very real variable of wanting out of prison on a GPS release. It would be reasonable to assume her relationship with the Deputy Warden would have an impact on her release. While her relationship with the Deputy Warden offered her hope, it was also stressful and fear producing event to the point of being damaging and traumatic.

In addition to the above conceptual structures, Ms. Garland reports symptoms consistent with a DSM V diagnosis of Post Traumatic Stress Disorder. The symptoms for this disorder which apply to Ms. Garland are as follows:

**A.** Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

1. Directly experiencing the traumatic event(s).

2. Witnessing, in person, the event(s) as it occurred to others.

**B.** Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).

2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).

3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.)

4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

**C.** Persistent avoidance of stimulus associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

**D.** Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad" No one can be trusted" "The world is completely dangerous)
2. Persistent, negative emotional state (e.g., fear, horror anger, guilt, or shame.)
3. Marked diminished interest of participation in significant activities.

**E.** Marked alterations in arousal and reactivity associated with the traumatic event, beginning or worsening after the traumatic events occurred as evidenced by tow of the following:

**1.** Hyper vigilance
**2.** Exaggerated startle response

**F.** Duration more than one month.
**G.** The disturbance causes clinically significant distress or impairment in social, occupational, or other areas of functioning.
**H.** Disturbance not attributable to the physiological effects of a substance or medical condition.

## Summary and Conclusion:

Ms. Garland was an inmate at Dr. Eddie Warriors Correctional Center in Taft Oklahoma. During her incarceration, she became involved in an inappropriate relationship with the Deputy Warden. The relationship was based on a markedly uneven distribution of individual power and personal/sexual exploitation. The relationship resulted in Ms. Garland developing significant psychological symptoms related to Post Traumatic Stress Disorder.

## Treatment and Recommendations:

In response to the PTSD diagnosis, Ms. Garland will require the following services to deal with her symptoms and return to a more normal life.

| Treatment | Frequency | Duration | Cost |
| --- | --- | --- | --- |
| Individual Psychotherapy | Weekly | 100 session. | $150.00 each |
| Psychiatric Evaluation. | Twice a year | 2 years | $275.00 each |
| Psychiatric Medication | Daily | 3 years | $600.00 monthly |
| Transportation | Weekly | 2 years | $100.00 weekly |
| Loss of income | Weekly | 2 years. | $100.00 weekly |

These services will be necessary for Ms. Garland to resume a normal level of functioning.

W. F. Schmid Ph.D.
Psychologist #489