CASE NO. CIV-20-306-RAW

---

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

---

LAURIE GARLAND, Plaintiff

v.

STATE OF OKLAHOMA, ET AL., Defendants

---

Ronald A. White, United States District Judge

---

DEFENDANTS SHARON MCCOY, PENNY LEWIS AND RABEKKA MOONEYHAM'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

KARI Y. HAWKINS, OBA No. 19824
JEB E. JOSEPH, OBA No. 19137
Assistant Attorneys General
Litigation Division
Oklahoma Attorney General's Office
313 N. E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-2976
Facsimile: (405) 521-4518
Email: Kari.Hawkins@oag.ok.gov
Email: Jeb.Joseph@oag.ok.gov
*Attorneys for Defendants McCoy, Lewis and Mooneyham*

September 13, 2021

## TABLE OF CONTENTS

**DEFENDANTS SHARON MCCOY, PENNY LEWIS AND RABEKKA MOONEYHAM'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** ........................................................ **1**

**STATEMENT OF THE CASE** ................................................................ **1**

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ............................ **2**

**STANDARD FOR SUMMARY JUDGMENT** ....................................... **10**

**ARGUMENT AND AUTHORITY** ...................................................... **11**

**PROPOSITION I:**

**PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES** ......................... **11**

**PROPOSITION II:**

**DEFENDANTS DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS** .................................................................. **14**

**PROPOSITION III:**

**PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM MUST FAIL** ............................. **17**

**PROPOSITION IV:**

**PLAINTIFF'S POLICY VIOLATION CLAIMS MUST FAIL** .......................... **18**

**PROPOSITION V:**

**PLAINTIFF'S FOURTH AMENDMENT CLAIM MUST FAIL** ........................ **20**

**PROPOSITION VI:**

**DEFENDANTS MCCOY, LEWIS AND MOONEYHAM DID NOT PERSONALLY PARTICIPATE IN A CONSTITUTIONAL VIOLATION** ...................... **21**

**PROPOSITION VII:**

**DEFENDANTS ARE ENTITTLED TO QUALIFIED IMMUNITY** .................................. **22**

**CONCLUSION** ................................................................................. **24**

**CERTIFICATE OF SERVICE** .......................................................... **25**

i

**TABLE OF AUTHORITIES**

## CASES

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ........................................................................... 22

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) ...................................................................... 10, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 21

*Beaudry v. Corr. Corp. of America*,
    331 F.3d 1164 (10th Cir. 2003) ......................................................... 14

*Bennett v. Passic*,
    545 F.2d 1260 (10th Cir. 1976) ......................................................... 21

*Berry v. City of Muskogee.*,
    900 F.2d 1489 (10th Cir. 1990) ......................................................... 15

*Bishop v. Wood*,
    426 U.S. 341 (1976) ........................................................................... 18

*Booth v. Churner*,
    532 U.S. 731 (2001) ........................................................................... 11

*Branson v. Price River Coal Co.*,
    853 F.2d 768 (10th Cir. 1988) ........................................................... 11

*Brewer v. Mullin*,
    130 F.App'x 264 (10th Cir. 2005) ..................................................... 12

*Brown v. Montoya*,
    662 F.3d 1152 (10th Cir. 2011) ......................................................... 22

*Burke v. Corr. Corp. of Am.*,
    2010 WL 890209 (D. Kan. Mar. 10, 2010) ....................................... 18

*Butler v. Rio Rancho Pub. Schs. Bd. of Educ.*,
    341 F.3d 1197 (10th Cir. 2003) ......................................................... 17

*Callahan v. Poppell*,
    471 F.3d 1155 (10th Cir. 2006) ......................................................... 14

*Camuglia v. City of Albuquerque*,
   448 F.3d 1214 (10th Cir. 2006) ............................................................ 17

*Castillo v. Day*,
   790 F.3d 1013 (10th Cir. 2015) ............................................................ 14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................ 10, 11

*Coit v. Zavaras*,
   2013 WL 3448340 (D. Colo. July 9, 2013) .......................................... 18

*Darr v. Town of Telluride*,
   495 F.3d 1243 (10th Cir. 2007) ............................................................ 17

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................ 14, 16

*Foote v. Spiegel*,
   118 F.3d 1416 (10th Cir. 1997) ............................................................ 21

*Grimsley v. MacKay*,
   93 F.3d 676 (10th Cir. 1996) ................................................................ 21

*Hannula v. City of Lakewood*,
   907 F.2d 129 (10th Cir. 1990) .............................................................. 23

*Herts v. Smith*,
   345 F.3d 581 (8th Cir.2003) ................................................................. 18

*Hunter v. Bryant*,
   502 U.S. 224 (1991) ............................................................................. 22

*Jenkins v. Wood*,
   81 F.3d 988 (10th Cir. 1996) ................................................................ 22

*Jernigan v. Stuchell*,
   304 F.3d 1030 (10th Cir. 2002) ............................................................ 12

*Keith v. Koerner*,
   843 F.3d 833 (10th Cir. 2016) ........................................................ 16, 21

*Little v. Jones*,
   607 F.3d 1245 (10th Cir. 2010) ............................................................ 12

*Malley v. Briggs*,
   475 U.S. 335 (1986) ............................................................................. 24

*Matsushita Electric Industrial Co. v. Zenith Radio,*
    475 U.S. 574 (1986) ............................................................................. 10

*Medina v. City and County of Denver,*
    960 F.2d 1493 (10th Cir. 1992) ........................................................... 23

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ............................................................................. 23

*Moreno v. Corizon Med. Provider,*
    2017 WL 3052770 (D.N.M. June 21, 2017) ........................................ 19

*Morris v. Noe,*
    672 F.3d 1185 (10th Cir. 2012) ........................................................... 23

*Mullenix v. Luna,*
    577 U.S. 7 (2015) ................................................................................. 24

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ............................................................................. 23

*Perkins v. Kan. Dep't of Corr.,*
    165 F.3d 803 (10th Cir. 1999) ............................................................. 16

*Perry v. Durborow,*
    892 F.3d 1116 (10th Cir. 2018) ........................................................... 22

*Riddle v. Mondragon,*
    83 F.3d 1197 (10th Cir. 1996) ............................................................. 17

*Roska ex rel. Roska v. Peterson,*
    328 F.3d 1230 (10th Cir. 2003) ..................................................... 23, 24

*Sandin v. Conner,*
    515 U.S. 472 (1995) ............................................................................. 20

*Serna v. Colorado Dept. of Corrections,*
    455 F.3d 1146 (10th Cir. 2006) ........................................................... 21

*Smith v. Town of Eaton,*
    910 F.2d 1469 (7th Cir. 1990) ............................................................. 17

*Tafoya v. Salazar,*
    516 F.3d 912 (10th Cir. 2008) ............................................................. 21

*Thompson v. Lengerich,*
    798 Fed. Appx. 204 (10th Cir. 2019) ................................................... 20

*Tilga v. United States*,
   2014 WL 12783121 (D.N.M. Dec. 5, 2014)..........................................................18

*Thorn v. Bristol-Myers Squibb Co.*,
   353 F.3d 848 (10th Cir. 2003) ........................................................................11

*Trask v. Franco*,
   446 F.3d 1036 (10th Cir.2006) ........................................................................21

*Whitley v. Albers*,
   475 U.S. 312 (1986) ..............................................................................15, 17

*Wiggins v. Sisco*,
   2018 WL 1035161 (D. Kan. Feb. 23, 2018) ........................................................18

*Woodford v. Ngo*,
   548 U.S. 81 (2006) ..............................................................................11, 13

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
   756 F.2d 1467 (10th Cir. 1985) ........................................................................11

## STATUTES

## <u>Federal</u>

42 U.S.C. § 1983 ..............................................................................11, 21, 22

42 U.S.C. §1997e ..............................................................................................11

## RULES

Fed. R. Civ. P. 56 ..............................................................................................1, 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| LAURIE GARLAND, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. CIV-20-306-RAW** |
| | ) | |
| STATE OF OKLAHOMA ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SHARON MCCOY, PENNY LEWIS AND RABEKKA MOONEYHAM'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

COME NOW Defendants Sharon McCoy, Penny Lewis and Rabekka Mooneyham, and pursuant to Fed. R. Civ. P. 56, move for summary judgment on all claims asserted by the Plaintiff, Laurie Garland.  In support of this Motion, Defendants submit the following brief.

**STATEMENT OF THE CASE**

At all times relevant to this case, Plaintiff Laurie Garland was in the custody of the Oklahoma Department of Corrections (DOC) and housed at the Eddie Warrior Correctional Center (EWCC) in Taft, Oklahoma from August 30, 2018 until April 12, 2019.  Defendant Sharon McCoy was the Warden of EWCC and Defendant Christopher Redeagle was the Deputy Warden at EWCC when Plaintiff's claims allegedly arose.  Defendant Penny Lewis serves as the Chief Administrator for DOC's Auditing and Compliance Unit.  Defendant Rabekka Mooneyham is an Administrative Programs Officer for the Auditing and Compliance Unit.

In her Amended Complaint, Plaintiff Laurie Garland claims that while she was housed at EWCC, Defendant Redeagle was able to sexually assault her due to Defendant McCoy's failure to supervise Redeagle and her failure to enforce certain policies that could have prevented the assault. Plaintiff's Amended Complaint also suggests Defendants Lewis and Mooneyham failed to ensure

compliance with policies and procedures that could have prevented the assault. Defendants McCoy, Lewis and Mooneyham submit that they are entitled to summary judgment for reasons more fully set forth below.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Laurie Garland was incarcerated at the Eddie Warrior Correctional Center from August 30, 2018 until April 12, 2019. Exhibit 1, Consolidated Record Card.

2.  Defendant Christopher Redeagle became Deputy Warden at EWCC on or about November 30, 2018. Exhibit 2.

3.  On Feb 25, 2015, Ms. Garland signed the Oklahoma Department of Corrections' zero tolerance acknowledgment form indicating she understood how to report sexual misconduct. Exhibit 3, page 1.

4.  On March 26, 2015, Ms. Garland signed the Oklahoma Department of Corrections' zero tolerance acknowledgment form indicating she understood how to report sexual misconduct. Exhibit 3, page 2.

5.  On August 1, 2018, Ms. Garland signed the Oklahoma Department of Corrections' zero tolerance acknowledgment form indicating she understood how to report sexual misconduct. Exhibit 3, page 3.

6.  On September 5, 2018, Ms. Garland signed the Oklahoma Department of Corrections' zero tolerance acknowledgment form indicating she understood how to report sexual misconduct. Exhibit 3, page 4.

7.  Between March 4, 2019 and March 8, 2019, Ms. Garland wrote letters to EWCC Deputy Warden Christopher Redeagle wherein she discussed her "sexual frustration," being able to make "some good ol' fashioned morning love" and being able to wear "lacy lil' under

2

garments of someone's choice – knowing they'll be coming off later in the day." Garland also told Redeagle in this correspondence that she would "like to show you appreciation in more ways than one … plus I'd have an excuse to touch and love on you! By the way, I think your glasses look very sexy on you… ." Garland also described a fantasy of traveling to New Orleans with Redeagle, eating crabcakes, crawfish and shrimp and "get[ting] naked as the blues music plays in the distance." Garland also spoke of her need to be held in Redeagle's arms tightly.    Exhibit 4[1], pages 32-40.

8.    Garland admits that she initiated written correspondence with Redeagle and wrote the first letter they exchanged. Exhibit 5 (Deposition of Laurie Garland) page 26, lines 20-23.

9.    From March 11, 2019 through March 15, 2019, Redeagle was on annual leave and therefore was not present at EWCC. Exhibit 4, page 64.

10.    On March 14, 2019, Garland, wrote a letter to Redeagle and, seemingly in reference to his absence, which said, "Baby, come back… ." She also said it was a "highlight" to receive mail from Redeagle and that she loved the way he made her feel special. She also asked Redeagle if he had thought about how their relationship would grow once she left the facility and said she was glad they had "mutual" feelings. Garland went on to say she was "wishing for a tender, loving big bear hug… ." She also wrote that Redeagle had "a way of making one feel so warm, fuzzy and safe deep inside." Garland then told Redeagle "you could use some pampering or better yet deserve some yourself. Will I ever get the chance to do any of these thoughts I'd enjoy doing for you?" Exhibit 4, pages 41-48.

---

[1] Exhibit 4 contains relevant portions DOC's investigation file regarding Defendant Redeagle. Due to the volume and redundancy of the file, it is not attached in its entirety.

11.  On March 14, 2019, EWCC teacher Joy Arnold wrote an incident report indicating that inmate Janessa Estes had reported a rumor that Garland and Redeagle were having coffee together and that Redeagle had brought Garland panties.  Exhibit 4, page 21.  Upon becoming aware of these rumors, EWCC Warden Sharon McCoy instructed Chief of Security Bryan Cox to conduct an inquiry into the claims.  Exhibit 6 (Affidavit of Sharon McCoy), ¶¶ 3-4.

12.  On March 14, 2019, Sgt Box monitored a phone call between Garland to her  boyfriend wherein Garland discussed having made a big network and having "connections" at EWCC that she didn't want to lose.  Exhibit 4, page 23.

13.  On March 18, 2019, Inmate Janessa Estes wrote a statement for EWCC Chief of Security Bryan Cox, as part of his inquiry into her claims about Garland and Redeagle.  Therein, Estes reiterated what she had told to teacher Joy Arnold.  Exhibit 4, page 19.

14.  On March 18, 2019, Garland wrote a letter to Redeagle, wherein she said she was "missing every single bit of you" and that she was feeling " 'lost' without an immediate connection to you."  Exhibit 4, pages 65-66.

15.  On March 19, 2019, as a result of Estes' allegations regarding Garland and Redeagle, Garland was interviewed by a mental health professional at EWCC[2].  Garland specifically stated, in reference to Redeagle, that "no one has given her any items nor acting inappropriately in any way."  Exhibit 8, pages 1-3.  *See also* Incident Report at Exhibit 4, page 22.

---

[2]  DOC's Oklahoma Prison Rape Elimination Act policy, at OP-030601, at part IV.B.1.b., specifically states that inmates who report sexual abuse or assault are referred for a mental health evaluation and counseling.  Exhibit 7.

16. March 19, 2019, Garland wrote out a statement saying the following: "I, Laurie Garland, have never had any inappropriate dealings with Deputy Warden, Mr. Chris Redeagle. He has not brought any items, namely undergarments, into me at this facility. In addition, we (Mr. Redeagle and myself) have never eaten together nor had any beverages in mixed company with one another…He has always been professional and our dealings have remained in regards to business at hand." Exhibit 4, page 18.

17. March 20, 2019, Mr. Redeagle submitted an Incident Report to EWCC Warden Sharon McCoy denying that he had brought Garland panties or that he had acted inappropriately with Garland. Exhibit 4, page 24.

18. March 20, 2019, Garland's property was searched by Officer Coomer and the only inappropriate item located was a white shirt that was not on Garland's property sheet. In other words, no panties or letters were found. Exhibit 4, page 25.

19. On March 29, 2019, Garland was again interviewed in a follow-up appointment by a mental health professional, and it was reported that Garland "denies having any occurrence with any sexual advances, sexual activity or sexual harassment. She indicated she didn't know anything like that had been reported." Garland denied having any medical needs during that visit. Exhibit 8, page 4.

20. On April 1, 2019, Warden McCoy transferred from EWCC to become the Warden at Jess Dunn Correctional Center, which is also located in Taft, Oklahoma. Exhibit 6, Affidavit of Sharon McCoy. *See also* Personnel Report at Exhibit 9.

21. On April 2, 2019, EWCC Psychologist Whitney Louis spoke with Inmate Julia Woolsey, who alleged that Garland was "having interaction" with Redeagle and that they had

physically touched[3] each other inappropriately.    Exhibit 4, page 26.    *See also* Incident Report of staff witness Rachel Vernon at Exhibit 4, pages 27-28.    On this same date, Woolsey report to Officer Anderson that Garland had worn black underwear and given them to Redeagle, and the underwear were at Redeagle's house.  Exhibit 4, page 30.  Also on this date, Inmate Woolsey wrote a letter to EWCC Warden Natalie Cooper making the same allegations and stating that Laurie Garland herself had made the allegations to her (Woolsey).  Exhibit 4, pages 16-17.

22.    On April 2, 2019, Officers Fox and Torres searched Garland's property but did not find any inappropriate items.  Exhibit 4, pages 29 and 31.

23.    On April 3, 2019, EWCC Warden Natalie Cooper sent a memo to DOC's Director of Fugitive Apprehension & Investigation indicating that the allegations of Janessa Estes, which were made to the previous Warden Sharon McCoy, were "based on second hand information" by her own admission and that Estes could not identify the source of the rumors and that, "based on the provided information inmate Estes allegations are unfounded" and that "no further action be taken."  However, Cooper's memo indicated that an investigation had been commenced as a result of the allegations made subsequent to Estes' allegations to McCoy and subsequent to McCoy's transfer to Jess Dunn Correctional Center.   Exhibit 4, pages 51-52.

24.    April 3, 2019, inmate Crystal Covalt submitted a statement regarding Garland and Redeagle's alleged interactions.  Exhibit 4, page 20.

---

[3] The specific terminology used by Woolsey will not be described herein but is set forth in the referenced incident report.

25.    April 3, 2019, Laurie Garland submitted a written statement saying she and Redeagle had kissed and touched each other but they "never had any sexual contact at any point and time... ."  Exhibit 4, pages 49-50.

26.    April 3, 2019, Chris Redeagle submitted a statement indicating that Garland had left a picture in his office and that she had written him letters and notes.  Redeagle stated that Garland gave him panties and that he had purchased panties to give her (that he never gave her).  Redeagle stated that the extent of his relationship with Garland was written correspondence[4].  Exhibit 4, page 53.

27.    April 3, 2019, Mr. Redeagle resigned from his employment with the Oklahoma Department of Corrections.  Exhibit 4, page 63.  The resignation was accepted by EWCC Warden Natalie Cooper.  *Id.*

28.    April 4, 2019, Garland was interviewed by Psychologist Whitney Louis about her alleged interactions with Mr. Redeagle and Garland denied there were any PREA violations. Exhibit 8, page 5.

29.    On April 12, 2019, Garland was transferred from Eddie Warrior Correctional Center. Exhibit 1.

30.    April 16, 2019, Ms.  Garland signed the Oklahoma Department of Corrections' zero tolerance acknowledgment form indicating she understood how to report sexual misconduct.  Exhibit 3, page 5.

31.    April 24, 2019, during a mental health assessment, Garland reported that she had never been sexually assaulted during her incarceration.  Exhibit 8, pages 6-7.

---

[4] Redeagle did send Garland a number of letters using an alias.  Exhibit 10.

32. The Sexual Assault Report completed by EWCC staff as a result of the allegations regarding Garland and Redeagle's interactions classified the relationship as consisting of a "[s]exual relationship between inmate and staff that appeared to be willing."  Exhibit 4, pages 54-61.  This report also cited the alleged incident that necessitated the investigation as being dated April 2, 2019, which was subsequent to McCoy's transfer to another prison. *Id.*

33. A "PREA Response Checklist" was completed by EWCC in response to the allegations about Redeagle and Garland, and it indicated that the relevant incident was reported on April 2, 2019, subsequent to McCoy's transfer.  Exhibit 4, page 62.

34. In a series of undated letters[5], Garland told Redeagle "you make me happy for unbelievable times that lie ahead."  Garland also wrote that she was thinking about "…when I'm lucky enough to have an encounter with you…the thought and actual act of you sliding your hands down my pants…if only we could have the chance to actually sit down, relax, and discuss our personal lives a bit…I get the notion we would have some FUN (for lack of a more descriptive work) getting to know one another on a "real" level, as well as an intimate one."  Garland also said Redeagle's "devious nature and handsome demeanor…" really turned her on and she thanked him for his "spontaneous gestures." Garland wrote to Redeagle about "imagining being bent over your desk with you spanking me from behind… ." Garland also said "there may be endless possibilities in store as freedom(s) ensue and the universe manifests our pent up desires and natural connections… ."  One of these letters appears to have been kissed by Garland while she was wearing red lipstick. Exhibit 11.

---

[5] The letters are too vulgar to fully describe in this brief.

35.   Redeagle was current on his PREA training when he transferred to EWCC on November 30, 2018.  Exhibit 12.

36.   Pursuant to DOC's "Oklahoma Prison Rape Elimination Act" policy, the Deputy Warden of each prison facility is responsible for compliance with DOC's PREA Policy.  The agency's PREA coordinator is responsible for agency-wide compliance with the policy. Exhibit 7 (DOC Policy OP-030601) at part II.A.  Thus, neither McCoy, Mooneyham nor Lewis was responsible for PREA compliance at EWCC or the Oklahoma Department of Corrections.

37.   Defendant Penny Lewis is Chief Administrator of DOC's Auditing and Compliance Unit and does not oversee, enforce or investigate compliance with DOC's Prison Rape Elimination Act Policy.   Affidavit of Penny Lewis at Exhibit 13.  Lewis has never had administrative or supervisory authority over Defendants McCoy and Redeagle.  *Id.* at ¶ 4.

38.   Garland mistakenly believes Lewis was a guard at EWCC and says "I don't think that she necessarily personally intentionally did anything" to violate her (Garland's) rights.  Exhibit 5 (Garland Deposition), page 270, lines 19-25; page 271, lines 1-2.

39.   Defendant Mooneyham is an Administrative Programs Officer for DOC's Auditing and Compliance Unit and is responsible for scheduling hotel rooms for unit staff, paying invoices and handling miscellaneous financial and administrative matters for the unit. Affidavit of Rabekka Mooneyham at Exhibit 14.  Mooneyham does not oversee, enforce or investigate compliance with DOC's Prison Rape Elimination Act Policy.   *Id.* Mooneyham does not have any authority over staff or inmates at EWCC nor does she review or oversee the day-to-day operations of the facility.  *Id.*

40.    Garland mistakenly believes Mooneyham was also guard and on a Board "overseeing things at Eddie Warrior."  However, Garland does not believe Mooneyham did anything to violate her rights.  Exhibit 5, page 272, lines 16-25;  page 273, lines 1-6.

41.    Defendant Sharon McCoy will have worked for the Oklahoma Department of Corrections for **40 years**, come October 12, 2021.  Specifically, Sharon McCoy began her career at the Oklahoma Department of Corrections on October 12, 1981 as a cadet and then as a Corrections Officer at the Oklahoma State Penitentiary.  *See* McCoy's first Cadet and Corrections Officer Badge at Exhibit 15.  McCoy continues to faithfully serve the agency, where she is currently the Warden of Jess Dunn Correctional Center in Taft, Oklahoma. Exhibit 6, Affidavit of Sharon McCoy.

42.    Garland claims former EWCC Warden Sharon McCoy violated her constitutional rights because "she wasn't around a whole lot there towards the transitioning of Ms. Cooper, but she was in and out. She was just here and there, hit and miss."  Exhibit 5, page 272, lines 2-15.

43.    Deputy Warden Chris Redeagle testified that McCoy was not excessively absent from the Eddie Warrior Correctional Center.  Exhibit 16 (Deposition of Christopher Redeagle) at page 115, lines 5-7; page 170, line 25; page 171, lines 1-22.  In fact, Redeagle testified that McCoy "was there most of the time.  Eight hours a day."  *Id.*

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247 (1986).  To survive a motion for summary judgment, the nonmovant must establish the

existence of a genuine issue of material fact. To demonstrate a genuine issue of material fact in opposition to a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Co.*, 475 U.S. 574, 586 (1986); *Anderson,* 477 U.S. at 252.

Once the movant meets the initial burden, the party opposing summary judgment must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence" that dispute the material facts as set forth by the movant. *Thorn v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.,* 477 U.S. at 328). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988). "The Court may only consider admissible evidence when ruling on a motion for summary judgment." *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir. 1985). Hence, the inquiry on a motion for summary judgment is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251-252.

## ARGUMENT AND AUTHORITY

## PROPOSITION I

## PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES.

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Thus, a prisoner cannot sue concerning prison conditions without first exhausting all available administrative remedies. *Booth v. Churner*, 532 U.S. 731, 733-34 (2001); 42 U.S.C. § 1997e(a). Exhaustion is required for all inmates seeking relief in federal district court regardless

of the type of relief available under the institutional administrative procedure. *Woodford v. Ngo,* 548 U.S. 81 (2006); *Booth,* 532 U.S. at 741.

To properly exhaust, the prisoner must comply "with an agency's deadlines and other critical procedural rules...." *Ngo,* 548 U.S. at 90. "Simply presenting a defective or non-complying grievance...does not constitute exhaustion of remedies." *Brewer v. Mullin*, 130 F.App'x 264, 265 (10th Cir. 2005) (not selected for publication). Prisoners must exhaust remedies, even if doing so seems futile. *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). Moreover, a prisoner must timely exhaust each and every step of a prison system's grievance procedure in full compliance with the procedure's requirements; partial compliance is not sufficient. *Id.* Courts will only excuse failure to exhaust if prison officials impede the prisoner's attempts. *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). Finally, the prisoner must complete the grievance process or there is no exhaustion of administrative remedies. *Id.* Plaintiff was incarcerated when the instant claims arose and when the instant litigation was commenced. Exhibit 1 and Doc. 1. Thus, the PLRA's exhaustion requirements are applicable.

## DOC'S Grievance Process

DOC Policy OP-090124, "Inmate/Offender Grievance Process," governs DOC offender complaints regarding incidences of prison life. Exhibit 17. Further, it provides the multi-step exhaustion process an offender must satisfy before filing suit. *Id.* According to OP-090124 (IV), an offender must first attempt to informally resolve his complaint by talking with the appropriate staff member. If unsuccessful, then the offender must submit a Request to Staff ("RTS") to the appropriate staff member. *Id.* at part (IV)(C). If the offender's complaint remains unresolved, the offender may begin the formal grievance procedure by submitting a Grievance to the Reviewing Authority. *Id.* at part (V). If the complaint concerns a medical issue, the offender must submit the

Grievance to the facility Correctional Health Services Administrator ("CHSA"). *Id.* at part (V)(B)(1). If a grievance response fails to resolve the issue, the inmate should appeal to the Administrative Review Authority ("ARA"), or if the complaint concerns a medical issue, to the DOC"s Medical Administrative Review Authority. *Id.* at part (VII).

When a RTS or Grievance is not answered, DOC's policy provides a remedy. Specifically, if there has been no response to a RTS within 30 days of submission but no later than 60 days, an inmate may file a Grievance regarding the lack of response. *Id.* at part IV(C)(11). Likewise, when a Grievance is submitted and there has been no response within 30 days but less than 60 days, an inmate may file a Grievance to the ARA on the issue of a lack of response. *Id.* at part V(C)(4).

Grievances that are of an emergency or sensitive nature can be submitted directly to the Reviewing Authority without informal resolution. This is appropriate where the inmate faces a substantial risk of personal injury, sexual harm or other irreparable harm. *Id.* at part (VIII). Grievances regarding allegations of sexual abuse can be submitted on behalf of an inmate by third parties including fellow inmates, family members, staff members, attorneys and advocates. *Id.* at part VIII(C).

### Plaintiff's Requests to Staff, Grievances and Appeals

Plaintiff claims Defendant Christopher Redeagle sexually harassed and assaulted her during her incarceration at Eddie Warrior Correctional Center in 2018 and 2019. Plaintiff claims Defendant McCoy allegedly knew about the misconduct but turned a "blind eye" to Redeagle's behavior and failed to adequately supervise him. Doc. 19, ¶ 19. Plaintiff also claims Defendants McCoy, Mooneyham and Lewis failed to enforce certain policies, which resulted in her constitutional rights being violated. Doc. 19, ¶¶ 25-30, 34-35, 37, 39 and 43. However, Plaintiff failed to submit a Request to Staff, Grievance or Appeal regarding ***any*** of these claims against

McCoy, Lewis and Mooneyham.    Exhibit 18, Affidavit of Mark Knutson, Manager of the Administrative Review Authority.

In *Woodford v. Ngo, 5*48 U.S. 81, 85 (2006), the Supreme Court held that a plaintiff "must exhaust administrative remedies even where the relief sought … cannot be granted by the administrative process."  The PLRA's exhaustion requirement is mandatory, and courts are not authorized to dispense with it. *Beaudry v. Corr. Corp. of America*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003).  For all the foregoing reasons, this Court should find that Plaintiff failed to exhaust administrative remedies on her claims against McCoy, Lewis and Mooneyham.  Plaintiff's claims must accordingly fail.

## PROPOSITION II

**DEFENDANTS DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS.**

Plaintiff's claims are best characterized as conditions of confinement claims and analyzed under the Eighth Amendment's deliberate indifference or failure to protect standard. *Castillo v. Day*, 790 F.3d 1013, 1018-1019 (10th Cir. 2015).  An Eighth Amendment deliberate indifference claim has two components:  (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the prison officials acted with a sufficiently culpable state of mind. *Id.*  Under the objective component, the deprivation must be sufficiently serious, with the prison official's act or omission resulting in the denial of the minimal civilized measure of life's necessities. *Farmer v. Brennan,* 511 U.S. 825*,* 834 (1994).  Under the subjective component, deliberate indifference is established only when a prison official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate that harm. *Id.* at 837-38.   *See also Callahan v. Poppell,* 471 F.3d 1155, 1159 (10th Cir.

2006).  Specifically, under the subjective prong, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm to the prisoner exists, and he must also draw the inference." *Id.* at 837.  Deliberate indifference requires "a higher degree of fault than negligence, or even gross negligence," but is less than the intentional and malicious infliction of injury standard in *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  *See also Berry v. City of Muskogee.*, 900 F.2d 1489, 1496 (10th Cir. 1990).

To support her claims of deliberate indifference, Plaintiff alleges Defendant McCoy knew Defendant Redeagle was "a large man" and that he "was spending an excessive amount of time with Plaintiff, in plain sight… ."  Amended Complaint (Doc. 19), page 5, ¶¶ 14-15.  Plaintiff also claims that Defendant McCoy "had information" that Plaintiff was wearing panties other than those issued by the prison.  *Id.* at ¶ 17.  Plaintiff further alleges that Defendant McCoy moved her away from Defendant Redeagle, who then manipulated Plaintiff's schedule in order to have access to her.  *Id.* at ¶¶ 17-19.  However, the evidence in the record indicates that Warden McCoy, upon being informed of rumors that Redeagle and Garland were fraternizing and that Redeagle had given Garland underwear commenced a facility-level inquiry into the matter.  *See* Affidavit of Sharon McCoy, Exhibit 6, ¶¶ 3-4.  During this investigation, both Garland and Redeagle ***denied*** the rumors.  Exhibit 4, pages 18 and 24.  *See* also Exhibit 8, pages 1-4.  It was also determined that the inmate who reported the rumors (Janessa Estes) admitted that they were based on second-hand information from inmates she could not even identify.  Exhibit 4, pages 51-52.  The rumor was therefore not referred for investigation prior to McCoy's April 1, 2019 transfer from EWCC.  *Id.* Also, it is notable that DOC's "Prison Rape Elimination Act" policy only required "known, suspected acts or allegations of sexual assault" to be referred to the Office of Fugitive Apprehension and Investigation for a formal investigation.  Exhibit 7 at part IV.A.2.  The rumors

15

that were reported to McCoy and the subsequent denial by both Garland and Redeagle did not concern sexual assault but instead they dealt with fraternizing and panties. The allegations certainly did not concern a "known" or even a "suspected" act or allegation of assault when viewed in the context of Garland's denial. Thus, Garland's claims of deliberate indifferent do not support a finding that McCoy knew or drew the inference that Plaintiff was being harmed by Defendant Redeagle or that she was deliberately indifferent in failing to follow any applicable policy. Specifically, these allegations, "viewed in isolation, could not support a finding that [the] Warden [] failed to respond to a known risk… ." *Keith v. Koerner*, 843 F.3d 833, 841 (10th Cir. 2016).

Significantly, there is no allegation or evidence that Plaintiff herself attempted to alert Defendant McCoy to the harm she allegedly sustained by availing herself of the prison's grievance process or the numerous ways Plaintiff could have reported sexual misconduct, as Plaintiff herself acknowledged repeatedly. *See* Exhibit 3. To the contrary, Garland flat out denied being subject to any inappropriate behavior at the hands of Redeagle, and Warden McCoy took Garland at her word. Exhibit 6, ¶¶ 5-7. Plaintiff now suggests it was inappropriate for McCoy to believe her written statement. However, it is Plaintiff – not McCoy - who failed to follow DOC policy regarding sexual assault allegations. Finally and remarkably, Plaintiff claims that McCoy's excessive absences from EWCC allowed Redeagle to assault her. Yet, Plaintiff cites no evidence to support her claim of impermissible, unconstitutional absenteeism. In fact, it is unclear how an inmate such as Plaintiff could have ever been in any position – physically, administratively or otherwise - to scrutinize the work schedule of a 40-year veteran of the Oklahoma Department of Corrections. Plaintiff's claims of absenteeism are baseless and insulting.

The record is devoid of any evidence to support any claim that Defendants acted with a culpable state of mind or knew of and disregarded facts that would have put them on notice that

Plaintiff was being sexually assaulted or that she was in danger of such harm. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994). At most, Plaintiff's criticisms of Defendants are best categorized as negligence claims that do not rise to the level of a constitutional violation. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). Accordingly, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.

<u>**PROPOSITION III**</u>

**PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM MUST FAIL.**

The theory upon which Plaintiff's Fourteenth Amendment claim is based is unclear. To the extent it is a substantive due process claim, it must fail. *See Whitley v. Albers*, 475 U.S. 312, 327 (1986), wherein the Court refused to consider a Fourteenth Amendment due process claim by a prison inmate for excessive force because the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners" in such cases. *See also Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996), which held that an inmate's deliberate indifference claim must be analyzed under Eighth Amendment and not more general provisions of substantive due process.

To the extent a Fourteenth Amendment claim is properly asserted, Defendants are still entitled to summary judgment. Specifically, a substantive due process claim requires assessing whether a governmental action is arbitrary, irrational, or shocking to the conscience of a federal judge. *Camuglia v, City of Albuquerque,* 448 F.3d 1214, 1222–23 (10th Cir. 2006); *Butler v. Rio Rancho Pub. Schs. Bd. of Educ.,* 341 F.3d 1197, 1200–01 (10th Cir. 2003); *see also Darr v. Town of Telluride,* 495 F.3d 1243, 1257 (10th Cir. 2007). The arbitrary deprivation of a property right may violate substantive due process only if the arbitrariness is extreme. *Camuglia,* 448 F.3d at 1222. "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* at 1222–23. An act is said to be arbitrary and

capricious when it is done for reasons that are trivial or wholly unsupported by a basis in fact. *Smith v. Town of Eaton,* 910 F.2d 1469, 1472 (7th Cir. 1990). Further, in order to constitute a violation of substantive due process, a government official's conduct "must generally be intended to inflict harm to be conscience shocking in the constitutional sense." *Herts v. Smith,* 345 F.3d 581, 587 (8th Cir.2003). Significantly, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood,* 426 U.S. 341, 350 (1976).

For reasons more fully set forth at Proposition II, *supra*, the record clearly indicates that Warden McCoy made well-informed decisions regarding Plaintiff at all times relevant. Specifically, when a rumor was reported to McCoy regarding Plaintiff and Redeagle, McCoy immediately ordered an inquiry into the matter and both Plaintiff and Redeagle **denied** the allegations prior to McCoy's transfer to another prison. Also, Defendants Mooneyham and Lewis are not charged with supervising McCoy or Redeagle, nor do they enforce DOC's Prison Rape Elimination Act policy. Exhibits 13 and 14. Thus, at no time did Defendants McCoy, Mooneyham or Lewis engage in extreme, irrational or conscience-shocking behavior. As such, Plaintiff's Fourteenth Amendment claim must fail.

## PROPOSITION IV

### PLAINTIFF'S POLICY VIOLATION CLAIMS MUST FAIL.

Plaintiff repeatedly claims that Defendants' alleged violations of the Prison Rape Elimination Act are tantamount to a constitutional violation. However, PREA does not create substantive rights for prisoners. In other words, Plaintiff has no enforceable right to have the procedures required by the PREA followed and no right to enforcement of those procedures. *Burke v. Corr. Corp. of Am.*, No. 09-3068-SAC, 2010 WL 890209 (D. Kan. Mar. 10, 2010); *Tilga v.*

*United States*, CV 14-256 JAP/RHS, 2014 WL 12783121 (D.N.M. Dec. 5, 2014); *Wiggins v. Sisco*, 17-3080-SAC, 2018 WL 1035161 (D. Kan. Feb. 23, 2018); *Coit v. Zavaras*, No. 12-cv-00609-WYD-MJW, 2013 WL 3448340 (D. Colo. July 9, 2013) ("PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. The statute does not grant prisoners any specific rights." (omission and internal quotation marks omitted) ); *Moreno v. Corizon Med. Provider*, No. 16-CV-01064-JCH-LF, 2017 WL 3052770 (D.N.M. June 21, 2017) ("[T]he PREA does not establish a private cause of action for allegations of prison rape." (internal quotation marks omitted)).

Plaintiff also alleges throughout her Amended Complaint that Defendants violated her constitutional rights because they failed to follow other miscellaneous policies that she believes would have prevented her alleged sexual assault. For example, Plaintiff claims Defendant McCoy violated DOC Policy OP-040101 (Facility Security Standards), which is attached at Exhibit 19. Plaintiff cites this policy for the broad idea that the Defendants are responsible for implementing security standards at prison facilities. Amended Complaint (Doc. 19), pages 6-7, ¶ 22-25. Plaintiff additionally cites OP-040103 ("Standards for Maintenance of Logs") for the argument that prison facilities, through their respective wardens, are required to maintain logs on various matters such as contraband, kitchen utensils, tools and keys. *Id.* at pages 9-11, ¶¶ 33-40. Yet, Plaintiff merely speculates, without any evidence ***or explanation***, that strict adherence the policies would have protected her from Redeagle's alleged misconduct. And while Plaintiff suggests that Defendants McCoy, Lewis and Mooneyham's failure to ensure compliance with the DOC's Prison Rape Elimination Act policy was unconstitutional or caused her to sustain harm, DOC Policy OP-030601, states that the Deputy Warden (as opposed to the Warden) of each prison facility is responsible for local compliance with DOC's PREA Policy, and the agency's PREA coordinator

is responsible for agency-wide compliance with the policy.  Exhibit 7 at part II.A.  *See also* Affidavits of Lewis and Mooneyham at Exhibits 13 and 14, which clarify that they are not responsible for enforcing compliance with the agency's PREA policy.

In fact, DOC operations memoranda are not designed to, and do not confer any additional rights unto any prisoner greater than those authorized by statute or protected by the Constitution. Instead, DOC procedures are implemented to "aspire to instruct subordinate employees how to exercise discretion vested by the state in the [Director], and to confine the authority of [department] personnel in order to avoid widely different treatment of similar incidents."  *Sandin v. Conner*, 515 U.S. 472, 482 (1995).  To find that agency procedures confer a right "creates [the very] disincentives" warned of in *Sandin*.  *Id.*  DOC created procedures to give guidance to staff in the day-to-day operations of the agency in situations that involve discretion.  Those same procedures cannot be used to create a right beyond what is authorized by the Constitution.  The present claim is tantamount to "prisoners comb[ing] regulations in search of mandatory language on which to base entitlements to various state-conferred privileges."  *Id.* at 481.  Accordingly, the Defendants' alleged failure to follow specific policies does not run afoul of the Constitution.  Plaintiff's policy claims must therefore fail.

## PROPOSITION V

### PLAINTIFF'S FOURTH AMENDMENT CLAIM MUST FAIL

There is no allegation in this case that Defendants McCoy, Lewis and Mooneyham personally searched or seized Plaintiff, and thus her Fourth Amendment claims are improperly asserted. *Thompson v. Lengerich*, 798 Fed. Appx. 204, 208 (10th Cir. 2019).  While, Plaintiff does allege the Defendants deliberate indifference "proximately" caused a violation of her Fourth Amendment rights, her claim must still fail.  Specifically, a government actor may be liable for

the constitutional violations that another committed if the actor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. *Trask v. Franco,* 446 F.3d 1036, 1046 (10th Cir.2006).  Beyond Plaintiff's purely conclusory allegations in her Amended Complaint, there is simply no evidence in the record that Warden McCoy, Defendant Lewis and Defendant Mooneyham did anything they knew would cause Plaintiff's alleged assault. Specifically, Garland herself confirmed to McCoy that Redeagle had not engaged in any inappropriate behavior.  Plaintiff can cite to no evidence that would support a claim that McCoy should have believed otherwise.  In *Keith v. Koerner*, 843 F.3d 833, 847 (10th Cir. 2016), the Tenth Circuit reversed summary judgment when it found that certain red flags" had not been acted on.  In this case, prior to her transfer from EWCC, Warden McCoy acted on rumors  or "red flags" about Garland and Redeagle, and Garland denied any inappropriate conduct had occurred.  Furthermore, these allegations, even if true, do not show that any Defendants' inaction was the ***cause*** of the constitutional violation.  *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  Plaintiff's Fourth Amendment claims must therefore fail.

## PROPOSITION VI

### DEFENDANTS MCCOY, LEWIS AND MOONEYHAM DID NOT PERSONALLY PARTICIPATE IN A CONSTITUTIONAL VIOLATION.

As a general rule, "[i]ndividual liability under [42 U.S.C.] § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citing *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996)); *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976) ("Personal participation is an essential allegation in a Section 1983 claim."  (citations omitted)).  A plaintiff must plead that each government-

official defendant, through the official's own individual actions, has violated the constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). There must be an affirmative link between the alleged constitutional violation and the defendant's own participation or failure to supervise. *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151–52 (10th Cir. 2006). Furthermore, government officials have no vicarious liability in a § 1983 suit for the misconduct of their subordinates, such as prison staff, because "there is no concept of strict supervisor liability under section 1983." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted). In other words, § 1983 does not authorize liability under a theory of respondeat superior. *Brown v. Montoya,* 662 F.3d 1152, 1164 (10th Cir. 2011). Thus, to the extent Plaintiff's claims turn on Defendants McCoy, Mooneyham and Lewis' failure to supervise Redeagle, they must fail. *See Perry v. Durborow,* 892 F.3d 1116, 1121 (10th Cir. 2018).

Notably, Defendants Mooneyham and Lewis do not even work at the Eddie Warrior Correctional Center or have supervisory authority over the staff at the facility. Exhibits 13 and 14. Furthermore, they are not even responsible for monitoring the facility's compliance with DOC's Prison Rape Elimination Act policy. *Id. See also* DOC Policy OP-030601, which states that the Deputy Warden of each prison facility is responsible for local compliance with DOC's PREA Policy, and the agency's PREA coordinator is responsible for agency-wide compliance with the policy. Exhibit 7 at part II.A. Clearly, these Defendants did not personally participate in any constitutional violation, and Plaintiff's claims against them must fail.

## PROPOSITION VII

### DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

This Court should find that Defendants McCoy, Lewis and Mooneyham are entitled to qualified immunity. A public official or employee is entitled to qualified immunity unless "clearly

established" federal rights of which a reasonable person would have known are shown to have been violated. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). "Clearly established" is predicated on a finding that in light of pre-existing law the unlawfulness is apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is an entitlement not to stand trial or face the burdens of litigation. It is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 527 (1985). It is effectively lost if a case is erroneously permitted to proceed to trial. *Hannula v. City of Lakewood,* 907 F.2d 129, 130 (10th Cir. 1990).

Once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate that (1) the defendant violated one of his constitutional rights, and (2) the right in question was clearly established at the time of the allegedly unlawful activity such that "every reasonable official would have understood that what he [was] doing" violated the law. *Morris v. Noe,* 672 F.3d 1185, 1191 (10th Cir. 2012). The court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992). The contours of the invoked right must be sufficiently clear such that objectively reasonable state officers would understand that what they are doing violates that right. *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1247 (10th Cir. 2003). "[T]he touchstone of [this] inquiry is whether the officers [were] on notice [that] their conduct [was] unlawful." *Id.* at 1248 (citations and quotations omitted). Thus, if the plaintiff has alleged a constitutional violation and has met his burden to establish that the law on the subject is clearly established, plaintiff must

further show that a reasonable official would have known that his actions would violate clearly established law.

> In considering the "reasonable state actor," we must keep in mind that qualified immunity precludes the imposition of liability for 'all but the *plainly incompetent* or those who knowingly violate the law.' *Malley v. Briggs,* 475 U.S. 335, 341 (1986) (emphasis added). Where "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Id. at 341.*

*Id.* at 1251.

In *Mullenix v. Luna*, 577 U.S. 7 (2015), the Supreme Court reiterated that the question of qualified immunity turns on whether the unconstitutionality of "particular conduct" in a "specific context" is clearly established. *Id.* at 11-12. The Supreme Court also reiterated that clearly established law should not be defined at a high level of generality. *Id.*

As more fully set forth above, Plaintiff can't meet her burden of demonstrating that Defendants violated her constitutional rights. In the alternative and in light of the cited authority, Plaintiff cannot demonstrate that any clearly established law would have put Defendants on notice that they violated her constitutional rights, especially when she denied that Redeagle had engaged in inappropriate conduct while Defendant McCoy was the Warden at EWCC. Defendants McCoy, Lewis and Mooneyham are therefore entitled to qualified immunity.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants McCoy, Lewis and Mooneyham's Motion for Summary Judgment.

Respectfully submitted,

/s/ Kari Y. Hawkins
**KARI Y. HAWKINS, OBA #19824**
**JEB E. JOSEPH, OBA # 19137**
Assistant Attorney General
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105
Telephone:  (405) 521-3921
Facsimile:  (405) 521-4518
Email:  Kari.Hawkins@oag.ok.gov
*Attorney for Defendants McCoy, Lewis and Mooneyham*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of the Notice of Electronic Filing to the following ECF registrants:

E.W. Keller
Henry Dalton
Keller, Keller & Dalton, P.C.
201 Robert S. Kerr, Suite 1001
Oklahoma City, OK  73102
*Attorneys for Plaintiff Garland*

Anthony L. Allen, OBA # 19738
106 S. Okmulgee Ave.
Okmulgee, OK  74447
*Attorney for Defendant Redeagle*

/s/Kari Y. Hawkins
Kari Y. Hawkins