1    IN THE UNITED STATES DISTRICT COURT FOR THE

2      EASTERN DISTRICT OF OKLAHOMA

3

4 (1) LAURIE GARLAND, an   )
 individual,        )

5     Plaintiff,    )
             )

6 vs.           ) Case No. CIV 2020-306-RAW
             )

7 (1) STATE OF OKLAHOMA EX  )
 REL OKLAHOMA DEPARTMENT OF )

8 CORRECTIONS,      )
 (2) CHRISTOPHER REDEAGLE, )

9 individually      )
 (3) SHARON MCCOY,    )

10 individually,     )
 (4) JOE ALLBAUGH,    )

11 individually,     )
 (5) PENNY LEWIS,     )

12 individually,     )
 (6) RABEKAH MOONEYHAM,  )

13 individually      )
 (7) HEATHER CARLSON,   )

14 indvidually      )
 (8) BOARD OF CORRECTIONS, )

15     Defendants.  )

16     DEPOSITION OF RANDY KNIGHT

17    TAKEN ON BEHALF OF THE PLAINTIFF

18     IN OKLAHOMA CITY, OKLAHOMA

19       MAY 19, 2021

20

21    REPORTED BY: JULIA JACKSON, CSR



METROPOLITAN BUILDING   MID-CONTINENT TOWER
400 North Walker, Suite 160  401 South Boston, Suite 310
Oklahoma City, OK 73102   Tulsa, OK 74103
405-235-4106      918-599-0507

depo@drreporting.com

D&R REPORTING & VIDEO, INC.

Randy Knight                                          May 19, 2021

Page 16

1     Q.    Okay.

2     A.    I believe in 2019.

3     Q.    Okay.  You were the lead investigator?

4     A.    Yes.

5     Q.    Okay.  Is there anybody else who has got more

6     knowledge of these events than you?

7     A.    No.

8     Q.    Is there anybody else who assisted you with

9     this investigation?

10    A.    No.

11    Q.    I guess, what I'm trying to get -- if I'm

12    looking for witnesses or people to talk to who would

13    have knowledge about this, other than the two parties,

14    in your mind is there anybody else in your investigative

15    office who I'd want to speak to?

16    A.    No.

17    Q.    Is there anybody else in general that you think

18    has a lot of knowledge about these event?

19    A.    Sharon McCoy, the warden --

20    Q.    Uh-huh.

21    A.    -- was present when I was speaking to Chris

22    Redeagle --

23    Q.    Okay.

24    A.    -- so she would have knowledge.

25    Q.    Anyone else you can think of?

Randy Knight                                    May 19, 2021

Page 21

1       Q.    Okay.

2       A.    My chief agent at the time Carl Wilks contacted

3   me at my home --

4       Q.    Uh-huh.

5       A.    -- and asked me to respond to the Eddie Warrior

6   Correctional Center.

7       Q.    Okay.  Was he your supervisor?

8       A.    Yes.

9       Q.    The morning, afternoon, night -- do you

10  remember?

11      A.    It was in the morning.

12      Q.    Okay.  Did you respond immediately?

13      A.    Yes.

14      Q.    Okay.  And what did you do?

15      A.    I kind of worked this case backwards.

16      Q.    Okay.

17      A.    The deputy warden was -- Mr. Redeagle was at

18  the facility.  They hadn't notified him that the

19  Inspector General's Office was going to be involved in

20  the investigations.  They were concerned about that,

21  concerned about him leaving the office and having

22  contact with any inmates.  So I met with him first and

23  conducted the interview with him initially.

24      Q.    Deputy warden is the second highest person you

25  can have at the Eddie Warrior Correctional Facility;

Randy Knight                                          May 19, 2021

Page 25

1     A.    Sure.

2     Q.    I wanted it to be easy.

3     A.    So initially he denied engaging in any kind of

4  inappropriate relationship with Ms. Garland.

5     Q.    Uh-huh.

6     A.    I asked him -- I gave him some information

7  regarding some underwear that was allegedly given to Ms.

8  Garland and had been returned to him.

9     Q.    Uh-huh.

10    A.    I asked him for consent to search his house.

11 He agreed.  We went to his residence.  The only room

12 that had furniture was his bedroom.  He had a bed and he

13 had two nightstands.  One of them contained a black

14 safe.

15    Q.    So I'm just -- is it a pretty sparsely

16 decorated house?

17    A.    He didn't have any furniture in there, except

18 for his bed and his nightstand.  I'm assuming he -- from

19 my understanding, he was driving back and forth on

20 certain occasions to his home.

21    Q.    Okay.  When you interviewed him originally, did

22 you think he was lying or being truthful or did you have

23 an opinion or do you recall?

24    A.    I believed he was lying.

25    Q.    Okay.  Did you guys drive in one -- I guess,

Randy Knight                                          May 19, 2021

Page 26

1    you walked probably to his house?

2        A.   So Warden McCoy was present there.

3        Q.   Okay.

4        A.   He went -- I believe we went in her vehicle,

5    drove to his house.  I started searching the residence,

6    went to his bedroom.  I discovered two different safes.

7    I had asked Warden McCoy to keep Mr. Redeagle in the

8    living room.

9        Q.   Uh-huh.

10       A.   I was hoping that the area that I was

11   searching, he would get concerned with and come to the

12   room to let me know that I was in the right area.  He in

13   fact did that when I got to the safe.  There was a black

14   safe.  And I asked him for the key or the code to get

15   into the safe.

16            He had told me that the -- he didn't have a

17   code for the safe and that the key that belonged to that

18   safe was at his residence in Pawhuska.  So I informed

19   Mr. Redeagle that I would secure the house and he was to

20   drive home and get his key and come back and open the

21   safe.

22       Q.   Did that make sense to you that he had no key

23   or no combination to that safe?

24       A.   I didn't believe he was telling the truth.

25       Q.   Okay.  Very good.  That's I guess what I was

Randy Knight                                          May 19, 2021

Page 27

1    really asking.  So did he leave you or what happened

2    next?

3        A.    So we secured the residence.  We were leaving

4    the facility.  I wanted to search his vehicle before he

5    left.  I initiated my search on the driver's side.  I

6    let -- by policy we're required to let the employee

7    stand near the vehicle to watch our search.

8        Q.    Uh-huh.

9        A.    Warden McCoy was in the back, so the rear of

10   the vehicle.  When I first looked into the vehicle, I

11   seen a photograph of a female and some correspondence

12   letters.

13       Q.    Say that again.

14       A.    Correspondence letters -- letters.

15       Q.    Yes, yes, yes.

16       A.    So I briefly reviewed the letters and I turned

17   the photograph or held the photograph and I could tell

18   that it was -- well, I wasn't for sure who the female

19   was.  I had never seen a picture of Inmate Laurie

20   Garland.  So I just kind of rused him and I picked the

21   photograph up and said, "Why don't you tell me the

22   truth".

23            And he got emotional and said, "I'm sorry.  I

24   lied to you".

25            So I retrieved the photograph and the letters.

1    In the back floorboard passenger's side, I seen a weapon

2    laying there and a magazine that was laying next to the

3    weapon that was loaded.  So I secured the weapon, the

4    photograph, the correspondence letters and then I found

5    another weapon in the trunk and I secured them in my

6    vehicle.

7        Q.    Okay.  He admitted to you that he had lied at

8    that point in time.  I don't know what the procedure is.

9    At that point do you re-interview him or what do you do

10   after that?

11       A.    Well, my intention was to re-interview him --

12       Q.    Uh-huh.

13       A.    -- but I wanted to -- I wanted to deal with the

14   underwear allegation.

15       Q.    Uh-huh.

16       A.    So I asked him there at the car, "Did you lie

17   to me about not having a code or a key to access the

18   safe".

19             And he said, "I did".

20             He gave me the key.  I said, "Is there female

21   underwear in your safe".

22             And he said, "Yes".

23             So we went back to the residence, opened the

24   safe and I found the underwear and some more letters and

25   photographs.  Again I didn't know at the time that it

Randy Knight                                    May 19, 2021

Page 47

1    -- these are correspondence that you did find during

2    your investigation?

3        A.   Yes.

4        Q.   And this is correspondence written by Mr.

5    Redeagle to Ms. Garland; is that correct?

6        A.   Yes.

7        Q.   Okay.  And all of these would violate the PREA

8    Act; correct?

9        A.   Yes.

10       Q.   That would be a Prison Rape Elimination Act;

11   correct?

12       A.   Yes.

13       Q.   Okay.  After April 3rd, did you ever have

14   another chance to re-interview Deputy Warden Redeagle?

15       A.   I don't believe I interviewed him a third time.

16       Q.   Okay.  You interviewed him twice on the April

17   3rd; correct?

18       A.   Correct.  I did make contact -- I did contact

19   him and request a third interview and he declined.

20       Q.   Okay.  There was reference in here about --

21   something about taking a polygraph test.  Was that ever

22   done?

23       A.   No.

24       Q.   Okay.  Did he decline that too or do you

25   recall?

Randy Knight                                          May 19, 2021

Page 49

1      A.     There's an employee lounge.  So that's where

2    she was assigned.  So just through conversation.

3      Q.    Okay.  Are -- is the deputy warden supposed to

4    kind of engage in idle chitchat or just visiting with

5    inmates?

6      A.    There's no violation against that.

7      Q.    Okay.  Okay.  Is there some point where that

8    would cross a line or not?

9              MR. JOSEPH:  Object to the form.

10             THE WITNESS:  If the conversation began to

11   be intimate, yes.

12     Q.    (BY MR. DALTON)  Okay.

13     A.    Having conversations about her family or, you

14   know, about what she was going to do after prison

15   there's nothing inappropriate about that, but...

16     Q.    Okay.  What about if you're -- what if a prison

17   official or prison -- just a staff is going out of the

18   way just to eat lunch and just have chitchat with an

19   inmate.  Is that inappropriate?

20     A.    If it's determined that that employee

21   intentionally went to an area to communicate with an

22   inmate, yes.

23     Q.    Okay.  Even if it's innocuous chitchat, if

24   they're doing that on purpose to meet that person, that

25   would be wrong?

```
1               MR. JOSEPH:  Object to the form.

2               THE WITNESS:  It would depend on the

3    circumstances.

4        Q.   (BY MR. DALTON)  Okay.  What about in this case

5    if Deputy Warden Redeagle had manipulated Ms. Garland's

6    work schedule so that he had more contact with her,

7    would that have been wrong?

8        A.   Yes.

9        Q.   What if he had delayed calling for rollcall or

10   called her at different times for rollcall, so he could

11   just have more time with her?  Would that have violated

12   Department of Corrections standards?

13       A.   In this particular case, yes.

14       Q.   Okay.  If those sort of things has been noticed

15   by other employees of the Department of Corrections,

16   would you expect them to -- are they expected to write

17   that up or notify the warden of unusual activity?

18               MR. JOSEPH:  Object to the form.

19               THE WITNESS:  If an employee observes a

20   policy violation, they're required to author an incident

21   report.

22       Q.   (BY MR. DALTON)  Okay.

23       A.   If they have suspicions, they're not really

24   required.  They're not required --

25       Q.   Okay.
```

Randy Knight                                      May 19, 2021

                                                     Page 52

1      you believe?

2          A.    Yeah.  We -- yes.  We found two videos.

3          Q.    Very good.  And then can you read this -- the

4      very last paragraph on this?

5          A.    Page 6?

6          Q.    Page 6, yeah.

7          A.    "On the first occasion, Garland reported she

8      and Redeagle engaged in a kiss and Redeagle had rubbed

9      her buttocks outside of her clothing."

10         Q.    Do you have any reason to dispute that that

11     happened?

12         A.    No.

13         Q.    Your evidence seems to suggest that it did

14     happen; correct?

15         A.    My evidence placed Mr. Redeagle in a room alone

16     with Inmate Garland.

17         Q.    Okay.  What you just read would clearly violate

18     everything in the PREA Act; correct?

19              MR. JOSEPH:  Object to the form.

20     Everything.

21              MR. DALTON:  You're right, counselor.

22         Q.    (BY MR. DALTON)  The paragraph you just read

23     would violate the PREA Act; correct?

24         A.    Yes.

25         Q.    It would also be a violation of Oklahoma

Randy Knight                                    May 19, 2021

Page 54

1   happen as written?

2        A.   No.

3        Q.   Again that's a violation of all -- of Oklahoma

4   Department of Corrections policies and procedures and a

5   violation of the Prevention of Rape Elimination Act;

6   correct?

7        A.   Yes.   Prison Rape Elimination Act.

8        Q.   Yeah.   Prison Rape -- I'm sorry.  And you would

9   expect every staff member to be aware that that -- what

10  you just read would violate both of those; correct?

11       A.   Yes.

12       Q.   The next paragraph says, "Garland denied she

13  and Redeagle engaged in sexual intercourse or performed

14  additional sexual acts".   That doesn't matter as far as

15  the Prison Rape Elimination Act, does it?

16       A.   No, sir.

17       Q.   Kissing, groping, grabbing each other -- that

18  is a violation of the act; correct?

19       A.   Yes.

20       Q.   And because she's an inmate, Garland cannot

21  give her consent for this to happen; is that correct?

22       A.   Yes.

23       Q.   Meaning this is akin to like a statutory rape,

24  where an inmate cannot give their consent for any sort

25  of sexual activity or groping or grabbing; correct?

Randy Knight                                    May 19, 2021

Page 60

1      Q.   So you were called in on April 3rd, 2019, and

2    you interviewed Mr. Redeagle a couple of times that day.

3    How long until your interviews were wrapped up do you

4    think?

5      A.   I attempted to interview Chris Redeagle one

6    more time, contacted him by phone.  That would have been

7    the last time I had done anything as far as interviewing

8    him on the case, I believe.

9      Q.   Okay.  Was there any -- did you go back to try

10   to interview any workers at Eddie Warrior Correctional

11   Center, any staff or anything like that?

12     A.   I don't recall.

13     Q.   Okay.  You were with Warden McCoy the whole

14   time, correct, or you were with her when you interviewed

15   Mr. Redeagle?

16     A.   I was with Warden McCoy at the vehicle and at

17   the residence.

18     Q.   You know, I keep saying that.  I had forgotten

19   there was two wardens or something funny at that time;

20   is that right?

21     A.   Yes.

22     Q.   And one of them is Warden McCoy and there's

23   also Natalie -- and I forget her last name.

24     A.   Cooper.

25     Q.   Cooper.  So with Warden McCoy, you were with

Randy Knight                                          May 19, 2021

Page 61

1    her while you were going through the car and the

2    residence?

3         A.    Correct.

4         Q.    Did you have any individual discussions or do

5    you remember any discussions with Warden McCoy during

6    that time?

7         A.    I don't recall what we spoke about.

8         Q.    Okay.  Did she bring you up to speed on

9    anything about Redeagle or Garland during that time?  Do

10   you remember?

11        A.    I don't believe I spoke with anybody, other

12   than them handing me documents when I first arrived

13   there.  I didn't really have time to sit down and do a

14   briefing on the situation.

15        Q.    Okay.  What about afterwards?  Did you have a

16   chance to visit with Warden McCoy with what had happened

17   or wrap up or anything like that?

18        A.    I believe I interviewed her -- I interviewed

19   her at some point in the investigation, I believe, after

20   I was asked to interview her by my supervisor.

21        Q.    Okay.  And I do know there's a reference to her

22   in your report, which is Exhibit No. 2.  It seems like

23   she had failed to report or pass on something.  Look

24   through your Exhibit No. 2 and I'll see if I can find it

25   mine.

1       A.     It's on Page 9.

2       Q.     Thank you.  On the very bottom, is that where

3   you're looking?

4       A.     Yes.

5       Q.     Can you just read that bottom paragraph for me?

6       A.     "Agent Knight conducted an informal interview

7   with Warden Sharon McCoy at the Jess Dunn Correctional

8   Center.  Warden McCoy confirmed she had not reported the

9   initial PREA complaint filed against employee

10  Christopher Redeagle, regarding a reported inappropriate

11  relationship with Inmate Laurie Garland through the

12  Region I Office or OFAI.  McCoy advised she had

13  forgotten to report the allegations as required."

14      Q.     Okay.  Any time there's an allegation like

15  that, that's supposed to be reported; is that correct?

16      A.     Yes.

17      Q.     Okay.  What should Warden McCoy have done?

18      A.     She should have taken the statements from the

19  individuals that were filing the complaint.  Those

20  statements are sent to a Region -- back the a Region I

21  Office, which would have been her supervisor.  They

22  forward them to the Inspector General's Office -- the

23  OFAI back then -- and it's assigned an investigation.

24      Q.     So when there's a report made, it goes outside

25  of Eddie Warrior above that to the inspector general; is

Randy Knight                                          May 19, 2021

Page 63

1    that correct?

2         A.   Yes.

3         Q.   Okay.  So if Eddie Warrior received the

4    complaint and then they just tried to handle it

5    in-house, without going outside of that, that would be

6    improper; is that correct?

7                   MR. JOSEPH:  Object to the form.

8                   THE WITNESS:  I don't know how to answer.

9    It wouldn't be improper if they conducted an inquiry,

10   which I believe they did.  But then failure to report it

11   to the Regional I Office to get to us was a violation.

12        Q.   (BY MR. DALTON)  Okay.  It's the reporting

13   that's the violation?

14        A.   Correct.

15        Q.   Or the failure to report is the violation?

16        A.   Yes.

17        Q.   Okay.  Someone like defendant Redeagle, he has

18   a lot of power or authority or he did over at Eddie

19   Warrior Correctional Center; correct?

20        A.   Yes.

21        Q.   And especially if you're an inmate.  We're in

22   agreement, inmates are stripped of basically all their

23   rights and those are provided for them by the jail or

24   correctional facility; correct?

25        A.   Could you be more specific when you're talking

Randy Knight                                          May 19, 2021

Page 64

1    about their rights?

2        Q.    Yeah.  Or their ability to support themselves

3    or take care of themselves.  I mean, they're relying on

4    the facility for food; correct?

5        A.    Not necessarily.

6        Q.    Can inmates go to like McDonald's and buy a

7    hamburger or cook their own meals or go grocery

8    shopping?

9        A.    Well, they can go grocery shopping and they do.

10   They have a -- they have a food vendor there -- a

11   canteen, if you will -- that sells chips, sandwiches,

12   pop, milk.  They can buy through the canteen and they

13   can also be provided meals through the State, through

14   the facility.  So they can get meals two ways.

15       Q.    How do they get money to buy those meals?

16       A.    So the money sent through to their books, which

17   is their inmate account.  So they could have friends,

18   associates send money through a system, it's put on the

19   books and then they take -- they go down to the

20   commissary and they buy their -- purchase their items

21   and that money is taken off of their books.

22       Q.    If they're working -- I know they're working

23   jobs.  Are they able to make enough money working jobs

24   at the jail to purchase this food and things like that

25   to support themselves?

Randy Knight

May 19, 2021

Page 65

1      A.    Some of the inmates get paid to do jobs at the

2    facility.  I don't -- I can't recall the amount.

3      Q.    Uh-huh.

4      A.    But inmates that are without money can request

5    different things through the facility, if they don't

6    have an outside source to gain any money.

7      Q.    Okay.  In your opinion, you think that inmates

8    don't require or they're not reliant upon the

9    correctional facility providing them food; is that

10   correct?

11     A.    My response to that would be that they can get

12   food two ways:  Yes, the facility is required to feed

13   them, but a lot of the inmates don't eat facility food.

14   They will purchase their own food and eat that in lieu

15   of the facility food.

16     Q.    Does the facility provide them shelter?

17     A.    Yes.

18     Q.    They're not allow today live wherever they

19   want.  They're incarcerated; correct?

20     A.    Correct.

21     Q.    They don't have a right to carry a gun when

22   they're in there or a knife or some sort of device like

23   that to protect themselves, are they?

24     A.    No.

25     Q.    They're reliant upon the facility to provide

Randy Knight                                      May 19, 2021

Page 66

1    protection to them; correct?

2        A.   Yes.

3        Q.   As far as getting up and regulating their day,

4    again they're regulated by the facility to a large

5    degree, aren't they?

6        A.   Yes.

7        Q.   Inmates probably don't want to get on the wrong

8    side of facility.  I think, it would make their life

9    miserable.  Do you agree with most inmates want to stay

10   on the right side of the facility --

11               MR. JOSEPH:  Object to the form.

12       Q.   (BY MR. DALTON)  -- of the staff?

13       A.   I would say yes.

14       Q.   Okay.  Somebody like a -- like Deputy Warden

15   Redeagle could make an inmate's life hard, if he wanted

16   to, couldn't he --

17       A.   Yes.

18       Q.   -- more uncomfortable?  This -- the staff has

19   much more power than the inmates; correct?

20       A.   Yes.

21       Q.   If you look at just the dynamics, that's why

22   there can't be a true relationship between a staff

23   member and an inmate, due to the power structure being

24   so divergent; correct?

25       A.   Yes.

Page 67

1      Q.    When you first went to look into this matter,

2   you didn't want Deputy Warden Redeagle to know that he

3   was going to be interviewed before he was, because you

4   didn't want him going to intimidate a witness; correct?

5      A.    My thought was I didn't want him to have any

6   contact with her at all.

7      Q.    Right.   Okay.

8      A.    I had no information to suggest that he was

9   intimidating her or there was anything more.   I just

10  didn't want him to have contact with the inmate.

11     Q.    Intimidation could be a concern in a case;

12  right?   Not that it would occur, but it's something that

13  you would not want to have happen; correct?

14     A.    Correct.

15     Q.    Okay.   And somebody in a position of power a

16  lot of times can coerce or have power over somebody in a

17  much lesser position, like an inmate?

18             MR. JOSEPH:   Object to --

19             THE WITNESS:   Yes.

20             MR. JOSEPH:   -- the form.

21     Q.    (BY MR. DALTON)   As a deputy warden, did Mr.

22  Redeagle -- he had an ability to control hours that

23  people worked or hours that he worked?

24     A.    To some degree, yes.

25     Q.    Okay.   He had the ability or the power to a

Randy Knight                                           May 19, 2021

Page 68

1   degree to kind of treat policies seriously or treat

2   policies laxly.  He kind of set a tone, didn't he, for

3   Eddie Warrior Correctional Center?

4       A.   I can't --

5            MR. JOSEPH:  Object to form.

6            THE WITNESS:  -- answer that.

7       Q.   (BY MR. DALTON)  Okay.  That's fine.  And if

8   you can't, just tell me.  I'm just asking.

9       A.   Yeah.  I can't.

10      Q.   As deputy warden he would have the ability to

11  manipulate or control to a degree how often he would run

12  into or didn't run into someone, like Laurie Garland;

13  correct?

14      A.   You're asking if he had control --

15      Q.   Yeah.

16      A.   -- to do that?  Yes.

17      Q.   Okay.  And he could kind of manipulate her work

18  schedule or where she was supposed to be so that he

19  could again, if he wanted to, run into her or be with

20  her; correct?

21      A.   Yes.

22      Q.   I think there was a lot of talk in the prison

23  yard about Deputy Warden Redeagle and Inmate Garland

24  talking or speaking together or visiting.  Were you

25  aware of that at all?

Randy Knight                                         May 19, 2021

Page 69

1      A.   Yes.

2      Q.   Okay.   Deputy Warden Redeagle would have had

3   the ability to make that happen; correct?

4      A.   Yes.

5      Q.   That would have been improper for him to do so;

6   correct?

7      A.   If the purpose was to engage in a relationship,

8   yes.

9      Q.   Okay.   Very good.   Is that something that

10   Warden McCoy or Warden Cooper should have been aware of?

11           MR. JOSEPH:   Object to the form.

12           THE WITNESS:   I believe at some point

13   Warden McCoy was made aware of it.

14      Q.   (BY MR. DALTON)   Okay.   And you would expect a

15   warden to look into that if they become aware of it;

16   correct?

17      A.   Yes.

18      Q.   You would expect them to treat it seriously?

19      A.   Yes.

20      Q.   And you would them to report that to the

21   Inspector General's Office?

22      A.   Yes.

23      Q.   Okay.   Likewise if just general staff at Eddie

24   Warrior Correctional Center was aware that a staff

25   member and an inmate were meeting on some regular basis

Randy Knight                                          May 19, 2021

Page 70

1    or greater than normal frequency, you would expect that

2    to be reported or an incident report made out?

3         A.   Yes.

4         Q.   Okay.  And if an incident report like that gets

5    made out, again that gets reported up to the Inspector

6    General's Office?

7         A.   Well, the incident would have been sent to the

8    chief of security and then to the warden or the deputy

9    warden.

10        Q.   Okay.  So it could have gone to Mr. Redeagle,

11   but then they were supposed to send that up on the chain

12   to the Inspector General's Office?

13        A.   Yes.  Yes.

14        Q.   Okay.  It would not be unusual for an inmate to

15   be very reticent or reluctant to say anything negative

16   against the deputy warden, wouldn't it?

17        A.   I'm sorry.  One more time.

18        Q.   Yeah.  It would be understandable for an inmate

19   not to want to bad mouth or say anything negative about

20   the deputy warden to a staff member; is that correct?

21             MR. JOSEPH:  Object to the form.

22             THE WITNESS:  I would say no.

23        Q.   (BY MR. DALTON)  Really?  How come?

24        A.   Because of my access to the facility, the

25   inmates constantly send up incident reports or complain

Page 74

1    they find that Mabel Bassett Correctional Center is one

2    of the highest instances of rape or violations of PREA

3    in the United States?  Do you remember reading anything

4    about that?

5         A.   Yes.

6              MR. JOSEPH:  Object to the form.

7         Q.   (BY MR. DALTON)  Okay.  Do you remember what

8    time frame that was taking place in?

9         A.   That would have been -- I don't recall the

10   year.

11        Q.   Do you recall approximately?

12        A.   I would say 2018, maybe 2017.

13        Q.   Okay.  Eddie Warrior also had a higher than

14   normal instances of PREA violations, didn't they?

15             MR. JOSEPH:  Same objection.

16             THE WITNESS:  Define normal.

17        Q.   (BY MR. DALTON)  Well, if you looked on a

18   national standard, they would have more than you would

19   expect?

20        A.   I mean, I really can't answer that, because

21   there's a whole different -- there's a whole different

22   -- there's various forms of the complaints --

23        Q.   Okay.

24        A.   -- verbal -- so I would say I don't know.

25        Q.   Okay.  Is the Department of Corrections, was it

Randy Knight                                          May 19, 2021

Page 76

1      Q.   Okay.  Okay.  Yeah.  I do show 2018 efficiency

2   review of Oklahoma Department of Corrections by U.S.

3   Department of Justice found understaffing.  Are Mabel

4   Bassett or Eddie Warrior understaffed, to your

5   knowledge?

6      A.   I don't know what the staffing is.  I couldn't

7   answer that.

8      Q.   That's fine.  Just in your experience, do you

9   think that having more staff helps to prevent PREA

10  violations?

11     A.   No.

12     Q.   Do you think that more staff there is, the more

13  able they are -- let's just say about staff PREA

14  violations:  The more people working there, the more

15  likely it is that staff can't be alone with inmates or

16  they will be discovered?

17     A.   No.

18     Q.   Okay.  So in your mind, is there any

19  correlation between staffing and finding out or

20  preventing PREA violations?

21     A.   It's training the staff and training the

22  inmates in the end.

23     Q.   Okay.

24     A.   Those kind of occurrences can happen inside of

25  a cell, outside of the view of an employee.

Randy Knight                                          May 19, 2021

Page 79

1        Q.   What would alert them that there was abuse

2   occurring?

3        A.   Most cases inmates -- inmates will tell the

4   staff if something is going on.

5        Q.   If the inmate is not reporting anything or is

6   staff trained to look for anything else or do they wait

7   until the inmate makes some sort of a report?

8        A.   I can't answer what the other -- so I would say

9   I don't know.

10        Q.   And that's fine.  I'm just exploring thoughts

11   with --

12        A.   Okay.

13        Q.   -- you and I'm trying to find out what you know

14   and what you don't know.

15        A.   Okay.

16        Q.   Do you know if because of this incident that

17   Eddie Warrior made any adjustments to their policies?

18        A.   I don't know.

19        Q.   Are there any adjustments to policies that you

20   think should have been made based upon this occurrence?

21        A.   I would say no.

22        Q.   Do you or -- do you meet with anybody at the

23   DOC to review incidents and adjustments and what they

24   could do to prevent things like this in the future just

25   in general?

Randy Knight                                        May 19, 2021

Page 85

1    cases I have worked, the female victims that I had that

2    were engaging in consensual act with an employee didn't

3    inform me that they were scared or concerned about

4    moving -- other than -- other than they were concerned

5    whether they were going to be written up or some kind of

6    violation.

7         Q.    They were concerned that they might get in

8    trouble by the jail or by the staff of the jail?

9         A.    But -- yes.  But they're informed that they

10   can't happen.  We control that.  So we control -- our

11   reports control what happens to the inmate.

12        Q.    You control that, because you're outside of the

13   individual facility.  If you're reporting on a deputy

14   warden who basically controls a lot of the facility, you

15   might have that worry, would you not?

16        A.    No.  Because we would ensure that the deputy

17   warden -- if there was a complaint filed against him, he

18   would be removed from that position.

19        Q.    Okay.  As soon as a complaint was made?

20        A.    Yeah.  Well --

21        Q.    Okay.

22        A.    -- if it's a -- if a complaint that they feel

23   is a valid complaint --

24        Q.    Uh-huh.

25        A.    -- they remove him until there's an inquiry.

Randy Knight                                          May 19, 2021

Page 87

1    that there was abuse.

2         Q.   Okay.

3         A.   Yes.  I would say yes.

4         Q.   Okay.  Are there any ways for an inmate to

5    report abuse or suspected abuse to a non-DOC personnel

6    or agencies?

7         A.   Inmates can contact family.  They can call a

8    hotline.

9         Q.   Okay.

10        A.   We have a -- we have -- one of our agents is

11   assigned to monitor that 24 hours a day.  Any calls that

12   comes in is reported.  They review them daily and then

13   we respond to these complaints, if it's what -- once we

14   contact the facility.

15        Q.   Okay.  Let's see, I think we already answered

16   this, but staff is required to report all suspected

17   sexual abuse or improper relationships; is that correct?

18        A.   Yes.

19        Q.   In this case with Ms. Garland, what steps did

20   you take to protect her from further sexual harassment

21   or abuse?

22        A.   My interview with her, I gave her information

23   that she could contact me.  By policy I'm required to

24   ensure that I feel like that she's safe where she's at.

25   If I don't feel like she's safe, then I can have her

Randy Knight                                    May 19, 2021

Page 89

1    witness when she spoke with you?

2         A.   Yes.

3         Q.   You didn't give her a polygraph or anything,

4    did you?

5         A.   No.

6         Q.   Did you feel any need to do that?

7         A.   I wouldn't have.

8         Q.   Okay.  In your mind, did any staff actions or

9    failures to act contribute to this abuse?

10        A.   I would say no.

11                  (Exhibit 8 marked for identification and

12                  made a part of the record.)

13        Q.   (BY MR. DALTON)  I'm going to mark something as

14   Exhibit No. 8 and give it to you here.  It's going to be

15   Bates stamped 5920 through 5922 -- 23.  Again this is

16   subject to nondisclosure, as we've already discussed and

17   ask if you've seen this before, if you'll review them.

18              MR. DALTON:  Can you pass these down to

19   him?  Do you mind just looking over his shoulder?  Thank

20   you.

21              THE WITNESS:  I don't recall whether I've

22   seen this or not.  If it was in my investigation report

23   or my attachments, but I don't recall this specific --

24        Q.   (BY MR. DALTON)  Okay.  What about on the last

25   page of this, there's -- it's marked 5922 the way

Randy Knight                                    May 19, 2021

Page 93

1   putting in here.  So I would have interviewed her first

2   and then I would have spoke with the warden or the chief

3   to find out if there had been any more allegations made.

4          Had there been more allegations made, I would

5   have interviewed those inmates or staff members that had

6   been involved and if it looked like there was something

7   to what was going on, I would have sent that information

8   into my boss to have a full and formal investigation

9   conducted.

10      Q.   Would you -- will you have interviewed just any

11   other inmates, you know, housing with or around Ms.

12   Garland?

13      A.   No.

14      Q.   Would you have done anything for Ms. Garland to

15   potentially remove her from the deputy warden at this

16   point?

17      A.   Well, you're going to have to be more specific

18   when that would have occurred.

19      Q.   If you had received this back on March 18th,

20   2019, would you have spoken with Ms. Garland about this?

21      A.   I would have interviewed Ms. Garland.

22      Q.   Would you have given any assurance of safety or

23   protection or anything from Mr. Redeagle --

24      A.   Yes.

25      Q.   -- Deputy Warden Redeagle?  Yes?

Randy Knight                                    May 19, 2021

Page 96

1    Forensic --

2         Q.   Anything.

3         A.   -- evidence or --

4         Q.   For example, I think you found letters?

5         A.   Yes.

6         Q.   I want to know what you found that you

7    considered evidence to support what you had been told by

8    her.

9         A.   Photographs, correspondence letters and

10   underwear --

11        Q.   Okay.

12        A.   -- and a video.

13        Q.   You're right.  Anything else?

14        A.   I don't recall.

15        Q.   Do you know where that evidence is kept or not?

16        A.   Yes.  It's supposed to be in Lexington.  We

17   have an evidence room there.  So there's -- that's where

18   it should be.

19        Q.   Okay.  Do you know if this -- is it being held

20   by the DA or by your office?

21        A.   We have an evidence office.

22        Q.   The Departments of Corrections or the

23   investigative office does?

24        A.   The Inspector General's Office does.  We have

25   our own evidence tag.

Randy Knight                                    May 19, 2021

Page 101

1   deputy warden in this case, and he's removed, I mean,

2   she's protected.

3       Q.   Okay.  Before he's removed though, I guess, do

4   you have a worry of staff retaliation, if she's made a

5   complaint?

6               MR. JOSEPH:  Object to the form.

7               THE WITNESS:  I couldn't say whether -- I

8   mean, I'm always -- again I'm always worried.  If it

9   would happen, then I would deal with it, but I don't

10  necessarily think I have a concern about it.

11      Q.   (BY MR. DALTON)  Okay.  It seems to me that I

12  read somewhere that the DOC has a duty to provide a

13  safe, humane and secure environment for all inmates.

14  There's a zero tolerance of staff sexual misconduct and

15  harassment of inmates.  Do you think that's true?

16      A.   Yes.

17      Q.   You've investigated other instances of staff

18  misconduct, sexual misconduct or harassment of inmates;

19  correct?

20      A.   Yes.

21      Q.   Where would be the documentation of those other

22  investigations?  If I want to find out who they were or

23  where they were or what was found out, how -- what would

24  I ask?

25      A.   You would contact -- we have a database called

Randy Knight                                    May 19, 2021

Page 104

1    Center.

2         Q.   Do you know what was paid out on that lawsuit?

3         A.   The inmates -- I was informed the inmates

4    withdrew their lawsuit that I mentioned.

5         Q.   Okay.  Do you know -- does it -- do you know

6    how much the DOC pays out to inmates for lawsuits for

7    PREA violations yearly or anything?

8         A.   I do not.

9         Q.   Okay.  Once Redeagle resigned, was any more

10   investigation done into him and what he had done or did

11   the investigation then stop?

12        A.   Again I -- I interviewed Warden Sharon McCoy.

13   I obtained the videos, reviewed the videos.  I attempted

14   to interview Chris Redeagle again and he declined and I

15   believe I spoke to Laurie Garland again shortly after

16   that.

17        Q.   Warden McCoy, what did she tell you in that

18   interview.

19        A.   I don't recall.  I -- I believe if I remember

20   correctly in the report she said that -- she said that

21   she forgot to send the information up for request.

22        Q.   I saw that in your report, too.  Do you

23   remember anything else she would have told you in that

24   interview?

25        A.   I don't recall.

Randy Knight                                          May 19, 2021

Page 106

1      A.    April 2nd, it looks like.

2      Q.    So are we in agreement that even after Eddie

3  Warrior was made aware something potentially was going

4  on, which was back in March; correct?

5      A.    Are you asking me -- I guess, I'm trying -- so

6  they did an inquiry in March.

7      Q.    Okay.

8      A.    I was aware they did an investigation --

9  inquiry, as they called it -- by the chief of security

10 and that was directed by Warden Sharon McCoy.

11     Q.    But even after that though, it looks like

12 Deputy Warden Redeagle continues to do improper

13 correspondence.   Would you agree with that?

14     A.    Well, the letter itself is inappropriate, so...

15     Q.    So the Eddie Warrior investigation does not

16 appear to have stopped his inappropriate conduct?

17     A.    No.

18     Q.    Deputy Warden Redeagle did have the power to

19 manipulate or use the storage area without any

20 compliance or monitoring; correct?

21     A.    Yes.

22     Q.    He also had the ability to go through

23 plaintiff's residence or cell; correct?

24     A.    Yes.

25     Q.    He had the ability to call her late to roll

1    Q.   Okay.  We also talked about Ms. Cooper.  Was

2   one of them more in charge than the other or was one of

3   them -- was McCoy on her way out it sounds like or

4   transferring or do you remember?

5    A.   No.  Warden McCoy is still the warden over

6   at -- she's now the warden over at Jess Dunn

7   Correctional Center, but she was directed to respond to

8   there to be the interim warden until she was officially

9   announced as the warden.  So she was basically the

10   warden of both facilities and then they brought in Ms.

11   Cooper.

12    Q.   Okay.  I got it.

13         MR. DALTON:  We're at an hour and 15

14   minutes, I take it.  Can we take a short break?

15         MR. JOSEPH:  Sure.

16         (Recess taken.)

17         MR. DALTON:  Back on the record.

18    Q.   (BY MR. DALTON)  You're still under oath.

19   You're aware of that, Agent Knight?

20    A.   Yes, sir.

21    Q.   I never asked you at the start, what's your

22   age?

23    A.   52.

24    Q.   52?

25    A.   Uh-huh.

Randy Knight                                           May 19, 2021

                                                    Page 111

1        Q.   Okay.  Have you --

2        A.   I can't answer that.

3        Q.   Have you heard any reason why she got

4   transferred to the other facility?

5        A.   It was an open spot.

6        Q.   Is it a bigger or better position?

7        A.   I believe that it has more of -- more of a pay

8   increase --

9        Q.   Okay.

10       A.   -- for the size of the facility, yes.

11       Q.   Okay.  Would you agree for the Oklahoma

12  Department of Corrections that sexual assault or

13  harassment by guards or deputy wardens is a continual

14  problem in Oklahoma?

15            MR. JOSEPH:  Object to the form.

16            THE WITNESS:  I would say yes.

17       Q.   (BY MR. DALTON)  Sure.  Do you know -- does the

18  Department of Corrections have any cure or anything to

19  try to prevent it in the future?

20       A.   I'm not aware of any.

21       Q.   You met Deputy Warden Redeagle; correct?

22       A.   Yes.

23       Q.   Is he physically intimidating if you --

24       A.   Yes.

25       Q.   He's a big guy, in other words?