Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

LAURIE GARLAND, an individual, )
                               )
          Plaintiff            )
                               )
v.                             ) CIV-2020-306-RAW
                               )
STATE OF OKLAHOMA EX REL       )
OKLAHOMA DEPARTMENT OF         )
CORRECTIONS, CHRISTOPHER       )
REDEAGLE, individually; SHARON )
MCCOY, individually; JOE       )
ALLBAUGH, individually; PENNY  )
LEWIS, individually; RABEKAH   )
MOONEYHAM, individually;       )
HEATHER CARLSON, individually; )
BOARD OF CORRECTIONS,          )
                               )
          Defendants.          )

DEPOSITION OF

BRYAN COX

HELD IN TULSA, OKLAHOMA

ON JULY 2ND, 2021

Prepared by:  DEBORAH S. (DEBI) REINHARDT, CCR, CSR

Bryan Cox                                    July 2, 2021

Page 25

 1   of 'em go missing?

 2        A.   Correct.

 3        Q.   And also make sure that they're in the

 4   correct area.  That they're not in the wrong area of

 5   the facility?

 6        A.   Correct.

 7        Q.   Was there -- did you have problems daily or

 8   weekly or monthly with counts or people not being

 9   where they're supposed to be at the Eddie Warrior

10   Correctional Facility in 2018 or '19?

11        A.   No.

12        Q.   Okay.  You said monitoring security was

13   another thing.  Did you have problems with the

14   security or the people that you're monitoring 2018

15   or '19?

16        A.   Not that I recall.

17        Q.   Okay.  And when you say monitoring security

18   was one of the things you were really concerned

19   with, does that mean making sure that they're doing

20   their job or that they're showing up, or how they're

21   treating the inmates?  Or what exactly does that

22   mean?  Your staffing levels?

23        A.   All the -- all the above.

24        Q.   Okay.  Did you ever feel like you could have

25   used more staff as the chief of security?

Bryan Cox                                    July 2, 2021

Page 26

1      A.   Yes, of course.

2      Q.   Okay.  You feel you could have used a better

3   trained staff while chief of security?

4      A.   No, I wouldn't necessarily say that.

5      Q.   Okay.  While you're chief of security, did

6   you ever run into an incident of -- of PREA

7   violations?

8      A.   Yes.

9      Q.   Okay.  2018, 2017 how often would you -- did

10   you run across PREA violations at the Eddie Warrior

11   Correctional Facility?

12      A.   I couldn't give you an exact number.

13      Q.   Weekly?  Daily?  Monthly?

14      A.   If I had to pick between those three, I

15   would probably say monthly would be more accurate.

16      Q.   During your time as chief of security, did

17   you run into problems with guards or Department of

18   the Corrections employees sexually abusing or

19   harassing inmates?

20      A.   Repeat that one more time.

21      Q.   During your time as chief of security at

22   Eddie Warrior Correctional Facility, did you run

23   into issues with guards or Department of Corrections

24   employees harassing or sexually abusing inmates?

25      A.   Are you asking about accusations or?

Bryan Cox                                    July 2, 2021

Page 28

1    would have been handled.

2         A.  If you're meaning referred out, like,

3    bringing in an outside person that would not be

4    under the purview of what I do as chief.   That's

5    the facility head decision.

6         Q.  Okay.  So you would try to handle it

7    yourself whenever complaints came in?

8         A.  I did do what they call inquiries which is

9    just like collecting of information, and stuff like

10   that.  But that was under the direction of my

11   supervisor.

12        Q.  Meaning the deputy warden and the warden?

13        A.  Yeah.  They would ask you to do that.

14        Q.  Okay.  So if a complaint or an accusation

15   came in where you would confer with either the

16   warden or the department warden.  And then if they

17   instructed you to then you do an inquiry and

18   collect -- collect evidence?

19        A.  Statements.

20        Q.  Would you ever just do an inquiry or collect

21   that evidence without consulting with the deputy

22   warden or the warden?

23        A.  No.

24        Q.  What about there's a -- there's a branch, I

25   think, of DOC called the fugitive apprehension and

Bryan Cox                                    July 2, 2021

Page 29

1   investigation division.

2        Are you aware of that?

3        A.   Yes.

4        Q.   Would you ever call -- you personally as

5   chief of security, would you ever call them in and

6   bounce ideas off them of get them involved?

7        A.   No.

8        Q.   If they needed to be involved, that was come

9   from?

10       A.   Warden.

11       Q.   So the investigation in what to do on any

12  accusations really is up to the warden how little or

13  how much to investigate; is that correct?

14       A.   I -- yes.

15       Q.   Okay.  You're not taking an initiative on

16  your own to investigate or do any of this.  You're

17  waiting to see what the warden tell you to do or

18  gives you instructions to do; correct?

19       A.   Correct.

20       Q.   Is there anything proactively that you're

21  doing at all times while chief of security to head

22  off any sort of sexual misconduct by staff against

23  inmates?

24       A.   Yes.

25       Q.   Okay.  Such as what?

Bryan Cox                                           July 2, 2021

Page 31

1        A.  Correct.

2        Q.  And that you'd be able to track the movement

3    of both staff and of inmates; correct?

4        A.  Correct.

5        Q.  Okay.  Are there holes in that camera

6    system, or does it cover everything pretty well?

7        A.  I couldn't say there was a hundred percent

8    coverage.

9        Q.  Okay.  Was -- were you -- as chief of

10   security did you want it to be a hundred-percent

11   coverage?

12       A.  That would be a good thing, I guess.

13       Q.  That would help prevent it; is that correct?

14   Sexual abuse; correct?

15       A.  Yes.

16       Q.  Welfare checks, I don't know what that means

17   exactly.

18       Tell me what a welfare check is.

19       A.  A welfare check, I guess, best be described

20   as just a -- it's not a formal count.  It's just a

21   general observation by the security staff, like,

22   they walk through their assigned areas and just make

23   sure that there's no issues and no concerns.

24       Q.  Does that happen on a daily?  Weekly?

25   Monthly?  Yearly?  How often do you welfare checks

Bryan Cox                                           July 2, 2021

                                                         Page 36

1        A.   Chris Redeagle.

2        Q.   Okay.  And you reported to him?

3        A.   Yes.

4        Q.   Okay.  As Deputy Warden, he had the ability

5    to control day-to-day workings of staff and inmates;

6    is that correct?

7        A.   Yes.

8                      MR. JOSEPH:  Object to the

9    form.

10                     THE WITNESS:  Yes.

11       Q.   (MR. DALTON):  Thank you.

12       While you're chief of security at Eddie Warrior

13   Correctional Facility, did you feel like it was

14   possible to -- to prevent sexual misconduct or

15   harassment from occurring?

16                     MR. JOSEPH:  Object to the

17   form.

18                     THE WITNESS:  I guess I'm

19   really not understanding what you're asking me.

20       Q.   (MR. DALTON):  While you were chief of

21   security at Eddie Warrior Correctional Facility, did

22   you feel like you had the staff or the ability or

23   the equipment to prevent sexual misconduct from

24   occurring -- or sexual harassment of the inmates?

25       A.   So are you asking me if I could prevent 100

Bryan Cox                                              July 2, 2021

Page 44

1    or five days later, the chief of security Bryan

2    Cox -- and that would have been you; correct?

3        A.   Correct.

4        Q.   Interviewed the inmate or Estes regarding

5    the PREA complaint; is that right?

6                        MR. JOSEPH:  Object to the

7    form.

8                        THE WITNESS:  Again, I can't

9    recall specific dates.  I'm just going by what this

10   says right here.

11       Q.   (MR. DALTON):  You don't any reason to

12   dispute that those dates are correct; do you?

13       A.   I do not.

14       Q.   Okay.  Do you remember who asked you to

15   investigate or look into this?

16       A.   I don't recall.

17       Q.   So you don't -- but it would have been

18   either the warden or deputy warden?

19       A.   That was the standard protocol, yes.

20       Q.   Would it have been normal to wait five days

21   to have somebody investigate it?

22       A.   I couldn't speak to that.  Like I said, I

23   just did that they asked me to do.

24       Q.   As chief of security, you're not setting any

25   policy; are you?

Bryan Cox                                          July 2, 2021

Page 45

1              MR. JOSEPH:  Object to the

2  form.

3              THE WITNESS:  Ask me again.

4     Q.  (MR. DALTON):  There's a policy decision in

5  here on how quickly to investigate accusations of

6  sexual misconduct; correct?

7     A.  Yeah.

8     Q.  Is the warden setting that policy or the

9  deputy warden, or are you setting that policy?

10    A.  I did not set that policy.

11    Q.  Do you believe the warden's the one who

12  makes the determination of how quickly or slowly to

13  investigate these accusations?

14    A.  I would say yes.

15    Q.  Okay.  Very good.

16    Before -- you don't remember who asked you to

17  investigate this, but did have you any inkling of

18  any of this going on before you were asked to

19  investigate it?

20    A.  No.

21    Q.  Would -- if there had been a incident or

22  staff report made, would you have been copied on

23  that on March 13 or -- or anything like that?

24             MR. JOSEPH:  Object to the

25  form.

Bryan Cox                                          July 2, 2021

Page 47

1    handwritten notes, would you have turned those over

2    to anybody?

3         A.   Yes.

4         Q.   Who to?

5         A.   Warden.

6         Q.   Which -- which would have been Sharon --

7    Sharon McCoy at the time?

8         A.   Yes.

9         Q.   Okay.  And would you expect Warden McCoy to

10   mold onto those notes and have 'em; is that correct?

11        A.   Yes.

12        Q.   Okay.  Did you ever interview people and not

13   take notes?

14        A.   No.

15        Q.   Okay.  So there would be not prepared by you

16   that would have related to your interviewing Miss

17   Estes; is that correct?

18                   MR. JOSEPH:  Object to the

19   form.

20                   THE WITNESS:  I would assume

21   so.

22        Q.   (MR. DALTON):  Okay.

23        Do you remember -- you don't remember being --

24   or do you remember being asked by either the warden

25   or deputy warden about investigating, looking into

Page 68

1    A.  Other than State-issued clothing.

2    Q.  Okay.  Are -- in your experience as chief of

3  security are prisoners, are they nervous or do

4  they -- do they worry about being retaliated against

5  by Oklahoma Department of Corrections DOC guards or

6  correctional officers?

7                    MR. JOSEPH:  Object to the

8  form.

9                    THE WITNESS:  I'm trying to

10  understand your question.  Are you saying in

11  general?

12    Q.  (MR. DALTON):  Yes.  Do they have a worry if

13  that if they upset a guard or a DOC employee that it

14  could come back to bite them.  That that guard or

15  person might make their life just harder or take it

16  out on them?

17    A.  I guess it's possible for them to worry

18  about that.

19    Q.  Do you -- did you ever run into -- is that a

20  worry of inmates that you've come across or not?

21    A.  In the past, yes.

22    Q.  Okay.  Well, I just say that because I

23  notice the very last sentence on this first page

24  says I'm having overwhelming feelings about being

25  retaliated on by staff including Redeagle.

Bryan Cox                                    July 2, 2021

Page 69

1       Do you see that?

2       A.  Yes.

3       Q.  Is that a valid concern of Ms. Woolsley?

4                   MR. JOSEPH:  Object to the

5   form.

6                   THE WITNESS:  I don't know what

7   you mean by "valid concern."  I mean, it's --

8       Q.  (MR. DALTON):  It's a concern of hers, do

9   you agree?

10      A.  No.

11                  MR. JOSEPH:  Object to the

12  form.

13      Q.  (MR. DALTON):  You don't agree that she had

14  that concern?

15      A.  I agree that she had the concern.  It's --

16          (Multiple parties speaking at the same

17  time.)

18      Q.  -- she Wrote it down; right?

19      A.  Right.

20      Q.  She was worried about it.

21      Okay.  In this concern you've seen other inmates

22  would have concerns such as this if they think if

23  they make the staff mad they might be retaliated

24  against?

25      A.  Yes.

Bryan Cox                                    July 2, 2021

Page 83

1                    MR. JOSEPH:  Object to the

2    form.

3        Q.  (MR. DALTON):  They're supposed to be

4    emotionally uninvolved with inmates; aren't they?

5        A.  I'm not sure exactly what specific question

6    --

7        Q.  Okay.  Are -- are Oklahoma Department of

8    Corrections staff supposed to have a emotional or a

9    friendship type relationship with inmates?

10       A.  I would say no.

11       Q.  Okay.  You never took any steps to protect

12   Laurie Garland at any time while you were the chief

13   security officer; did you?

14                   MR. JOSEPH:  Object to the

15   form.

16                   THE WITNESS:  I would say that

17   would be beyond the purview of my involvement.

18       Q.  (MR. DALTON):  That's fine.

19            You never took any actions to separate

20   Laurie Garland from Deputy Warden Redeagle; correct?

21       A.  Not that I recall.

22       Q.  You never asked for a housing change;

23   correct?

24       A.  No.

25       Q.  You never removed her from any sort of staff

Bryan Cox                                    July 2, 2021

Page 84

1   or work re-assignment?

2        A.   No.

3        Q.   Never ordered a facility change or asked for

4   any of that; did you?

5        A.   No.

6        Q.   You didn't review and retain any video

7   footage regarding any alleged incident; did you?

8        A.   I don't remember.

9        Q.   Do you know was there any retaliation

10  against Miss Garland ever for reporting or

11  discussing these -- or these events?

12       A.   Not to my knowledge.

13       Q.   Did you ever monitor to see if there would

14  be any retaliation against her?

15       A.   Not that I recall.

16       Q.   Did you ever talk to Investigator Knight?

17                  MR. JOSEPH:  Object to the

18  form.

19                  THE WITNESS:  Yeah, I've talked

20  to him.

21       Q.   (MR. DALTON):  Did you ever talk to him

22  about his investigation into Deputy Warden Redeagle

23  and inmate Garland?

24       A.   I wasn't involved in that part of the

25  investigation.

Bryan Cox                                            July 2, 2021

Page 85

1       Q.  So I guess my question is:  Did you ever

2   talk to investigator Knight about his investigation

3   into that?

4       A.   I don't -- not that I recall.

5       Q.  Okay.  Have you ever personally done

6   anything to assess the credibility of Miss Garland

7   or polygraph her or anything like that?

8       A.  No.

9       Q.  If there was -- strike it.

10   Was the warden or deputy warden satisfied with

11   your investigation that you did, that they had

12   requested you to do into Miss Estes's incident

13   report?

14                   MR. JOSEPH:  Object to the

15   form.

16                   THE WITNESS:  They never told

17   me they were dissatisfied.

18       Q.  (MR. DALTON):  Okay.  Were Miss Estes's

19   allegations found to be substantiated,

20   unsubstantiated, or unfounded or do you know?

21       A.  I don't know.

22       Q.  Did you spend anything more than a day or

23   two on her allegations, or would have everything

24   been concluded within a day or two?

25       A.  I don't remember.

Bryan Cox                                          July 2, 2021

Page 86

1      Q.  What documents would you have prepared
2   and -- and given to the warden as a result of your
3   investigation into Ms. Estes's allegations?
4      We talked about your handwritten notes; correct?
5      A.  Yes.
6      Q.  Any other -- any other stuff you would have
7   given on to the warden?
8      A.  I can't remember specifically what documents
9   were in the file.
10     Q.  How about just as a general rule or policy,
11  is there anything else you would have provided on up
12  to the warden?
13     A.  Any statements, incident reports, or any
14  synopsis.
15     Q.  Did you ever offer any counseling care or
16  protection or anything to plaintiff -- to
17  Ms. Garland?
18     A.  Not that I recall.
19     Q.  Do you know at the time of late 2018, for
20  the first four months of 2019 were the staffing
21  levels -- were you-guys under-staffed, over-staffed,
22  properly staffed?  Do you have any idea?
23     A.  I don't recall.
24     Q.  Okay.  Do you -- when you were chief of
25  security of Eddie Warrior Correctional Facility did

Bryan Cox                                          July 2, 2021

Page 87

1    you ever have any worry about staff retaliation of

2    inmates reporting sexual harassment?

3        A.   No.

4        Q.   When you were the chief security officer did

5    you ever take any specific actions to

6    potentially protect inmates from harassment from

7    guards or DOC personnel?

8                    MR. JOSEPH:  Object to the

9    form.

10                   THE WITNESS:  I don't recall

11   any specific incidents.

12       Q.   (MR. DALTON): Any time there's been an

13   allegation of sexual harassment, have you ever

14   taken any sort of action to protect inmates from

15   further harassment?

16       A.   Again, I don't recall any specific

17   incidents.

18       Q.   Okay.  Do you believe that Oklahoma

19   Department of Corrections inmates face a substantial

20   risk of sexual assault or sexual harassment?

21                   MR. JOSEPH:  Object to the

22   form.

23                   THE WITNESS:  Are you asking my

24   personal opinion?

25       Q.   (MR. DALTON):  Yes?

Bryan Cox                                      July 2, 2021

                                                    Page 90

1    was dealing with this that deputy wardens were in

2    charge of, like, the PREA coordinator or whatever.

3         Q.   So that would have fallen more you think to

4    Deputy Warden Redeagle at that time?

5         A.   Yes.

6         Q.   Okay.  You'd agree with me this the Oklahoma

7    Department of Corrections has a duty to provide a

8    safe, humane, and secure environment for all

9    inmates?

10        A.   You're asking me if I agree with that

11   statement?

12        Q.   Yes.

13        A.   Yes.

14        Q.   And the Oklahoma Department of Corrections

15   is to provide -- as a zero tolerance staff sexual

16   misconduct and harassment policy; is that correct?

17        A.   Yes.

18        Q.   The deputy warden would have had the ability

19   to manipulate inmate Garland's work schedule or his

20   to be around her; is that correct?

21        A.   I don't know if he had direct involvement

22   with her schedule because I don't know what.

23        Q.   Did he have the ability to -- did he have

24   the ability to manipulate any of the inmates work

25   schedules or schedules so he could find time to be

Bryan Cox                                             July 2, 2021

Page 94

 1                    MR. JOSEPH:  Object to the
 2      form.
 3                    THE WITNESS:  I don't remember.
 4      Q.  (MR. DALTON):  Okay.  While you're
 5      interviewing or while you -- strike that.
 6          When a -- when a claim or on allegation of some
 7      sort of sexual abuse or harassment is made, is there
 8      anything as a policy or procedure that you do to
 9      make that inmate feel secure or protected or do you
10      do anything special?
11                    MR. JOSEPH:  Object to the
12      form.
13                    THE WITNESS:  Not that I'm
14      aware of.
15      Q.  (MR. DALTON):  Would you have then --
16      once -- as a matter of policy or procedure, once you
17      became aware of the -- the complaint, or the
18      incident report filed by Miss Estes, would you have
19      told Deputy Warden Redeagle in essence what was
20      being complained of?
21      A.  No.
22      Q.  Okay.  So would he have been in the dark as
23      far as what was being said by -- by Miss Estes in
24      the incident report?
25      A.  You asked if I would have informed him?

Bryan Cox                                           July 2, 2021

1       Q.   Yeah.

2       A.   No, I would not.

3       Q.   Would somebody had informed her when he had

4   a chance to see that incident report?

5       A.   That would be up to the warden.

6       Q.   Okay.  Do you have experience with inmates

7   being victims of sexual harassment or sexual abuse?

8       A.   I'm not sure what I -- what you mean by

9   "experience."

10      Q.   You've worked at the Department of

11  Corrections for many years and the chief of

12  security.  Did you have any experience about victims

13  of sexual abuse or any interactions with inmates who

14  have been victims of sexual abuse or harassment?

15      A.   Yes.

16      Q.   Did -- did those victims ever feel helpless

17  to deny the advances of prison guards or do you

18  know?

19                    MR. JOSEPH:  Object to the

20  form.

21                    THE WITNESS:  I don't know.

22      Q.   (MR. DALTON):  Is -- is that a concern that

23  inmates would feel helpless to deny advances, or

24  that they're going to be pun-or retaliated against

25  if they deny guards; do you know?

Bryan Cox                                    July 2, 2021

Page 97

1    form.

2                        THE WITNESS:  Not that I

3    remember.

4        Q.  (MR. DALTON):  Would it have been reasonable

5    for inmate Garland to believe that the deputy warden

6    would have an impact on her release or her day-to-

7    day living conditions; the job she had at the Eddie

8    Warrior Correctional Facility?

9                        MR. JOSEPH:  Object to the

10   form.

11                       THE WITNESS:  Say it one more

12   time.

13       Q.  (MR. DALTON):  Yeah.  Would it have been

14   reasonable for inmate Garland to believe that the

15   deputy warden could have an impact on her day-to-day

16   living conditions, her release, the jobs that she

17   had there at the Eddie Warrior Correctional

18   Facility?

19                       MR. JOSEPH:  Same objection.

20                       THE WITNESS:  I guess it would

21   be reasonable.

22       Q.  (MR. DALTON):  As -- I'm wrapping this up,

23   by the way.

24                       During the time you investigated

25   miss Estes's complaints or allegations, Sharon McCoy