Laurie Garland                                          July 6, 2021

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA


LAURIE GARLAND,                        )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )  NO. CIV-20-306-RAW
                                       )
                                       )
STATE OF OKLAHOMA, ex rel              )
OKLAHOMA DEPARTMENT OF                 )
CORRECTIONS,                           )
CHRISTOPHER REDEAGLE,                  )
individually,                          )
SHARON McCOY, individually,            )
JOE ALLBAUGH, individually,            )
RABECKAH MOONYHAM,                     )
individually,                          )
HEATHER CARLSON, individually,)
and BOARD OF CORRECTIONS,              )
                                       )
            Defendants.                )



DEPOSITION OF LAURIE ELIZABETH GARLAND

TAKEN ON BEHALF OF THE DEFENDANTS

IN OKLAHOMA CITY, OKLAHOMA

ON JULY 6, 2021, 2021



REPORTED BY:  JANA C. HAZELBAKER, CSR

Laurie Garland                                    July 6, 2021

1    criminal justice.  And actually went to work for my

2    father, who is now deceased, for his title insurance

3    businesses, as well as oil and gas brokerage.

4         Q    Like landman type of thing?

5         A    Yes, exactly.

6         Q    Is that what you do now?

7         A    Not right now.  I'm, like, managing a

8    marina down at Lake Murray, my hometown.

9         Q    Okay.  How long have you been doing that?

10        A    Just since May.  Just opened up in May.

11        Q    Is it a new marina?

12        A    Yes, it's brand new.

13        Q    Okay.  What's the name of it?

14        A    Murray Harbor.

15        Q    Do you live in Ardmore still?

16        A    Yes.

17        Q    Okay.  And do you live by yourself there?

18        A    No.

19        Q    With whom do you live?

20        A    With Jason Watterson, my boyfriend.

21        Q    And how long have you all lived together?

22        A    Since 2017.

23        Q    Was Mr. Watterson your significant other

24   when you went to prison?

25        A    Yes.

Laurie Garland                                    July 6, 2021

1      Q    Was the one in Stillwater -- or was that
2   presumably while you were in school?
3      A    Under- -- under- -- just underage.  Zero
4   tolerance.
5      Q    Right.  Okay.  And you said that -- I guess
6   you went back to prison in 2018?
7      A    Yes, sir.
8      Q    What was that for?
9      A    DUIs.
10     Q    Also DUI?
11     A    That's the only charge I have.
12     Q    This is the only thing you've ever been
13  charged with, DUI or DUI-related charges?
14     A    Yes.
15     Q    Okay.  And, I guess, when were you released
16  from prison this last time?
17     A    I was released on an ankle monitor in 2019
18  and re-admitted to finish my sentence in 2020, and
19  finished up in April.  April 2nd is when I finished
20  my sentence.  2021.
21     Q    Okay.  But that was all on the same
22  sentence?
23     A    Right.  Correct.
24     Q    Okay.  I guess, since the time that you
25  were discharged, have you had any other charges?

Laurie Garland                                    July 6, 2021

Page 20

```
 1        Q     Okay.  So that I'm clear about it,
 2   Building 8 is the administrative offices for all of
 3   the Eddie Warrior staff?
 4        A     Right.  Correct.
 5        Q     However, the warden, deputy warden and
 6   chief of security are in a different building?
 7        A     Correct.
 8        Q     Okay.  So the reason why the deputy warden
 9   would be coming to Building 8 would be to interact
10   with the administrative staff?
11        A     Normally.
12        Q     Right.  Okay.  I guess, was anything else
13   there at Building 8 besides administrative staff?
14        A     They served lunch, so --
15        Q     So, like, a cafeteria of some sort or
16   something?
17        A     They catered, yes.
18        Q     More of a break room type thing?
19        A     Yes.
20        Q     Okay.  Wasn't like a full kitchen or
21   anything, I guess is what I'm asking.
22        A     No.
23        Q     And it was while you were working there
24   that you first met Mr. Redeagle?
25        A     Correct.
```

Laurie Garland                                    July 6, 2021

Page 21

1        Q    Okay.  Was it just in passing or did you

2    guys have a conversation?  What happened?

3        A    He introduced himself to me, asked why I

4    was there, what brought me to prison, and we

5    discussed that.  And he said he knew certain people

6    that I knew and vice versa, but I -- I mean, it was

7    just a short conversation there at the beginning.

8        Q    Other people that you knew, meaning other

9    inmates or --

10       A    No, other people outside of the facility.

11       Q    Okay.  Do you remember who it was that you

12   all knew in common?

13       A    Yes.

14       Q    Who was that?

15       A    Joe Ben Mashunkashey.

16            MR. DALTON:  Hold on.  I didn't hear the

17   last name.

18            THE WITNESS:  Mashunkashey.

19            MR. DALTON:  Mashunkashey?

20            THE WITNESS:  M-a-s-h-u-n-k-a-e-y

21   (verbatim).

22       Q    (By Mr. Allen) And you said his first name

23   was Joe?

24       A    Joe Ben, yes.

25       Q    Joe Ben.  Okay.  And how do you know him?

Laurie Garland                                    July 6, 2021

Page 22

```
 1      A    I was roommates in college with his
 2   daughter, and also grew up with her, and her parents
 3   later split.  And he's from Osage County.
 4      Q    "He," meaning --
 5      A    His family is from there, et cetera, so
 6   when they divorced he went back to Osage County.
 7      Q    So this is Joe Ben's family --
 8      A    Correct.
 9      Q    -- is from Osage County?
10      A    Right.
11      Q    And that's how Christopher Redeagle knew
12   him?
13      A    I assume.
14      Q    Okay.  So you guys had this one first
15   encounter, brief discussion about happening to know a
16   certain person outside of the facility.
17           When was your next meeting?
18      A    When was our next meeting?
19      Q    When was the next time that you had a
20   personal encounter?
21      A    Well, I saw him, generally, every day.
22      Q    Okay.  So from that time in August of 2018,
23   you basically saw him every day thereafter?
24      A    Correct.
25      Q    Okay.  Did you guys talk every day?
```

Laurie Garland                                    July 6, 2021

Page 23

1      A    He would sometimes -- he would a lot of the
2  time wait on me to be at work at certain hours, yeah.
3      Q    What do you mean by that?
4      A    I mean that I had certain duties that I was
5  obligated to.
6      Q    What were your duties?
7      A    Basically, cleaning up everything, taking
8  out the trash, janitorial type stuff, but basically
9  taking care of everything that they needed, cleaning
10  their offices, et cetera.
11     Q    Okay.  And so you said Mr. Redeagle would
12  wait for you?
13     A    Yes.
14     Q    There at Building 8?
15     A    Yes.
16     Q    And where would he wait?
17     A    In the break room.
18     Q    Okay.  And so then you would come into the
19  break room and you guys would have some sort of
20  interaction?
21     A    Not necessarily.  There's a lot of times
22  that my coworkers that I worked with -- it was kind
23  of a privilege to work there in that specific area.
24          And he would ask my coworkers, "Where's
25  Laurie?  When is she going to be here?"  Or leave me

Laurie Garland                                    July 6, 2021

Page 24

1    notes.

2           Q     What kind of notes are we talking about?

3           A     Well, like notes on -- like he's made

4    different notes, he's sent cards, et cetera.

5           Q     So he left you a note with these coworkers?

6           A     In the janitorial closet, yes.

7           Q     Okay.  So kind of secretly?

8           A     Yes.

9           Q     And they're just random notes or, I

10   guess --

11          A     They just said, "From your secret admirer."

12          Q     Okay.  How did you know it was him?

13          A     Because he told me to go look underneath

14   the -- certain, like, floor cleaning pads, et cetera,

15   different stuff that we had in the break room -- or

16   in the office.

17          Q     Okay.  So he would place notes but kind of

18   give you a clue as to where to find them?

19          A     Conspicuously, yes.

20          Q     All right.  So, I guess, how long did this

21   note-writing campaign go on before you guys had, I

22   guess, expanded your relationship?

23          A     Approximately, five months.

24          Q     Okay.  And did you also write him notes in

25   this same way?

Laurie Garland                                      July 6, 2021

Page 26

1      A     Yes.

2      Q     Was that on a regular basis?

3      A     Pretty consistently, yes.

4      Q     Okay.  What was the nature of the verbal

5   conversations that you all would have?

6      A     Well, it started out very informal, just

7   like I said, he asked, you know, "What are you doing

8   here, what brings to you prison," et cetera.

9            We started talking and he just --

10  conversations were minimal for a certain degree, but

11  then it just escalated into, "Well, I really want to

12  kiss you," and things of that nature --

13     Q     Right.

14     A     -- which was uncomfortable.

15     Q     Right.  Did you, I guess, respond to him in

16  any way that was, I guess, romantic in these verbal

17  conversations?

18     A     In verbal conversations?  No.  But I did in

19  letters, yes.

20     Q     Okay.  And who would you say wrote the

21  first letter?

22     A     I did.

23     Q     Okay.

24     A     It gets lonely in prison, so you write.

25  You just take yourself on a little mind trip journey.

1      A     I believe it was starting to escalate

2   somewhat, but it could have been a figment of the

3   imagination at that time.

4      Q     What do you mean by "a figment of the

5   imagination"?

6      A     Well, writing letters is -- I mean, I can

7   write a novel, basically.  It doesn't have to be one

8   specific person really --

9      Q     Okay.

10     A     -- as far as that's concerned.  I mean --

11     Q     Yeah.  So I guess you had a building

12  fantasy of a relationship with Mr. Redeagle at that

13  point?

14     A     No.

15     Q     Okay.  What was your relationship with him

16  at the point that you wrote these -- this note?

17     A     I mean, we were getting to know each other.

18     Q     Okay.  Was it your intent to have a

19  romantic relationship with him?

20     A     No.

21     Q     Okay.  What was your intent in writing the

22  letter?

23     A     Not to a sexual degree.

24     Q     Okay.  What was your intent in writing the

25  letter?

1   conspicuous -- Mr. Redeagle, to be exact, hanging

2   out, making my coworkers feel uncomfortable, waiting

3   on me if I was at a class, or whatever.  I mean,

4   that's exactly what I was referring to.

5        Q    Okay.

6        A    I mean --

7        Q    And so I guess you followed it up

8   immediately thereafter with, "All I want is to avoid

9   any drama and make my transition back home as soon as

10  possible as we both know this" -- and then it goes

11  over to the next page -- "type of attack usually

12  presents itself when you" -- and I don't know what

13  that next word is.

14       A    "Near."

15       Q    Have?

16       A    "Near."

17       Q    -- "when you near a big blessing in life."

18            So what big blessing in life were you

19  discussing at that time?

20       A    There wasn't any particular one, but I'm

21  just speaking spiritual.  Usually the devil will

22  attack you right before you get a blessing in life.

23       Q    Okay.  I see what you're saying.

24       A    I mean, it could be anything.

25       Q    About midway down this second page -- which

Page 71

1    seen, so this never even existed.  This is the first

2    time I've seen this.  So if there was a casual

3    conversation, absolutely, I'm sure it could have

4    happened.  It could have -- there could have been

5    multiple people in there talking about the issue

6    because it was an ongoing deal.

7         Q    But you don't have any specific memory of

8    this conversation?

9         A    No.

10             (Whereupon, Exhibit Number 9 was marked for

11   identification purposes and made a part of the

12   record.)

13        Q    (By Mr. Allen) I am going to give you a

14   document that we'll label Exhibit 9.

15             Okay.  Are you familiar with this document?

16        A    Absolutely.

17        Q    Okay.  And it appears to be a document that

18   you signed, correct?

19        A    Correct.

20        Q    And did you, in fact, handwrite this

21   document?

22        A    They asked me to handwrite a document.

23        Q    Is this that document that you, in fact,

24   hand wrote?

25        A    They -- yes, they asked me to handwrite

Laurie Garland                                    July 6, 2021

Page 72

1    this document and told me exactly what I needed to

2    put on it.

3         Q    Okay.  And who is "they"?

4         A    It would have been Cox and -- Lieut- -- or

5    Chief Cox, rather.  And I don't believe I remember

6    her name.  I always forget it.  It's whoever was

7    acting lieutenant at the white house at that time for

8    disciplinary.

9         Q    Okay.

10        A    A lady.

11        Q    Okay.  And she -- you're saying she was

12   acting lieutenant?

13        A    Yeah.  They would always switch positions

14   and she was the acting lieutenant at the time.

15        Q    Would this be similar to the lieutenant who

16   disciplined you for the phone call?

17        A    No.

18        Q    Okay.

19        A    Not the same person.

20        Q    Okay.  That's a different position?

21        A    Different person, different position.

22   Yeah.  She was just a guard.

23        Q    Okay.  Okay.  And so Mr. Cox and this

24   female lieutenant told you to write what's in this

25   letter?

Laurie Garland                                    July 6, 2021

                                                    Page 73

 1      A    Correct.

 2      Q    Okay.  Did you have a conversation with

 3  them prior to writing this letter?

 4      A    No.  I was pulled in to their office and

 5  that's -- it was all -- it all took place at one

 6  time.

 7      Q    Okay.  So you got pulled in to Chief Cox's

 8  office presumably?

 9      A    Correct.

10      Q    And there was another lieutenant -- female

11  lieutenant there?

12      A    Correct.

13      Q    And during that time period they just told

14  you to write the letter, or did you guys have a

15  conversation also?

16      A    We had a conversation and then they asked

17  me to write this letter.  And Mr. Redeagle was

18  actually on vacation at that time.

19      Q    Okay.  So while you were in the office and

20  having the conversation, what was the conversation

21  about?

22      A    They said that it had been brought to their

23  attention that Mr. Redeagle was very friendly with

24  me.  And multiple people had brought it to their

25  attention, they'd noticed that I had come into the

Laurie Garland                                    July 6, 2021

Page 74

1    office -- gotten called into his office.  And,

2    basically, he was absent so they were basically

3    quizzing me about what was going on.

4         Q    Right.

5         A    At that time -- I mean, I'm in prison, so

6    he has total authority over my life.

7         Q    So what did you tell them?

8         A    Whatever's written here is exactly what --

9    I even asked, "What should I write here because I

10   don't want anybody in trouble."

11        Q    Is that what you --

12        A    But --

13        Q    -- told them prior to writing the letter?

14        A    We had a conversation for maybe five

15   minutes, approximately.

16        Q    Okay.

17        A    And then they asked me to write a

18   statement, yes.

19        Q    So during that conversation, had you

20   already said everything that's in this letter?

21        A    No.

22        Q    Okay.

23        A    They asked me particularly.

24        Q    Okay.  So --

25        A    Because they had gotten other people

Laurie Garland                                    July 6, 2021

Page 75

1    telling them things.  Other inmates.

2         Q    Other inmates had told Chief Cox something?

3         A    It was apparently reported to Chief Cox and

4    the acting lieutenant/disciplinary hearing officer.

5         Q    Okay.  And the report was that Mr. Redeagle

6    was too friendly with you, essentially?

7         A    He brought, yes, undergarments and things

8    to me, yes.

9         Q    Okay.  And when you were asked about it,

10   you denied these things?

11        A    Yes.  I didn't want anybody to get in

12   trouble.  Like I said, he's in authority over my

13   entire life.

14        Q    I guess what I'm trying -- I'm trying to

15   make clear is -- or I'm trying to understand clearly

16   is did you, in fact, tell Chief Cox, "Yes, we're

17   having a inappropriate relationship but I'm willing

18   to write a letter that says otherwise," or did --

19        A    Well, he just basically said, "Well, I need

20   you to write a statement."  I mean, it was a very

21   brief conversation.  There wasn't a whole lot of

22   discussion.

23        Q    And during the conversation --

24        A    They had just gotten wind of something by

25   other inmates, apparently.

Laurie Garland                                      July 6, 2021

Page 76

1      Q    And during that conversation you denied any
2  inappropriate relationship?
3      A    I just said, "Listen, I -- I just -- I
4  don't know what to do at this point in time."  But,
5  yeah, I mean, I -- I wrote the letter.
6      Q    But did you deny it in the verbal
7  conversation you'd had with Chief Cox prior to
8  writing the letter?
9      A    The verbal conversation is -- I mean, this
10  (indicating) is what I was asked to do, period.
11  That's what I was told to do.
12      Q    So you were told to write a statement that
13  was consistent with your conversation, or you were
14  told to write these specific words?
15      A    Basically, I said, "What do you need me to
16  write?"
17           And that's exactly what happened.  I mean,
18  you're -- you're reading it.
19      Q    Okay.  At that time, I guess March 19th,
20  2019 -- and just to be clear, that's the date that
21  you wrote on this letter that's Exhibit 9.  Is that,
22  in fact, the date that you wrote it?
23      A    If -- I mean, that's what it says, so --
24      Q    Do you have any reason to believe it's a
25  date other than March 19th of 2019 that you wrote

Laurie Garland                                    July 6, 2021

Page 77

1     that letter?

2          A     No.

3          Q     Okay.  So probably is on March 19th of

4     2019?

5          A     Correct.

6          Q     Okay.  And, at that time, had your

7     interaction with Christopher Redeagle been anything

8     other than conversations and letters?

9          A     Yes.

10         Q     Okay.  What had happened, other than

11    conversations and letters at that time?

12         A     He called me to his office multiple times,

13    called me to the property room after I got off work.

14    There he fondled me, kissed me.

15               What -- I mean, would you like details

16    or --

17         Q     Yeah.  What -- I guess, when was the first

18    time that you guys had actual physical contact?

19         A     In the property room --

20         Q     Okay.

21         A     -- when he called me --

22         Q     Do you remember about when that was?

23         A     I believe it would have been around March.

24    It was in March of 2019.

25         Q     Okay.  Was it on this same day that you got

Laurie Garland                                      July 6, 2021

Page 78

1    interviewed by Chief Cox?

2         A    No.  I just told you, he was on vacation --

3         Q    All right.  He was on vacation.

4         A    -- at that time.

5         Q    So prior to that, presumably?

6         A    In or around that area of time.

7         Q    Okay.  But, I mean -- just so that I'm

8    clear, the physical contact you're talking about with

9    Mr. Redeagle happened prior to this conversation you

10   had with Chief Cox?

11        A    I'm not exactly sure exactly what time it

12   was.  I believe -- I believe the first interaction

13   when he called me over to his -- I mean, I noted it

14   down here, but I didn't put an actual date on that.

15   But it says, "I have met with Mr. Redeagle two to

16   three times in his office."

17        Q    Right.

18        A    So I've noted it.

19        Q    Okay.  And what happened during that first

20   interaction you had with Mr. Redeagle?  The first

21   physical interaction, I should say.

22        A    Well, he kissed me and stuck his hand down

23   the back of my pants.

24        Q    Okay.  And, I guess, did anything other

25   than sticking his hands down the back of your pants

Laurie Garland                                    July 6, 2021

Page 79

1   happen at that time?

2        A    On a different occasion, it did.

3        Q    But did it at that -- that first encounter?

4        A    At that first encounter?

5        Q    Right.

6        A    He -- well, yeah, he kissed me and stuck

7   his hand down the back of my pants.  Like -- yes.  I

8   don't know what else you want me to tell you.

9        Q    I mean, essentially, he was grabbing

10  your --

11       A    Yes.

12       Q    -- butt, correct?

13       A    Yes.

14       Q    Okay.  And, I guess, for about how long did

15  this physical interaction go on that first time?

16       A    They were doing some maintenance and a guy

17  walked in, and I was -- I was, like, ready to get out

18  of there, and that was a clean break for me to get

19  out.

20       Q    Okay.

21       A    So, I mean, approximately ten, 15 minutes

22  or so.

23       Q    Okay.  Do you -- and you don't know what

24  the date of that particular interaction was?

25       A    I mean, no, I didn't like -- no.  I have no

Laurie Garland                                    July 6, 2021

                                                      Page 80

1    specific date, no, but it was on or around the time

2    of all these things.

3         Q    Right.

4         A    Besides the letters.  I think that they

5    were -- ended on the 18th.

6         Q    Okay.  So that was the first interaction --

7    physical interaction that you guys had that you can

8    recall?

9         A    The first?

10        Q    That one that you were just describing, you

11   were in the property room, he kissed you --

12        A    That was the first, yes.

13        Q    -- and put his hand down the back of your

14   pants?

15        A    Yes.  And then he called me several times

16   to his office and had my case worker -- when I got

17   off work, she called me and several guards escorted

18   me to the white house to go to his office, yes.

19        Q    So when was the second -- I guess, how long

20   after that first interaction was the second

21   interaction?

22        A    Approximately, a couple of days later.

23        Q    Okay.  And what happened during that

24   particular time?

25             Presumably, you got taken to his office?

Laurie Garland                                    July 6, 2021

Page 81

1      A    Correct.

2      Q    Okay.  So the first time was in the

3  property room, the second time was at his office?

4      A    It happened in his office and in the

5  property room again.

6           He called me to his office.  I had just

7  gotten off work.  By the time I got there, they said,

8  "Oh, I think he went down to the property room"

9  because everybody else leaves.  So they said, "You

10 probably just need to walk down there," so I went

11 down there.

12     Q    Okay.

13     A    So there's been several instances.

14     Q    Okay.  And so what happened on that second

15 time -- I guess, when you were in the property room

16 the second time with him that a physical interaction

17 happened?

18     A    He kissed me and stuck his hand down my

19 pants and said, "Your pants shouldn't be so tight so

20 that I can take them off of you," and he put my hand

21 on his penis, for lack of a better term.  I --

22     Q    Like, outside the clothes, inside the

23 clothes?

24     A    No, outside the clothes and asked me to

25 masturbate.  Like, basically -- I mean, fondle him.

Laurie Garland                                    July 6, 2021

Page 82

1      Q      Right.

2      A      Please him.

3      Q      And how long did that go on?

4      A      Probably -- not very long because I was

5   very nervous and -- I mean, he even knew I was very,

6   like -- he said, "You don't act like you want me to

7   be around you anymore," and different things like

8   that.  He came to work and told me that before he

9   even called me back down there.  But --

10     Q      Before this second incident, he said that?

11     A      Correct.

12     Q      And what did you say back to him?

13     A      I said, "I'm just, like" -- I think it's

14  written in a letter here.

15            I said, "I just got a lot going on.  I

16  don't mean to be offensive to you, but I just have a

17  lot going on," you know, in my mind.

18     Q      Right.

19     A      "I'm not trying to offend you, but I'm

20  uncomfortable."

21     Q      Right.  Okay.  And so --

22     A      "I just want to get home."  I think that

23  was actually written in the letter.  "We both know I

24  just -- I just want this thing to be over and get --

25  get to, you know, where I need to get, home."

Laurie Garland                                    July 6, 2021

Page 84

1       A    Well, actually, like, to be specific on the

2   date, I believe it was, what, the 8th, when

3   Lieutenant Minnick pulled me in there?  That was on

4   the 14th.  So I was actually already released from

5   Building 8 at that time.

6       Q    Okay.  So it was before that?

7       A    Right.

8       Q    Okay.

9       A    And then thereafter as well.  I mean, he

10  continued to call me to his office.

11      Q    After you'd gotten released from the job?

12      A    Correct.

13      Q    Okay.  So how long after the second

14  incident did the third incident occur?

15      A    I mean, it all took place between a span

16  of, like, February, March.  I mean, this all

17  encompassed around about, you know, a month, month

18  and a half, like that -- the actual physical contact.

19      Q    Right.  So the first incident happened, and

20  then a couple of days later there was a second

21  incident.  How long was it before the third incident

22  happened?

23      A    Matter of days.

24      Q    Okay.  Another couple of days maybe?

25      A    (Nodding head).

Laurie Garland                                    July 6, 2021

Page 85

1    Q    And what happened on that third incident?

2    A    He brought some panties to me and said, "I

3    found you something."  And he had some pictures that

4    he'd gotten off Facebook of me.

5         And he said, "But just -- you've got to --

6    you've got to hide these."

7         And so -- and then I ended up giving them

8    back to him because that had nothing to do with my

9    property box.  But that's what he utilized for his

10   reasonings on calling me to his office, et cetera,

11   was to talk about this property deal.

12   Q    Okay.  So this third time that he came --

13   that you had one of these interactions with

14   Mr. Redeagle, he called you to his office?

15   A    Correct.  Through my case manager.

16   Q    And you're -- in the office is whenever he

17   gave you the panties?

18   A    Well, he gave me one pair when I was at

19   work in Building 8, actually cleaning the women's,

20   like, bathrooms.  And there's not a camera right

21   there because I -- I mean, I was, like, very nervous.

22   And he came and just handed me a pair of pink lacy

23   panties and said, "Why don't you wear these and I'm

24   going to call you to my office later."

25   Q    Okay.  And then what happened?

Laurie Garland                                      July 6, 2021

Page 86

1       A       And then there were two more pair in that

2    property box when he called me down to his office.  I

3    mean, I was summoned to go and got escorted down

4    there and -- yeah, had nothing to do with what was

5    actually in my property box, but I guess he -- he

6    said he just bought them for me.

7       Q       Okay.

8       A       I didn't ask him to bring me anything.  So

9    all so the property issue is one thing.

10      Q       Right.  And then you -- you said you gave

11   them back to him?

12      A       Uh-huh.

13      Q       How long after he gave them to you did you

14   give them back to him?

15      A       I actually was, like -- what do they

16   call -- more or less, they call it a "shakedown," but

17   they go through your -- the only things that you do

18   have that have locks on them.  And they're little

19   bitty lockers.

20              And they had shaken me down several times

21   and I just told him it was -- it was too -- too

22   nerve-racking for me to have those.  And, like, I

23   don't -- again, I don't want to offend you or piss

24   you off because I am under your scrutiny and control

25   right now, but this is -- this is not where I want

Laurie Garland                                    July 6, 2021

Page 87

1    this to go.

2         Q    And so --

3         A    Also, it's contraband, so it could get you

4    in trouble, it could get me in trouble, and that's

5    the last thing I really want.

6         Q    But you realized it was against the rules

7    for him to bring --

8         A    Absolutely.

9         Q    -- these kind of things into the jail?

10        A    Correct.

11        Q    And you realized that it was against the

12   rules for you to get something like that from him?

13        A    To possess them, yes.

14        Q    And so you just didn't want them in your

15   possession anymore, correct?

16        A    No.  I never wanted them in the first

17   place.

18             (Whereupon, Exhibit Number 10 was marked for

19   identification purposes and made a part of the

20   record.)

21        Q    (By Mr. Allen) Okay.  I'm going to hand you

22   another document that we'll mark as Exhibit 10.

23             Have you ever seen this email?

24        A    I believe I reviewed it in his (indicating)

25   office.

Laurie Garland                                July 6, 2021

Page 99

1    which took place of the current warden at the time.

2         Q     Okay.  I guess what I'm trying to find out

3    is, by this point, were you still having physical

4    meetings with Mr. Redeagle?  "By this point" meaning

5    March 26th.

6         A     I mean, I didn't put a -- I didn't put a

7    Rolodex in my head at that point in time.  I mean,

8    there was a lot going on.

9               So to be exact, on Tuesday, March 26th, do

10   I remember if that exactly was when he kissed me and

11   called me to his office?  I'm not exactly sure, but I

12   know that -- I mean, he sent the -- your question, I

13   guess, is misleading.

14        Q     How's that?

15        A     Because I've told you already that it all

16   took place in between February and extended into

17   March.  Then he resigned.

18        Q     Right.

19        A     What date did he resign?  That would give

20   you an accurate date.

21        Q     Of what?

22        A     Of the physical contact as well.

23        Q     Did he -- are you saying you had physical

24   contact with him on the date he resigned?

25        A     No, but -- but prior to that, like, the

Laurie Garland                                      July 6, 2021

                                                    Page 100

1    week before.

2         Q    Okay.  So the week before Mr. Redeagle

3    resigned, you guys had had a physical interaction?

4         A    He had called me down to his office, yes.

5         Q    And what happened during that interaction?

6         A    When I came down to his office that time?

7         Q    Yes.

8         A    He gave me a shirt out of my property box

9    and he talked to me and he said, "Listen, I -- I just

10   don't know what's wrong with me."

11             And I said, "The thing is, you get to go --

12   I do not want to hurt your feelings.  You're a great

13   guy.  But I didn't -- never wanted this to escalate.

14   You get to leave at the end of the day.  I don't.  So

15   I have to deal with all these rumors and all

16   these" -- I mean, there's, what, 12 -- almost 1,200

17   females there at that time?  Yeah.  So, I mean, it's

18   not comfortable.  No part of it is comfortable.

19             I mean, writing a letter, that's innocent

20   comparatively to calling me and -- and it's already

21   enough of a humbling experience to be there, much

22   less be on spotlight in a very uncomfortable way.

23        Q    Okay.  And so I guess he gives you a shirt

24   and you guys have this conversation.  Is that all

25   that happened during that -- during this exchange?

Laurie Garland                                    July 6, 2021

Page 101

1      A     Well, he stuck his hand down the back of my

2     pants again.

3      Q     Okay.  And --

4      A     And then the lady that I was referring to

5     earlier that was the disciplinary hearing officer,

6     she started to walk in there.

7      Q     Okay.  Into his office?

8      A     Uh-huh.

9      Q     Okay.  And that's what ended the

10    interaction?

11     A     Yeah.  And I just -- I basically just told

12    him that I -- like I said, "I don't want to offend

13    you, but -- and I think you're a great guy, but at

14    the end of the day you get to leave and I just don't

15    want" -- you know, basically, don't take this too far

16    in your head because apparently I -- you know, that's

17    not what I want is the whole physical thing.

18     Q     Okay.  And you made that clear to him at

19    that time?

20     A     Right.  Right.  I just said, "Please

21    respect that.  You know, it's stressing me out.  And

22    you're wondering why I'm acting, you know, a little

23    off kilter.  I'm stressed out, you know."

24     Q     Right.

25     A     And I don't want to be called over there

Laurie Garland                                        July 6, 2021

Page 102

1    all the time and get escorted over there.  I mean,

2    it's just -- it's very uncomfortable.

3              And then as far as the physical contact,

4    that's even more uncomfortable.

5        Q    Okay.  And you made that clear to him at

6    that time?

7        A    I tried.

8        Q    So from my recollection of what we

9    discussed, I believe this has been three different

10   physical interactions that you all had that we've

11   discussed.

12             Were there others?

13       A    I mean, that -- that's all I can really

14   recollect are several different occasions that I was

15   called to the property room, which was at least -- I

16   know that was twice for sure, and then I was called

17   to his office multiple times.

18       Q    Okay.  And every time that you went to his

19   office, would you say that each one of those resulted

20   in a physical interaction?

21       A    Not every single time.

22       Q    Okay.  The one time, for instance, he just

23   gave you the underwear, that kind of thing?

24       A    Well, that was two separate occasions.

25   Like, I worked in Building 8.  Like I said, I was

Laurie Garland                                    July 6, 2021

Page 107

```
 1   relationship," no.
 2        Q    Did you confirm to her in any way that
 3   there was something weird going on with you and Chris
 4   Redeagle?
 5        A    Yes, she knew.
 6        Q    How did you confirm it to her?
 7        A    I mean, "confirm"?  I mean, when someone
 8   says, "Hey, you know, he's coming looking for you
 9   again," I mean, isn't that a little -- and I told
10   her, I said, "Listen -- yeah."
11             "What were y'all doing?"
12             I said, "He kissed me, you know, and he
13   made me feel uncomfortable."
14             And she started crying and she was, like,
15   "He makes me feel uncomfortable.  He's creepy.
16   You're not the only one."
17        Q    So you actually told Julia Woolsey --
18        A    I admitted --
19        Q    -- that he had kissed you?
20        A    -- that -- yeah, that incident.
21   Absolutely.
22        Q    Okay.
23        A    I mean, I was -- I was pretty shaken up
24   about it.
25        Q    Okay.
```

1      Q    Okay.  I guess, when you say, "stuck his
2  hand down your pants," I think of him grabbing your
3  butt.  Are you saying that something other than that
4  happened?
5      A    I believe these are her words, not --
6      Q    No.  No.  I'm asking you if, in fact, that
7  happened.
8      A    I mean, he -- he did stick his hand down
9  the back of my pants, yes.
10     Q    Okay.  Did he ever insert himself into you?
11     A    Like, his penis?  No.
12     Q    His fingers.
13     A    I mean, they got pretty close, yeah.
14     Q    Okay.  But, I guess, this whole
15 "finger-banged" thing, this is just Julia Woolsey's
16 comments?
17     A    Well, I mean, that's her -- that's her
18 terminology --
19     Q    Okay.
20     A    -- of the situation.
21     Q    Okay.  Do you know what she would have
22 meant by "cheating with the guy that has power over
23 us"?
24          What's "cheating with the guy?"  What's
25 that mean?

Laurie Garland                          July 6, 2021

Page 138

1      Q    Okay.  So, at this time, you are, I guess,
2   given a "New Arrival Intake," is how it's described.
3      A    Uh-huh.
4      Q    Do you remember having a new arrival intake
5   at Mabel Bassett?
6      A    Just standard, yes.
7      Q    Okay.  This is normal things that happen
8   whenever you arrive at a new facility, correct?
9      A    Correct.
10     Q    And you'll notice there, just a few
11  questions down from the top, it says, "Have you had
12  any negative experiences, e.g., sexual victimization
13  at this facility or at a previous time?"
14     A    It shows that you reported "Yes."
15     Q    Do you remember reporting "Yes"?
16     A    Yes.
17     Q    Okay.  Immediately under that it has a
18  little "Comments" section.  It says, "Inmate reported
19  that she was sexual victimized as an adult.  None
20  occurred while incarcerated or detained."
21          Do you remember making that report?
22     A    No.  They actually asked me -- and it's
23  standard.  They asked me if I was the aggressor.  And
24  that's exactly what they ask.  Was I the aggressor in
25  any kind of a rape type incident.  Like it's protocol

Laurie Garland                                    July 6, 2021

Page 144

1   any PREA allegations to Whitney Louis on April 4th?

2        A    I believe this is, like you said, congruent

3   with this other exhibit, so --

4        Q    Exhibit 16?

5        A    Correct.

6        Q    And in Exhibit 16, it obviously also says,

7   "Inmate denied PREA allegations.  Stated she was

8   attempting to get a job."

9             So these appear to be consistent with each

10  other.  I guess I'm just making sure to give you the

11  opportunity to tell me whether you believe that

12  that's inaccurate.

13            Is that accurate that you, in fact, deny

14  PREA allegations?

15       A    Yeah.  We -- she actually, like I -- like I

16  had stated earlier, she just wanted -- she said, "I

17  know things are going on.  I know it's stressful.  I

18  appreciate having you in here to do these -- like,

19  you know, organize these self-help groups,"

20  et cetera.  And it was really general conversation,

21  more of like she was being, like, a friend.  Like,

22  "If you need to talk to anybody, I know things are

23  going on, I know you're uncomfortable."

24            And that's basically exactly our

25  conversations.  They were very, I guess, you would

Laurie Garland                                July 6, 2021

Page 166

1   inside."

2           Now, I think we've discussed this a few

3   times --

4       A   Uh-huh.

5       Q   -- it was my understanding from your

6   earlier testimony that he had never actually

7   penetrated you with his hands or anything else.  Is

8   that accurate?  Did he actually penetrate you or did

9   he not?

10      A   Well, what is your description of

11  "penetrate"?

12      Q   I don't know, did any part of his body

13  enter inside of any part of your body?

14      A   His hands.

15      Q   Did it enter into your genitals?

16      A   It was right there.

17      Q   It was touching them, essentially?

18      A   Uh-huh.  And -- right -- yes, from the

19  backside.

20      Q   Okay.  Kind of rubbing on your genitals,

21  essentially?

22      A   More or less, but, I mean, what -- I mean,

23  I guess, are you asking -- is this going back to the

24  finger-banging thing?

25      Q   Yes.

Laurie Garland                                    July 6, 2021

Page 265

1    in the chief of security with Cox.  When that

2    statement was written, her name's Ketcher.

3         Q    And what was your contacts with her?

4         A    That's -- she was actually in there when

5    they had me write that statement.

6         Q    Okay.  What, if anything, did Robin Ketcher

7    do personally to violate your civil rights?

8         A    I mean, she just instructed me on what to

9    write on that statement.

10        Q    And did you feel like anything she said was

11   a violation of your rights?

12        A    I just -- I mean, they're authority figures

13   and they basically told me what I needed to write on

14   the -- I mean, they basically tell you what to do at

15   all times, so --

16        Q    And when you say "they" in this

17   particular --

18        A    Guards.

19        Q    -- you mean Robin Ketcher and Mr. Cox?

20        A    Specifically, yes, they called me into the

21   office and had me write that statement.

22        Q    Did they tell you to write anything that

23   was untrue?

24        A    Well, yeah, they basically told me what to

25   write.

Laurie Garland                                     July 6, 2021

Page 266

1        Q    But did they tell you to write anything
2    that was untrue?
3        A    Uh-huh.
4        Q    Factually?
5        A    Yes.
6        Q    What was that?
7        A    Because there was an inappropriate
8    relationship and I wrote that there wasn't.
9        Q    And it's your testimony that they told you
10   to write that there was no inappropriate
11   relationship?
12       A    Well, they asked me and basically told me
13   what I needed to write.
14       Q    Well, they asked you and you denied
15   it; isn't that right?
16       A    I basically -- yeah.  Yes.
17       Q    Who is -- I think you testified about this
18   person before.  Who's Luke Combs?
19       A    Oh, that's who -- Mr. Redeagle would use
20   that and Frank Eaton.  And he would make up weird
21   names and use them on the return address when he
22   would mail in stuff, letters and cards and stuff.
23       Q    Is that a real person?
24       A    Luke Combs?
25       Q    Yes, ma'am.

Laurie Garland                                    July 6, 2021

```
                                              Page 287
 1        Q    So no?

 2        A    That would not have been appropriate.

 3        Q    Okay.  I believe earlier when you were

 4   answering questions from Mr. Redeagle's attorney, you

 5   were shown some documents, some PREA acknowledgment

 6   forms.

 7             Do you remember seeing those?

 8        A    Yes, sir.

 9        Q    And you understood those forms, didn't you?

10        A    Yes.

11        Q    And you understood in those forms that you

12   had the express ability to report PREA violations

13   directly to Oklahoma City, didn't you?

14        A    I mean, the deputy warden is in charge of

15   PREA.  That's one of his jobs, actually, within the

16   prison system.

17        Q    Nonetheless, it does say on those forms

18   that you can report that sort of thing directly to,

19   say, a hotline, right?

20             And we can go back --

21        A    Right.  Right.

22        Q    -- and look at the forms if you want to?

23        A    Right.  Right.  Right.

24        Q    Yeah.  And you acknowledge that there were

25   signs around the facility that shared the same
```