Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LAURIE GARLAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. CIV-2020-306-RAW |
| | ) |
| STATE OF OKLAHOMA ex rel | ) |
| OKLAHOMA DEPARTMENT OF | ) |
| CORRECTIONS, CHRISTOPHER | ) |
| REDEAGLE, Individually, | ) |
| SHARON McCOY, Individually, | ) |
| JOE ALLBAUGH, Individually, | ) |
| PENNY LEWIS, Individually, | ) |
| RABEKAH MOONEYHAM, | ) |
| Individually, HEATHER | ) |
| CARLSON, Individually and | ) |
| BOARD OF CORRECTIONS, | ) |
| | ) |
| Defendants. | ) |

\* \* \* \* \* \*

DEPOSITION OF SHARON McCOY

TAKEN ON BEHALF OF THE PLAINTIFF

IN MCALESTER, OKLAHOMA

ON AUGUST 25, 2022

\* \* \* \* \* \*

\*\*\*\*\*\*ALL EXHIBITS ARE CONFIDENTIAL
AND SUBJECT TO PROTECTIVE ORDER\*\*\*\*\*\*

1    Q    You believe that Deputy Warden Redeagle did
2  the things that are alleged in here; is that correct?
3    A    That's correct.
4    Q    One of those things is he was, in your mind,
5  mailing letters or cards to Inmate Garland; is that
6  correct?
7    A    That's correct.
8    Q    And is that a clear violation of DOC policy?
9    A    Yes.
10   Q    Would that be considered an inappropriate
11 relationship with an inmate?
12   A    Yes.
13   Q    Should there have been any doubt in any DOC
14 staff member's mind that that was not allowed?
15        MS. WILKES:  Object to form.
16        THE WITNESS:  Should there be any doubt?  In
17 any DOC's -- there should be no doubt.
18   Q    (By Mr. Dalton)  Very good.  Deputy Warden
19 Redeagle was talking or having intimate relationships
20 beyond just a working relationship in this report.  Was
21 that a violation of DOC protocols, rules and
22 regulations?
23   A    Yes.
24   Q    And again, there should be no doubt in any
25 DOC staff member that that was not allowed; correct?

```
 1                 identification purposes)
 2       Q     (By Mr. Dalton)  Okay.  I'm going to hand you
 3   what I've marked as Plaintiff's Exhibit No. 8.  I'm
 4   going to represent to you that this is a picture of
 5   Ms. Garland.  Do you see that?
 6       A     Yes.  I see it.
 7       Q     Does it appear that's laid out on the same
 8   comforter as the other ones we've just gone over?
 9       A     It appears to be the same comforter.
10       Q     If Investigator Knight testified that this
11   was a photograph of Inmate Garland in the possession or
12   the car or the residence of Deputy Warden Redeagle,
13   would you have any reason to dispute that?
14       A     No.
15       Q     You don't have any independent knowledge of
16   this actual photograph, do you?
17       A     No.
18       Q     These Exhibits, 2 through 8, should not have
19   been in Deputy Warden Redeagle's possession.  Do you
20   agree?
21       A     I agree.
22       Q     If you had knowledge of any of these things,
23   2 through 8, being in Deputy Warden Redeagle's
24   possession prior to this, what would you have done?
25       A     I would have put him on leave.
```

```
 1      Q    And put him on leave.  Does that mean he
 2  would have been removed from the Eddie Warrior
 3  Correctional Facility?
 4      A    Yes.  And I would have contacted my
 5  supervisor and notified her of the issue.  And I would
 6  have issued a memorandum from my office that he was not
 7  allowed on the premises.
 8      Q    Would you have done that to protect Inmate
 9  Garland?
10      A    Yes.
11      Q    And if just any one of these had been found,
12  not all 2 through 8, but just any one of these, would
13  that have been enough to have those actions taken?
14      A    Yes.
15      Q    In your mind these are serious violations;
16  correct?
17      A    Yes.
18      Q    Under Oklahoma Department of Corrections
19  policy, is this considered abuse or sexual misconduct
20  towards an inmate?
21      A    Yes.
22           MS. WILKES:  Counsel, we've been going for
23  about an hour.  How are you feeling?  I didn't want to
24  interrupt a line of questioning.  Do you think this is a
25  good breaking point?
```

1  I need more budget for this or that.  Or if you wanted
2  something updated, would she have been the one to go to?
3          MS. WILKES:  Object to form.
4          THE WITNESS:  I don't understand the question.
5  Are you talking about --
6      Q    (By Mr. Dalton)  If you had wanted more video
7  monitoring at Eddie Warrior Correctional Facility, would
8  you have talked to Penny Lewis about that or somebody
9  different?
10     A    No.  My supervisor.
11     Q    Penny Lewis, was she contacting you regarding
12 failures or areas of concern that she was seeing with
13 the Eddie Warrior Correctional Facility?
14     A    If there was something that they noticed or
15 noted in the audit, yes.
16     Q    So I can see where they would contact you
17 after the audit.  But would you have any reason to
18 contact them outside of the audit?
19     A    No.  Not her office.  No.
20     Q    And as a compliance officer, was she in
21 charge of making sure that you were complying with PREA
22 and sanitation and medical and just the running of the
23 Eddie Warrior Correctional Facility?
24     A    Yes.
25          MS. WILKES:  Object to form.

```
 1      A    No.
 2      Q    Let's look at the third one in, 5935.  You
 3 see the bottom?  There's a Bates stamp?  It says, with a
 4 special friend who means so much.  Do you see that?
 5      A    Yes.
 6      Q    And it says, you're truly special to me and
 7 always will be.  There's no dispute that's just
 8 inappropriate; correct?
 9      A    Yes.
10      Q    That violates PREA; is that correct?
11      A    Yes.
12      Q    That's the Prison Rape Elimination Act?
13      A    Yes.
14      Q    This is basic knowledge that any person
15 working for the Department of Corrections should be
16 aware of; correct?
17      A    Yes.
18      Q    You've reviewed these.  Do any of these look
19 like they would be appropriate for a deputy warden to
20 send to an inmate?
21      A    No.
22      Q    You don't know the time period that any
23 letters were sent from Deputy Warden Redeagle to Inmate
24 Garland, do you?
25      A    No.
```

```
 1      Q     Let's look at the very last one.  I don't
 2   want to spend a lot of time on these, but let's just
 3   look at the last one.  You see the third paragraph down
 4   that says, I know that?
 5      A     Uh-huh.
 6      Q     Can you just read what it says?
 7      A     I know that you can't take my letters, notes
 8   and my mementos home with you.
 9      Q     Do you know what -- I'm sorry.  That's good.
10   And it goes on.  But do you know what mementos he's
11   referring to?
12      A     No.  I have no clue.
13      Q     Would that be the underwear?
14            MS. WILKES:  Object to form.
15            THE WITNESS:  I don't know.
16      Q     (By Mr. Dalton)  Letters, notes, mementos
17   obviously clearly violate the Prison Rape Elimination
18   Act; correct?
19      A     Yes.
20      Q     Do you know of anything else that Deputy
21   Warden Redeagle would have given to Inmate Garland?
22      A     No.
23      Q     We are aware of some letters, of underwear.
24   Is there anything else that you're aware of that he gave
25   her?
```

 1     Q    And then who -- it was chief of security, was
 2  it Mr. Cox; is that right?
 3     A    Yes.
 4     Q    Is it Brian Cox?
 5     A    Brian Cox.  Yes.
 6     Q    Is he the one that would have interviewed the
 7  inmates?
 8     A    Yes.
 9     Q    Do you know what inmates he interviewed?
10     A    No.  I don't remember.
11     Q    Do you remember how many he was supposed to
12  interview or anything to that?
13     A    I don't remember.
14     Q    What would you have expected?  Like, four or
15  five?  Everybody in her pod?
16     A    Yeah.  Probably.
17     Q    Is there --
18     A    As many as it took.  It didn't necessarily
19  have to be on her pod either.  It could have been
20  inmates that was in the building where she worked at, I
21  mean.
22     Q    So you would have expected him to interview
23  several inmates anyway?
24     A    Yeah.  Depending on where the inmates lived
25  at and where they worked.

1     Q     Are you looking for people that would have
2  had a connection to Ms. Garland or seen her working?
3     A     Yes.
4     Q     What about staff?  How many staff would you
5  have expected him to interview?
6     A     Every staff member that had -- that was
7  connected saw her or dealt with her or had any dealings
8  at all with Ms. Garland.
9     Q     So that would have been anybody wherever this
10 coffee, Area 8, they would have all been interviewed?
11    A     Yes.  In that area.  Yes.
12    Q     Anybody to deal with property, I guess, would
13 have been interviewed?
14    A     What do you mean property?
15    Q     Seems like they were going in and out of the
16 property room with some regularity.
17    A     At this point we didn't have -- I mean,
18 nobody --
19    Q     So this would have been any staff members
20 that were with Mr. Redeagle or wherever this coffee type
21 area was?
22    A     Yes.
23          MS. WILKES:  Object to form.
24    Q     (By Mr. Dalton)  Was there any thought to
25 tailing or watching Deputy Warden Redeagle?  Or did

1  correct?

2      A     Yes.

3            MS. WILKES:  Object to form.

4            THE WITNESS:  Except for -- everything that
5  I've heard is pure hearsay.  Again, we are talking about
6  a rumor but we still would have looked into it.  So she
7  specifically named the deputy warden and what her
8  concerns were.

9      Q     (By Mr. Dalton)  This could have prompted an
10 outside investigation to be brought in, if you had
11 wanted to?

12           MS. WILKES:  Object to form.

13           THE WITNESS:  Yes.

14           MR. KELLER:  I don't think she answered that
15 verbally.  I don't know whether she did or not.  Just
16 shook her head.

17           MR. DALTON:  That's fine.

18     Q     (By Mr. Dalton)  I'm just going to ask you
19 the same question again.

20     A     Okay.

21     Q     Exhibit No. 12 could have justified you
22 bringing in an outside investigation; correct?

23           MS. WILKES:  Same objection.

24           THE WITNESS:  Yes.

25     Q     (By Mr. Dalton)  I did not hand you 13 yet

1   Cooper for doing that, do you?

2       A    No.

3       Q    Would this have been enough for you to turn
4   it over to an outside investigator or not?

5            MS. WILKES:  Object to form.

6            THE WITNESS:  Yes.

7       Q    (By Mr. Dalton)  And why?

8       A    Because this was April, 2019.  If something
9   keeps coming up, even though you didn't find anything
10  the first time, then you go ahead and make sure.

11      Q    (By Mr. Dalton)  If you guys had been aware
12  of Julia Woolsey, that's an inmate; correct?

13      A    Uh-huh.

14      Q    If during the March investigation, if her
15  name had come up or you guys had been aware of Julia
16  Woolsey, would you guys have questioned her?

17           MS. WILKES:  Object to form.

18           THE WITNESS:  If she would have reported or --
19  is that what you're asking if she would have reported
20  this back in -- is that the question?

21      Q    (By Mr. Dalton)  No.  My question's a little
22  different. Would you have talked to -- March 18th,
23  Chief of Security Cox, it looks like, talked to Inmate
24  Garland, and you talked to Deputy Warden Redeagle.  If
25  during that time somebody had brought up the name of

1    Julia Woolsey, Inmate Julia Woolsey, would you have or
2    Chief of Security Cox, would somebody have investigated
3    Julia Woolsey further at that point in time?
4              MS. WILKES:  Object to form.
5              THE WITNESS:  We would have gotten a statement
6    from her.  Yes.
7         Q    (By Mr. Dalton)  And if she had provided this
8    information to you and Ms. Woolsey, you would have
9    called in an outside investigate or not?
10             MS. WILKES:  Object to form.
11             THE WITNESS:  Yes.  We would have written it
12   up and requested an investigation.
13        Q    (By Mr. Dalton)  Do you have any reason to
14   dispute what's written in Exhibit No. 15?
15        A    No.
16        Q    And in hindsight is there anything she said
17   in here that you believe is incorrect or not true?
18        A    I don't know.  I wasn't there.  But it -- I'm
19   sorry.  Can you ask that question again?
20        Q    Do you have any reason to dispute anything
21   that was written in Exhibit Number 15?
22        A    No.
23        Q    Crystal Covalt, is that an inmate or do you
24   know?
25             MS. WILKES:  Object to form.

1  posted. We do orientation with new arrival inmates
2  regardless of if they've already been to a facility and
3  gone through the same orientation. Every inmate gets
4  that same orientation from the new facilities. Sexual
5  harassment is discussed. They have a chance to ask
6  questions.
7      Q   (By Mr. Dalton) So I guess my question is
8  after there's a complaint made on March 13th, 2019, by
9  Ms. Estes, what actions were taken by the DOC to protect
10 the Plaintiff from any further sexual abuse after that?
11         MS. WILKES: Object to form.
12         THE WITNESS: When the complaint is made and
13 the investigation starts, the inmate is kept separate
14 from the alleged perpetrator.
15     Q   (By Mr. Dalton) So you would have separated
16 her from Deputy Warden Redeagle?
17     A   Yes.
18     Q   Anything else done to protect her?
19     A   Like?
20     Q   Remove staff, work reassignment, facility
21 changes, or anything -- any of that done?
22     A   Remove Redeagle from the area or from the
23 facility.
24     Q   Did you ever review or see any video footage
25 of Deputy Warden Redeagle and Inmate Garland that you

1   A   I don't believe any other staff member played
2   a part.
3   Q   Until he resigned, you agree that Redeagle
4   still had control over Garland and still had friends at
5   the Department of Corrections?
6       MS. WILKES:  Object to form.
7       THE WITNESS:  I don't know about his friends.
8   But he was removed from the facility.  So no.  I don't
9   believe.
10  Q   (By Mr. Dalton)  Up until he was removed
11  though, did he still have some control over Inmate
12  Garland and/or connections at the Eddie Warrior
13  Correctional Facility?
14      MS. WILKES:  Object to form.
15      THE WITNESS:  Yes.
16  Q   (By Mr. Dalton)  Has a staff and inmate's
17  sexual relationship or sexual misconduct ever happened
18  before while you were warden?
19  A   Repeat the question.
20  Q   While you've been warden at the Department of
21  Corrections has there been a staff/inmate sexual
22  relationship or sexual misconduct occurred?
23  A   Yes.
24  Q   Many times?
25  A   On occasions.  Yeah.