IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

LAURIE GARLAND, an individual,

Plaintiff,

v.

CHRISTOPHER REDEAGLE, et al.,

Defendants.

Case No. 20-CV-306-JWB

## MEMORANDUM AND ORDER

Presently before the court is a motion for summary judgment filed by Defendants Sharon McCoy and Penny Lewis.[1] (Doc. 65.) Plaintiff Laurie Garland filed her response in opposition (Doc. 71), and Defendants filed a reply (Doc. 80). The court subsequently granted the parties leave to file supplemental briefing. (Docs. 104-1, 111.) Accordingly, the motion is fully briefed and is ripe for decision. For the reasons stated herein, the motion is GRANTED.[2]

**I.    BACKGROUND**

The court finds the following facts to be uncontroverted for purposes of summary judgment. Factual disputes about immaterial matters are excluded from the following statement, as are factual averments asserted by the parties that are not supported by the record citations provided.

Garland was housed or under the supervision of the Oklahoma Department of Corrections ("ODOC") at various points in 2015-2016 and from August 3, 2018 until April 2, 2021. (Doc. 80-10.) Garland was incarcerated at the Eddie Warrior Correctional Center ("EWCC") from August

---

[1] Defendant Rabekka Mooneyham joined McCoy and Lewis in moving for summary judgment. Mooneyham was subsequently dismissed from the case via stipulated dismissal. (Doc. 72.)

[2] McCoy and Lewis also move to amend the pretrial order to re-include a defense they asserted in the proposed pretrial order submitted to the court, which the court later removed. (Doc. 116.) Because the court is granting the motion for summary judgment, this motion is denied as moot.

1

30, 2018 until April 12, 2019. On four separate occasions between February 25, 2015 and September 5, 2018, Garland signed the ODOC's zero tolerance acknowledgment form indicating she understood how to report sexual misconduct. (Doc. 65-3.)

McCoy was the Warden of EWCC from November 1, 2012 until April 1, 2019, when she became Warden of Jess Dunn Correctional Center ("JDCC"). Lewis serves as the Chief Administrator of the Auditing and Compliance Unit at ODOC.

Defendant Christopher Redeagle became Deputy Warden at EWCC on or about November 30, 2018. Between March 4-8, 2019, Garland and Redeagle exchanged numerous letters and notes that were romantic and sexual in nature. Garland initiated the written correspondence with Redeagle and wrote the first letter they exchanged.

On March 14, 2019, EWCC teacher Joy Arnold wrote an incident report indicating that inmate Janessa Estes had reported a rumor that Garland and Redeagle were having coffee together and that Readagle had brought Garland panties. (Doc. 66-1 at 21.) Upon becoming aware of these rumors, McCoy instructed Chief of Security Bryan Cox to conduct an inquiry into the claims.[3] (Doc. 65-6 at 1.)

Cox interviewed Estes on March 18. Estes informed Cox that the information she provided to Arnold was hearsay, and she was unable to identify the inmates disclosing the information. (Doc. 70-1 at 1.) On March 19, Garland was interviewed by a mental health professional at EWCC.[4] Garland stated, in reference to Redeagle, that "no one has given her any items nor act[ed]

---

[3] Plaintiff attempts to controvert this statement by arguing that Cox was not instructed to investigate or collect evidence. (Doc. 71 at 7.) Plaintiff cites Cox's deposition testimony. However, the cited testimony merely establishes that, in general, Cox would only do an inquiry and collect evidence if instructed by the deputy warden or warden. (Doc. 71-20 at 28.) It does not establish that McCoy failed to instruct Cox to do an inquiry or collect evidence regarding these rumors.

[4] DOC's Oklahoma Prison Rape Elimination Act policy, at OP-030601, at part IV.B.1.b., specifically states that inmates who report sexual abuse or assault are referred for a mental health evaluation and counseling. (Doc. 65-7.)

inappropriately in any way." (Doc. 65-8 at 1-3.) On that same date, Garland also submitted a written statement,[5] which provided:

> I, Laurie Garland, have never had any inappropriate dealings with Deputy Warden Mr. Chris Redeagle. He has not brought any items, namely undergarments, into me at this facility. In addition, we (Mr. Redeagle and myself) have never eaten together nor had any beverages in mixed company with one another. Mr. Redeagle has been assisting with a "property issue" that was unresolved since November 2018. He has always been professional and our dealings have remained in regards to business at hand.
>
> Also, I was approached by Inmate Julia Woolsey in regards to her being told I was speculated as spending too much time in the company of Mr. Redeagle at my job approximately two weeks ago.
>
> I have met with Mr. Redeagle two to three times in his office over the property issue.

(Doc. 70-8 at 1.)

On March 20, Redeagle submitted an Incident Report to McCoy acknowledging the rumors but denying that he had brought Garland panties or that he had acted inappropriately with Garland. (Doc. 66-1 at 24.) On that same day, Garland's property was searched by an officer and the only inappropriate item located was a white shirt that was not on Garland's property sheet. No unauthorized panties or letters were found. (Doc. 65-4 at 25.) On March 29, Garland was interviewed in a follow-up appointment with a mental health professional. Garland denied "having any occurrence with any sexual advances, sexual activity or sexual harassment." (Doc. 66-2 at 4.) On April 1, McCoy was named the interim Warden at JDCC. Natalie Cooper replaced McCoy as

---

[5] Garland attempts to controvert this statement of fact by arguing that she testified in her deposition that she was called in by Cox and a female officer who told her what to write in her statement. (Doc. 71 at 8.) However, when asked further, Garland testified that she first had a conversation with the officers where they asked her "about what was going on." (Doc. 71-22 at 14-15.) Garland was asked what she told them, and Garland replied: "Whatever's written [in her written statement] is exactly what." (*Id.* at 15.) Garland further testified that she denied the allegations involving Redeagle because she "d[idn't] want anybody in trouble." (*Id.*)

Warden of EWCC. However, McCoy's official appointment was not signed until April 9. (Doc. 65-9.) In the interim, McCoy had some responsibilities at both facilities. (Doc. 71-19 at 35.)

On April 2, EWCC Psychologist Whitney Louis spoke with inmate Woolsey, who stated that Garland was "having interaction" with Redeagle and that they had physically touched each other inappropriately. (Doc. 65-4 at 26.) Woolsey also reported to Officer Anderson that Garland had worn black underwear and given them to Redeagle, and the underwear were at Redeagle's house. And Woolsey additionally wrote a letter to Warden Cooper making the same allegations and stating that she had learned this information directly from Garland.

On April 3, Officers Fox and Torres searched Garland's property again but did not find any inappropriate items. On that same day, Warden Cooper sent a memo to ODOC's Director of Fugitive Apprehension & Investigation, stating:

> During the course of this Inquiry, it was found that inmate Estes's allegations, by her own admission, are based on second hand information she had obtained from overheard conversations. Furthermore, Inmate Estes cannot identify the inmates that she overheard talking. The allegations have been denied by both Deputy Warden Redeagle and Inmate Garland. I believe based on the provided information Inmate Estes['s] allegations are unfounded, I recommend that no further action be taken.

(Doc. 66-1 at 52.)

However, Cooper's memo indicated that an investigation had been commenced as a result of the allegations made by Woolsey. Cooper wrote:

> On April 2, 2019, at approximately 12:45 p.m. Psychologist Whitney Louis met with Inmate Woolsey . . . for a scheduled appointment. According to Dr. Louis, Inmate Woolsey became tearful during the appointment and stated she did not feel safe at [EWCC] due to having information regarding Inmate Garland . . . having inappropriate interaction with [Redeagle]. Inmate Woolsey reported to Dr. Louis that [Redeagle] went to property with inmate Garland and had inappropriate sexual contact with her and had given inmate Garland new panties. Inmate Woolsey then requested to speak with Rachael Vernon, Correctional Health Services Administrator in which she further reported that at the end of February or beginning of March 2019 inmate Garland informed Woolsey that twice [Redeagle] had inmate

>Garland report to his office and on two other occasions took inmate Garland to property to retrieve a box.  Inmate Woolsey further alleged that on one of the trips to property inmate Garland and [Redeagle] "made out" and on a separate occasion [Redeagle] had sexual contact with inmate Garland. Inmate Woolsey also stated inmate Garland informed her that [Redeagle] had sent inmate Garland mail while he was on vacation that were [sic] addressed from a P.O. Box in Davis, Oklahoma but were [sic] post marked out of Tulsa, Oklahoma from a writer by the name of Frank Eaton. Inmate Woolsey reported [Redeagle] had brought Garland three pairs of lace panties the colors of black, pink, and light blue.
>
>On April 2, 2019, at approximately 9:38 p.m. Johnny Blevins, Director, Office of Fugitive Apprehension and Investigations was notified.
>
>On April 3, 2019, at approximately 1:00 a.m. mental health was notified to provide to support.
>
>On April 3, 2019, at approximately 8:18 a.m. Randy Knight, Agent, Office of Fugitive Apprehension and Investigations arrived at the facility.

(*Id*.)

Garland submitted another written statement on April 3, stating that she and Redeagle had kissed and "there was touching briefly on the buttocks (underneath underwear) and his genital area (over the clothes)."  (*Id*. at 49-50.)  Garland also stated that her and Redeagle "never had any sexual contact at any point in time . . . ."  (*Id*. at 50.)

On April 3, Redeagle submitted a statement indicating that Garland had left a picture in his office and that she had written him letters and notes.  Redeagle stated that Garland gave him panties and that he had purchased panties to give her (that he never gave her), and that the extent of their relationship was written correspondence.  Redeagle resigned later that day.  The resignation was accepted by Warden Cooper.  Garland was transferred from EWCC on April 12.

The Sexual Assault Report completed by EWCC staff as a result of the allegations cited the alleged incident that necessitated the investigation as occurring on April 2, 2019.  (*Id*. at 54-61.)  A "PREA Response Checklist" completed by EWCC in response to the allegations also indicated that the relevant incident was reported on April 2, 2019.  (*Id*. at 62.)  The Sexual Assault

Report classified the relationship as consisting of a "[s]exual relationship between inmate and staff that appeared to be willing." (*Id*. at 60.)

Garland filed this lawsuit on September 4, 2020. (Doc. 1.) Garland filed her amended complaint on November 24, 2020. (Doc. 19.) The amended pretrial order was entered on October 19, 2022, which supersedes the pleadings and now controls the course of litigation.[6]

## II.   LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored, information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing that an adverse party [i.e., the movant] cannot produce admissible evidence to support

---

[6] In the parties' proposed pretrial order, Garland brought a total of 11 claims. Many of these were not actually legal claims (e.g, two claims for "compensatory damages") or were duplicative/redundant of other claims. During the October 4, 2022 Pretrial Conference, Garland agreed to consolidate her claims down to three. The only remaining claim against McCoy and Lewis is a § 1983 claim alleging that Defendants McCoy and Lewis denied Plaintiff humane conditions of confinement and were deliberately indifferent to a substantial risk of serious harm to Plaintiff, in violation of the Eighth Amendment. (Doc. 115 at 11.) This motion does not address the legal arguments raised in the motion for summary judgment pertaining to claims that are no longer in this case.

the fact." Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. 317. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

When a defendant asserts an affirmative defense—such as the failure to exhaust administrative remedies—in a motion for summary judgment, she "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted when the evidence is viewed in the light most favorable to the plaintiff." *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 746 (10th Cir. 2014) (internal quotation marks and citation omitted). "If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact," *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997), or show that the remedies were unavailable to him as a result of the actions of prison officials, *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011). In the absence of either showing, the defendant would be entitled to summary judgment on the affirmative defense. *See Tuckel*, 660 F.3d at 1254.

### III.   ANALYSIS

Garland brings a § 1983 claim alleging that McCoy and Lewis denied her humane conditions of confinement and were deliberately indifferent to a substantial risk of serious harm to her, in violation of the Eighth Amendment. (Doc. 115 at 11.) Garland alleges that McCoy and Lewis were aware or should have been aware of high prison sexual misconduct rates at EWCC, and that a close relationship between Redeagle and Garland had developed; but they failed to create and enforce policies, investigate the relationship, take disciplinary action, or take other reasonable steps to protect Garland from sexual assault, abuse, and harassment. (*Id.*) McCoy and Lewis argue that they are entitled to summary judgment because the uncontroverted material facts establish that

Plaintiff failed to exhaust her administrative remedies. McCoy and Lewis additionally argue that no reasonable jury could find that they violated Garland's Eighth Amendment rights.

### A. Administrative Exhaustion

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed. *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). Exhaustion is required for all inmates seeking relief in federal district court, "even where the relief sought . . . cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *see also Booth*, 532 U.S. at 741. The PLRA's exhaustion requirement is mandatory, and the courts are not authorized to dispense with it. *Beaudry v. Corr. Corp. of America*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). Courts will only excuse failure to exhaust if prison officials impede the prisoner's attempts. *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). The Supreme Court has explained that "[e]xhaustion of administrative remedies serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). The first purpose is to protect agency authority, both by giving the agency "an opportunity to correct its own mistakes

with respect to the programs it administers before it is haled into federal court," and by discouraging disregard of agency procedures. *Id*. (internal quotation marks omitted). The second purpose is to promote efficiency by permitting claims, where possible, to be settled at an administrative level; and, even where this is not possible, to develop "a useful record for subsequent judicial consideration." *Id*.

According to the ODOC Offender Grievance Process, OP-09124, an inmate first must attempt to resolve her complaint informally by communicating with staff within three days of the incident. (Doc. 65-17.) If that is unsuccessful, she may submit a Request to Staff ("RTS") to the appropriate staff member. (*Id*. at 7.) If she does not receive a response to her RTS within 30 calendar days of submission, she may submit a grievance to the reviewing authority (facility head). (*Id*. at 8.) However, grievances may be submitted directly to the reviewing authority without informal resolution process when the "complaint is of a sensitive nature or when substantial risk of personal injury, sexual assault or other irreparable harm exists." (*Id*. at 15.) To do so, the inmate "must use the 'Inmate/Offender Grievance' form (DOC 090124A)." (*Id*.) Grievances regarding allegations of sexual abuse can be submitted on behalf of an inmate by third parties including fellow inmates, family members, staff members, attorneys, and advocates. (*Id*. at 16.)

If the complaint is not resolved after the response to the RTS, the inmate then may file a grievance regarding the lack of response. (*Id.* at 8.) Inmates must submit the grievance to the facility reviewing authority or facility correctional health services administrator, whichever is appropriate. (*Id*. at 12.) If the grievance also does not resolve the issue, the inmate may appeal to the Administrative Review Authority (ARA) or the Medical ARA, whichever is appropriate. (*Id*.) The administrative process is exhausted only after all of these steps have been taken.

McCoy and Lewis argue that prior to commencing this lawsuit, Garland failed to exhaust her administrative remedies concerning the failure to create and enforce policies, investigate the relationship, take disciplinary action, or take other reasonable steps to protect Garland from sexual assault, abuse, and harassment. In support, McCoy and Lewis submit an affidavit from Mark Knutson, Manager of the ARA at ODOC. (Doc. 65-18.) Knutson states that he has reviewed the ARA records for Garland, and the ARA has not received a grievance or grievance appeal from Garland regarding: (1) being sexually assaulted and harassed by Redeagle; (2) the failure of ODOC's employees to protect Garland from PREA violations; (3) ODOC's failure to implement policies and procedures to protect female inmates; or (4) any other issues. (*Id*.)

Garland concedes that she did not complete every step of the offender grievance process. But she argues it was unnecessary because her concerns and issues were informally resolved at the first step when she spoke to ODOC Investigator Randy Knight. (Doc. 71 at 19-20.) Garland contends that Redeagle resigned later that day, McCoy was transferred to JDCC, and she was transferred to the Kate Barnard Correctional Center. Thus, Garland argues, there was no need to file an RTS.

The court disagrees. Garland fails to cite to any evidence establishing that she communicated to Knight that she had any issues or complaints with *McCoy or Lewis*, her conditions of confinement, or any perceived failure to implement policies to protect her and other female inmates from sexual abuse. Indeed, Knight's investigative report indicates that Garland only discussed her relationship and contact with *Redeagle* during the interviews. (Doc. 70-1 at 5-7.) Because Garland did not communicate that she had any issues or complaints with ODOC, McCoy, or Lewis, the purposes of the exhaustion requirement were not satisfied. She did not give ODOC an "an opportunity to correct its own mistakes [with respect to McCoy and Lewis]. . .

before it is haled into federal court." *Woodford*, 548 U.S. at 89. Nor did she grant ODOC the opportunity to develop "a useful record for subsequent judicial consideration." *Id*. Thus, Garland fails to establish that she attempted to resolve her complaint informally during her interviews with Knight.

Garland also fails to establish that any exceptions to the exhaustion requirement apply. Courts will only excuse failure to exhaust if prison officials impede the prisoner's attempts. *Little*, 607 F.3d at 1250. There is no evidence of that here. Although Garland's concerns were seemingly resolved by Redeagle's resignation and McCoy's transfer to JDCC, this did not excuse her from completing the grievance process. *See Beals v. Jay*, 730 F. App'x 633, 637 (10th Cir. 2018) (stating that exhaustion is required even "where the 'available' remedies would appear to be futile at providing the kind of remedy sought"). And the fact that she is no longer incarcerated does not excuse her either. "[I]t is the plaintiff's status at the time he files suit that determines whether § 1997e(a)'s exhaustion provision applies." *Norton v. The City of Marietta, OK*, 432 F.3d 1145, 1150 (10th Cir. 2005). Garland was in ODOC custody when she filed both the complaint and the amended complaint, and was thus required to exhaust her administrative remedies prior to filing suit.

Accordingly, the uncontroverted material facts establish that Garland failed to exhaust her administrative remedies with respect to McCoy and Lewis.[7] *See Jennings v. Dowling*, 642 F. App'x 908, 912-13 (10th Cir. 2016) (affirming district court's dismissal where the prisoner's

---

[7] The court additionally finds that McCoy and Lewis did not waive their right to argue failure to exhaust at this stage of the litigation. They raised it as an affirmative defense in their answers. (Doc. 62 at 11; Doc. 63 at 11.) *See, e.g., Murray v. Matheney*, 2017 WL 5894545, at *2 (S.D.W. Va. Nov. 29, 2017) (holding that a party who raised the affirmative defense of failure to exhaust under the PLRA in a motion in limine had not waived the defense by failing to raise it earlier in a motion to dismiss where the party had pleaded it as an affirmative defense in his answer); *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010) (declining to read into the PLRA a requirement that "the defense of exhaustion is waived if it is not prosecuted by the deadline imposed by the court for dispositive motions").

grievance did not sufficiently describe the incident at issue in the lawsuit and accordingly failed to satisfy the purposes of the exhaustion requirement).

**B.     Eighth Amendment Violations**

Even if Garland's claims against McCoy and Lewis were exhausted, summary judgment would still be granted to them because there are no facts by which a reasonable jury could find that McCoy and Lewis were constitutionally liable for Redeagle's actions. "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including reasonable measures to guarantee the safety of the inmates." *Poore v. Glanz*, 724 F. App'x 635, 639 (10th Cir. 2018) (quotation omitted). "However, this minimum standard does not impose constitutional liability on prison officials for every injury an inmate suffers during detention." *Id*. First, the injury must be "sufficiently serious." McCoy and Lewis do not dispute that Redeagle's actions meet this standard.

Second, the prison official must have had "a sufficiently culpable state of mind" amounting to "deliberate indifference." *Id.* Under this standard, a prison official may be held liable under the Eighth Amendment only if that official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The official must actually be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Poore*, 724 F. App'x at 639. "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id*.

This mens rea standard extends to Eighth Amendment claims brought against supervisors such as McCoy and Lewis. To prevail on a supervisory liability claim, Garland must establish that

McCoy and Lewis *personally* violated her constitutional rights. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018). In other words, there must be an "affirmative link" between the constitutional deprivation and the supervisors' actions. *Id.* And to demonstrate such an affirmative link, Garland must establish: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *Id.*; *Poore*, 724 F. App'x at 639.

        **1.**     **Lewis is entitled to summary judgment.**

Here, the court finds that Garland has failed to demonstrate an affirmative link between the constitutional deprivation and Lewis's actions. It is uncontroverted that Lewis is Chief Administrator of ODOC's Auditing and Compliance Unit and does not oversee, enforce, or investigate compliance with ODOC's PREA Policy. (Doc. 65 at 15, SOF ¶ 36; Doc. 71 at 11, SOF ¶ 36.) It appears that Garland's theory of liability is based upon the fact that "[s]afety and the physical structures of the EWCC" is part of Lewis's job purview. (*See* Doc. 71 at 11, 29.) While Garland does not develop this argument any further in her brief, she does contend in the amended pretrial order that "Redeagle manipulated use of physical structures and buildings." (Doc. 115 at 6.) But this argument is far too vague and speculative. *See, e.g.*, *Cox v. Glanz*, 800 F.3d 1231, 1249 (10th Cir. 2015) (stating that plaintiffs are required to identify "specific policies over which particular defendants possessed supervisory responsibility"). She also contends in the amended pretrial order that Lewis failed to take disciplinary actions after she was made aware of McCoy's "violation." (Doc. 115 at 7.) But it is also uncontroverted that Lewis has never had administrative or supervisory authority over McCoy or Redeagle. (Doc. 65 at 15, SOF ¶ 37; Doc. 71 at 11, Response to SOF ¶ 37.) Thus, these allegations are entirely insufficient to establish Lewis's personal involvement.

The court also finds there is insufficient evidence to establish causation or deliberate indifference. Garland contends that "[t]estimony makes it clear better video monitoring, staffing, and tracking of inmates lead to less sexual misconduct." (Doc. 71 at 29.) But "the deliberate-indifference standard is not a negligence standard—[Lewis] had to *actually know* of the risk." *Castillo v. Jones-Cooper*, 660 F. App'x 614, 617 (10th Cir. 2016). And there are no facts to suggest that Lewis knew there was insufficient monitoring, staffing, or tracking, such that Garland was at risk of sexual assault at any point before Redeagle resigned. *See id*.

Accordingly, there are no facts by which a reasonable jury could find that Lewis was constitutionally liable for Redeagle's actions.

### 2.     McCoy is entitled to summary judgment.

The court also finds that Garland has failed to demonstrate an affirmative link between the constitutional deprivation and McCoy's actions. To establish the known risk of sexual assault on her, Garland first contends that ODOC "has had unusually high amounts of sexual [misconduct] and exploitation of its inmates." (Doc. 71 at 26-27.) In support, Garland cites Knight's deposition testimony. (*Id*. at 14.) However, the relevant portion of the deposition transcript merely establishes that Knight had read that "*Mabel Bassett Correctional Center* is [sic] one of the highest instances of rape or violations of PREA in the United States . . . in 2018, maybe 2017." (Doc. 71-19 at 24) (emphasis added.) Knight was asked if *EWCC* "had a higher than normal instances of PREA violations," but Knight's answer was: "I don't know." (*Id*.) Thus, this evidence fails to demonstrate that McCoy would reasonably believe Garland was at risk while incarcerated at EWCC.[8] *See Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 711-12 (10th Cir. 2011) (holding that statistics showing high levels of PREA violations in all CDOC facilities were insufficient to

---

[8] And even if Garland had established that McCoy had knowledge that EWCC had unusually high amounts of sexual misconduct, Garland presents no evidence showing that a change in policies would likely reduce these numbers.

establish that prison officials would reasonably believe inmate was at risk of sexual assault in specific facility when there were no substantiated occurrences of sexual assault in that facility in the previous two years); *E.D. v. Sharkey*, 2017 WL 2126322, at *11 (E.D. Pa. 2017) (finding plaintiff failed to state a claim against prison official where the complaint did not allege the official had notice of similar prior incidents of sexual assault at the facility that would indicate the policies were insufficient and created a risk of harm).

Next, Garland contends that McCoy knew Garland was at risk of sexual assault on March 13, 2019, when Estes reported that Redeagle and Garland were involved in an inappropriate relationship. (Doc. 71 at 28.) However, Arnold's incident report only indicated that Estes had reported a rumor that Garland and Redeagle were having coffee together and that Readagle had brought Garland panties. (Doc. 66-1 at 21.) This report may have given McCoy reason to be concerned about "undue familiarity" between Redeagle and Garland, but it was insufficient to put McCoy on notice of a "*substantial* risk of *serious* harm." *See Keith v. Koerner*, 843 F.3d 833, 840-41 (10th Cir. 2016) (finding prison employee's sexually explicit conversations with inmates were appropriately classified as "undue familiarity" and insufficient to put deputy warden on notice that the employee may sexually assault an inmate).

Regardless, even if McCoy was on notice of a substantial risk of serious harm, there is no evidence that McCoy "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Arnold's incident report was made on March 14, 2019. Upon becoming aware of the rumors, McCoy instructed Chief of Security Cox to conduct an inquiry.[9]

---

[9] Garland contends that McCoy waited five days before having Cox obtain a statement, which placed her at risk of further sexual abuse at the hands of Redeagle. (Doc. 71 at 28.) However, it is uncontroverted that Redeagle was on annual leave and was not present at EWCC the week of March 11-15, 2019, when Arnold submitted her incident report. (Doc. 68-1 at 64; Doc. 81-4; Doc. 81-7.) Cox interviewed Estes the following Monday, March 18 and Garland was interviewed by a mental health professional at EWCC on Tuesday, March 19.

Cox interviewed Estes on March 18. Estes informed him that the information she provided to Arnold was hearsay, and she was unable to identify the inmates disclosing the information. (Doc. 70-1 at 1.) Cox and a female officer interviewed Garland on March 19. Garland denied that she had "any inappropriate dealings" with Redeagle and denied that he had brought her undergarments. (Doc. 70-8 at 1.) Garland informed them that Redeagle had "always been professional," and that their dealings were always related "to business at hand." (*Id*.) On March 20, Redeagle submitted an incident report to McCoy acknowledging the rumors but denying that he had brought Garland panties or that he had acted inappropriately with Garland. (Doc. 66-1 at 24.) On that same day, Garland's property was searched by an officer; no unauthorized undergarments or letters were found. (Doc. 65-4 at 25.) On March 29, Garland was interviewed in a follow-up appointment with a mental health professional, and Garland again denied "having any occurrence with any sexual advances, sexual activity or sexual harassment." (Doc. 66-2 at 4.)

This internal investigation was more than reasonable given the circumstances. Statements were obtained from everyone involved. Estes was unable to identify anyone with firsthand knowledge of the inappropriate relationship. Redeagle denied any inappropriate dealings with Garland. Garland likewise denied the allegations during three separate interviews and also in a written statement. And Garland's cell was searched for unauthorized undergarments, but none were found.[10] It was reasonably determined that the rumors were unsubstantiated as of April 1, when Cooper was named Warden of EWCC. (*See* Doc. 66-1 at 52 (stating that Warden Cooper recommended that no further action be taken concerning Estes's allegations because they were investigated and determined to be unfounded)). Accordingly, the March 14 incident report would

---

[10] Garland contends that these items were in Redeagle's safe, which McCoy did not have searched. (Doc. 71 at 9.) However, there are no facts to indicate that McCoy had any reason to believe the items could be found in Redeagle's safe, which was located inside his residence. (Doc. 70-1 at 4.)

16

not have caused McCoy to subjectively believe that Redeagle posed a substantial threat to Garland. *See Ard v. Rushing*, 597 F. App'x 213, 220 (5th Cir. 2014) (holding that sheriff did not have subjective knowledge of a substantial risk of serious harm when, after hearing rumor that guard had sexually harassed an inmate, sheriff initiated an internal investigation and rumor was "was found to be unsubstantiated as each female inmate denied hearing any such comment from" the guard); *Cf. Doe v. Dallas Ind. Sch. Dist.*, 220 F.3d 380, 388-89 (5th Cir. 2000) (finding that deliberate indifference was not established where the school investigated allegations of harassment, although the investigator's finding that harassment did not occur turned out to be false).

The rumors remained unsubstantiated until April 2, when inmate Woolsey reported firsthand knowledge of a sexual relationship between Redeagle and Garland. (Doc. 65-4 at 26.) This is the earliest date by which a reasonable jury could conclude that McCoy was on notice of a substantial risk of serious harm. (*See* Doc. 66-1 at 54-62.) McCoy contends that she transferred to JDCC on April 1, but there is some evidence to suggest that McCoy had official responsibilities at both facilities until April 9. However, this factual dispute does not preclude summary judgment because this report was made one week *after* the last alleged incident of sexual assault had occurred. Which, according to Garland, happened on March 27, 2019 or in "late March, 2019."[11] (Doc. 71 at 29; Doc. 115 at 5.) Accordingly, Woolsey's April 2 report has no bearing on McCoy's knowledge prior to the final assault. *See Ard*, 597 F. App'x at 220 (concluding that allegations reported several months after the inmate's alleged sexual assault had no bearing on the sheriff's subjective knowledge prior to the assault).

---

[11] The court agrees with McCoy that this alleged incident could not have occurred on March 27, 2019, as it is uncontroverted that Redeagle was on annual leave the week of March 25-29, 2019. (Doc. 68-1 at 64; Doc. 81-4; Doc. 81-7.)

And, assuming that McCoy was still Warden of EWCC on April 2, the uncontroverted material facts establish that she took reasonable measures to abate Garland's risk of further sexual assault. The Office of Fugitive Apprehension and Investigations was notified that same day, and a more robust investigation was commenced. Investigator Knight arrived at EWCC at approximately 8:18 a.m. on April 3. Garland and Redeagle both admitted to an inappropriate sexual relationship, and Redeagle resigned his position at EWCC later that day. There are no facts to suggest that Garland was subjected to any sexual harassment, abuse, or assault after Woolsey's April 2 report.[12]

Finally, Garland contends that better training could have prevented Redeagle's sexual misconduct. But Garland fails to present any evidence showing how more or different training would have prevented the assault on her. *See Castillo*, 660 F. App'x at 617-18 ("People should understand without training that they shouldn't sexually assault people because it's a criminal act."); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior.") Garland further fails to identify what training was necessary. "It is not enough to allege 'general deficiencies' in a particular training program." *Keith*, 843 F.3d at 838. Rather, a plaintiff "must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* at 839. Garland has not met this burden.[13]

---

[12] The Sexual Assault Report states that "[s]taff was present upon Deputy Redeagle's arrival to EWCC to ensure there was no contact with any inmates prior to the Warden's arrival to the facility." (Doc. 61-1 at 55.)

[13] The only evidence about Redeagle's training in the summary judgment record is that Redeagle was current on his PREA training when he transferred to EWCC on November 30, 2018. (Doc. 65-12.)

Accordingly, there are no facts by which a reasonable jury could find that McCoy was constitutionally liable for Redeagle's actions.

## IV.   CONCLUSION

The court does not mean to minimize the seriousness of Redeagle's actions. But there are no facts that create an inference that McCoy or Lewis had actual or constructive notice that their actions, or failure to act, was substantially certain to result in a constitutional violation, and they consciously and deliberately chose to disregard the risk of harm. *See Lobozzo*, 429 F. App'x at 712.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 65) is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to amend the pretrial order (Doc. 116) is DENIED as moot.

IT IS SO ORDERED. Dated this 9th day of November, 2022.

*s/ John W. Broomes*
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE